1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

UBER TECHNOLOGIES, INC. and PORTIER, LLC,

                       Plaintiffs,

    v.

CITY OF SEATTLE,

                      Defendant.

No. 2:24-cv-2103

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Uber Technologies, Inc. and Portier, LLC (collectively, "Uber") bring this suit under 42 U.S.C. § 1983 for declaratory and injunctive relief against Defendant the City of Seattle (the "City") and allege as follows:

## INTRODUCTION

1.    Through its App-Based Worker Deactivation Rights Ordinance (the "Ordinance"), Mun. Code, ch. 8.40 and § 3.02.125, the City of Seattle seeks to impose an unconstitutional regime of compelled speech, forced association, indecipherable government mandate, sweeping disclosure demand, and impairment of contract rights on companies like Uber.

2.    Uber is a technology company that operates a platform connecting people seeking ride and delivery services to drivers and couriers who seek to provide them. For delivery services, the platform also connects couriers with merchants, who are seeking delivery services for their goods. This widely-used platform allows millions of people around the globe to hail rides within minutes and, relevant here, to use Uber Eats for ordering food, beverages, and other goods for

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

delivery on demand. And it provides millions of drivers and couriers with the opportunity to earn income by providing those services, and provides merchants with an additional market opportunity.

3. This case implicates Uber's delivery platform. Every day, through its Uber Eats marketplace, Uber connects Seattle consumers with independent couriers and merchants to facilitate the delivery of meals, groceries, and more. Managing this complex and dynamic delivery platform requires Uber to make prompt decisions based on real-world and real-time consumer feedback and other information about couriers' actions on and off the platform. Couriers drive through busy streets, go to people's homes, and have face-to-face interactions at any hour of the day. Uber's decisions—which include determining when a courier's access to the Uber platform should be deactivated—are based on robust policies tailored to its platform to promote safety, privacy, reliability, quality, non-discrimination, and a positive merchant and consumer experience.

4. The Seattle City Council wants Uber to adopt different policies, however. Its overriding priority is to ensure that couriers remain on Uber's platform. And to be sure, that is one of Uber's goals too: Uber has every incentive to keep couriers on the platform. But in some cases, based on its experience, judgment, and values, Uber has struck a balance different from the one the City prefers. To take a few examples: Uber believes that ensuring consumers receive reliable, efficient, and, above all, safe deliveries is more important than allowing couriers with consistently low consumer ratings—a sign of serious performance and/or safety issues—to keep disappointing consumers. The City does not. Uber believes it is important that couriers on its platform should not refuse to deliver to particular neighborhoods based on the characteristics of the people or businesses there. The City does not. And Uber believes that guarding against fraud, and protecting consumers who may have been victimized from retaliation, should take precedence over giving every courier with a deactivated account every document or detail on which a deactivation determination is based, no matter how sensitive. But the City, once again, does not.

5. Understandably, though, the City does not want to be in the complex business of directly deciding which courier accounts should be deactivated and which should not. Such

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

micromanagement would make it easy for residents to hold the city government accountable for the consequences if their deliveries become unreliable, or even worse, if people are hurt on the roads or at their doors.  To avoid that problem, the City has enacted, and is about to implement, an unprecedented Ordinance that offloads its new vision to companies like Uber—who must themselves announce specific policies that threaten these consequences.  In doing so, the City walks straight into grave constitutional problems.

6.    The Ordinance compels Uber to speak—and to voice the City's views, not Uber's own, even when those views would suggest to the world that Uber is not fully committed to the quality of the services provided on its own platform, or worse, to safety and privacy.  To the extent it leaves Uber any choice in what to say about important and often controversial matters, the City offers vague standards and confusing guidance that further chill Uber's speech.  It forces Uber to associate with couriers whose presence on the platform undermines its commitments and reputation, and it substantially impairs Uber's contractual relations with those couriers.  And finally, to ensure that Uber sticks to the City's script, the Ordinance requires Uber to turn over an array of sensitive, confidential business information.  Whatever objectives the City may have, it cannot pursue them in defiance of the First, Fourth, and Fourteenth Amendments and the Contracts Clause of the U.S. Constitution.

7.    In the year-and-a-half between the Ordinance's enactment and the effective date, the City has slow-walked its implementation and resisted providing guidance.  Now, on the eve of an unconstitutional new regime, and still without answers from the City, Uber has no other option than to seek relief from this Court.

## PARTIES

8.    Plaintiff Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

9.    Plaintiff Portier, LLC is a wholly owned subsidiary of Uber Technologies, Inc. and enters into agreements with restaurants, merchants, and couriers to facilitate the delivery of food, beverages, and other goods.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

10.     Defendant the City of Seattle is a municipality in the State of Washington.  It enacted the Ordinance through its City Council and will enforce the Ordinance through its Office of Labor Standards ("OLS" or the "Agency").

## JURISDICTION AND VENUE

11.     This Court has original subject-matter jurisdiction under 28 U.S.C. § 1331 because Uber's causes of action arise under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and the Contracts Clause of Article I, Section 10 of the U.S. Constitution.

12.     The Court may award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2022, as well as any other equitable relief it deems appropriate under its inherent powers.

13.     Venue is proper in the Western District of Washington under 28 U.S.C. § 1391(b)(1) because Defendant the City of Seattle is located within this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Uber's claims occurred in this District.

## FACTUAL ALLEGATIONS

14.     In any given city, thousands of couriers deliver food, groceries, and other goods from merchants at a given time.  Those couriers travel to homes and businesses at any hour of the day and engage in direct, face-to-face interactions with consumers.

15.     Uber launched its delivery marketplace in the City of Seattle in 2015.  Many independent couriers who provide delivery services in Seattle facilitated by the Uber Eats platform have had accounts with Uber since before the Ordinance was enacted.

## I.     Uber Values Safety, Privacy, and Quality

16.     In order to carry out its operations at the massive scale that it does and at the high standard that it seeks, Uber has built its business on foundational values that include safety, privacy, reliability, quality, and accessibility.  Uber has made prominent, public commitments to these values.  It then follows through on those commitments every day.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

A.      **Uber is Committed to Safety**

17.      Because person-to-person connections are the foundation of Uber's business, Uber believes that safety must be at the core of its mission.  At its scale, Uber reflects the world in which it operates, including with respect to safety matters.  Accordingly, a fundamental tenet of Uber's mission statement is to make safety "a top priority every single day."[1]

18.      Uber makes this commitment to safety clear to the public, by stating that the company "care[s] deeply about the safety of the millions of people using our platform" and that "[s]afety is embedded in our cultural values."[2]  One of the core values described in Uber's Values Statement includes to "stand for safety" by making "Uber safer for everyone using our platform."[3]

19.      Uber also maintains publicly available Community Guidelines that govern the conduct of anyone who uses the platform.  These Community Guidelines focus on three tenets: treat everyone with respect, follow the law, and help "keep one another safe."[4]  The Community Guidelines note that Uber is "hard at work every day to help create safer experiences for everyone."[5]  Uber tells consumers and couriers that violating the Community Guidelines, including Uber's safety-related Community Guidelines, could lead to temporarily or permanently losing access to the platform through deactivation of their accounts.[6]  The potential paths to losing access

---

[1] *Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Dec. 17, 2024).

[2] Uber, 2021-2022 US Safety Report 3, https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=7b682b1a-ca30-4310-b88c-e7d072cd23fc (last visited Dec. 17, 2023).

[3] *Values*, *supra*.

[4] *Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Dec. 17, 2024).

[5] *Uber Community Guidelines,* Uber (Nov. 19, 2024), https://www.uber.com/legal/en/document/?name=general-community-guidelines&country=united-states&lang=en&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb (Uber's full Community Guidelines).

[6] *Deactivations*, Uber, https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 17, 2024) ("All users of the platform (including riders, Uber Eats users [*i.e.*, consumers], and restaurants) can lose access" for violating Community Guidelines).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

to Uber's platform, including low consumer ratings, failing to drive safely and carefully, quality issues, and fraud, are described in more detail on Uber's website.[7]

20.     Uber also voices its commitment to safety in a number of other ways.[8]  For example, beginning in 2019, Uber set an industry standard by publishing public safety reports related to its mobility operations in the United States.[9]  These reports include information about Uber's actions related to safety and data on serious safety incidents reported while using Uber's platform.  Uber chooses to publish this data to demonstrate its commitment to safety, to maintain and encourage accountability, and to improve safety on the platforms of Uber and other industry members.

21.     As another example, Uber hosts an annual "Only on Uber" event for drivers (on its mobility platform) and couriers (on its delivery platform) that is led by Uber executives.[10]  At this event, executives discuss with drivers and couriers the company's latest safety initiatives and innovations—some of which are driven by feedback the company gathers from couriers and drivers.  The event is attended and led by Uber's most senior leadership and demonstrates that the commitment to safety comes from the very top of the organization.

22.     Uber has also convened and is regularly advised by a Safety Advisory Board that provides the company with external expertise and perspective on safety issues.[11]  The Safety

---

[7] *Id.*

[8] *Safety*, Uber, https://www.uber.com/us/en/safety/ (last visited Dec. 17, 2024).

[9] *Uber's US Safety Report*, Uber, https://www.uber.com/us/en/about/reports/us-safety-report/ (last visited Dec. 17, 2024); *see also* Tony West, *Uber Delivers Second U.S. Safety Report* (June 1, 2022), https://www.uber.com/newsroom/2022-us-safety-report/ (post by Uber Chief Legal Officer Tony West about Uber's U.S. Safety Report for 2019-2020); Tony West, *Sharing to Build a Safer Industry* (Mar. 11, 2021), https://www.uber.com/newsroom/industry-sharing-safety/ (announcing Uber's partnership in a program for sharing information about safety incidents, which Uber committed to doing in its first U.S. Safety Report).

[10] *Only on Uber*, Uber, https://www.uber.com/us/en/u/only-on-uber/ (last visited Dec. 17, 2024); *see also* Dara Khosrowshahi, *Only on Uber: Helping to make driving and delivering safer, fairer, and easier*, Uber (Sept. 17, 2024), https://www.uber.com/newsroom/onlyonuber24/ (post by Uber CEO Dara Khosrowshahi about 2024 event); Dara Khosrowshahi, *Only on Uber: Becoming the best—and fairest—platform for flexible work* (Nov. 13, 2023), https://www.uber.com/newsroom/onlyonuber23/ (post by Uber CEO Dara Khosrowshahi about 2023 event).

[11] *Uber Strengthens its Safety Advisory Board with Two New Members*, Uber (Mar. 13, 2024), https://www.uber.com/newsroom/uber-strengthens-its-safety-advisory-board/ ("We founded the

---

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Advisory Board is comprised of leading industry experts on safety, including, for example, a former U.S. Secretary of Homeland Security and a former senior member of the Occupational Safety and Health Administration.[12]  Uber convened this Advisory Board in recognition of the fact that its work on safety is never done, and based on its desire to source feedback from leaders whose expertise enriches Uber's development and implementation of best-in-class safety measures for its platform.[13]

23.    Uber understands that both couriers and consumers value having a safe experience on the platform and that safety is an important component of the success of delivery services facilitated through Uber.

24.    Uber often speaks publicly about the steps it takes to ensure the safety of couriers. Uber is aware that its platform both contributes to and relies on road safety.  It thus seeks to help protect couriers on the roads by offering couriers educational programming on road safety and safe deliveries, and developing special features for couriers using two-wheeled vehicles such as "bike-friendly navigation."[14]  Uber has also developed information related to maintaining respectful interactions with couriers that it will be sharing with couriers, merchants, and consumers.[15]

25.    Uber has spoken about and adopted safety measures that are also designed to keep consumers and the general public safe.  These measures include in-app safety features for both consumers and couriers and background checks for couriers before they ever take a trip, at least

Uber Safety Advisory Board in 2015 to provide critical external counsel on our approach to safety management, processes, and technologies.").

[12] *Id.* (stating composition of Uber's current Safety Advisory Board).

[13] Uber, 2024 Environmental, Social, and Governance Report 26, https://s23.q4cdn.com/407969754/files/doc_downloads/2024/04/Uber-2024-Environmental-Social-and-Governance-Report.pdf (last visited Dec. 17, 2024) (explaining Uber's work with Safety Advisory Board).

[14] *Road safety*, Uber, https://www.uber.com/us/en/safety/road-safety/  (last visited Dec. 17, 2024); *Deliver with confidence*, Uber, https://www.uber.com/us/en/deliver/safety/ (last visited Dec. 17, 2024); *Prioritizing safety while delivering*, Uber, https://www.uber.com/us/en/deliver/basics/before-you-start/staying-safe-with-the-uber-app/ (last visited Dec. 17, 2024).

[15] Khosrowshahi, *Only on Uber: Helping to make driving and delivering safer, fairer, and easier*, *supra*

every year thereafter, and through the use of technology to look for issues in between.[16] Courier quality and safety is important to Uber because, when performing third-party delivery services, couriers are not only driving on public roads but also interacting with both merchants (providing the food or other goods) and consumers receiving the deliveries, and the nature of these interactions is important to building and maintaining consumer trust.

26.    Uber also develops policies and practices to address serious safety incidents that may occur on the platform.  Uber recognizes that such serious incidents can represent real traumas, and has gone to great lengths to establish policies that are trauma-informed and informed by expert guidance.  This includes providing agent training in phone investigation skills, trauma-informed support, identifying racism and discrimination in customer service, and addressing difficult conversations with precision and care.[17]  Uber also worked with the National Sexual Violence Resource Center, the Urban Institute, and RALIANCE to create a taxonomy to categorize and count sexual assault incidents in a behaviorally specific manner that is standard in research around sexual violence.[18]

**B.    Uber Protects the Privacy of Consumers and Couriers**

27.    Uber is committed to earning and keeping the trust of couriers and consumers who use its platform by protecting their privacy and safeguarding their personal data.  This commitment is reflected in Uber's Privacy Principles, which establish the foundation of Uber's privacy practices.[19]

---

[16] *Safety*, *supra*.

[17] Uber, US Safety Report 2021-2022, *supra*.

[18] *Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault*, RALIANCE, https://www.raliance.org/report_posts/helping-industries-to-classify-reports-of-sexual-harassment-sexual-misconduct-and-sexual-assault/ (last visited Dec. 17, 2024) (link to joint report of RALIANCE and the Urban Institute in partnership with and Uber); Chad Sniffen, *Three Lessons Businesses Can Learn from Uber's Collecting and Reporting Sexual Assault Data*, National Sexual Violence Resource Center (Dec. 6, 2019), https://www.nsvrc.org/blogs/three-lessons-businesses-can-learn-ubers-collecting-and-reporting-sexual-assault-data.

[19] *Privacy*, Uber, https://www.uber.com/global/en/privacy/overview/ (last visited Dec. 17, 2024).

28.    The Privacy Principles require that Uber protect users' data by "provid[ing] reasonable and appropriate safeguards to prevent loss, and unauthorized use or disclosure, of personal data."[20]

29.    Uber has also in its application "a series of privacy and data security features to help users understand and control how [it] use[s] their data."[21]  These features include, for example, the ability for consumers to get a copy of their personal data and to see the personal information that is shared with a courier.

30.    Uber's efforts to safeguard the data of consumers and couriers extend to Uber's disclosure of such data to regulators.  For example, as described in its Government Transparency Report, Uber works closely with regulators to minimize the amount of information shared that could potentially identify any individual.[22]

31.    Importantly, Uber safeguards the personal data of consumers to protect them from physical and other harm.  For this reason, Uber does not release to couriers the date, time, and location of a consumer complaint.  Releasing such data—even in an anonymized fashion—may inadvertently reveal information that can be used to identify the consumer who made the report, risking their physical safety.  Such disclosures are particularly concerning for Uber's delivery business, given that couriers often interact with consumers at their homes and businesses.

32.    Uber also safeguards data about the couriers who use its platform, including data about the number of couriers who work in a particular market, where those couriers reside, couriers' contact information, the number of couriers whose accounts are deactivated, and the company's reasons for deactivating courier accounts.  Uber considers much of this information to

---

[20] *Id.*

[21] Ruby Zefo, *Living Up to Our Privacy Principles: Introducing Uber's Privacy Center*, Uber (Jan. 18, 2022), https://www.uber.com/newsroom/privacycenter/.

[22] *Government Transparency Report: Regulatory Requests*, Uber, https://www.uber.com/us/en/about/reports/transparency/regulatory/?uclick_id=2547e942-a587-4b6c-a1b9-c52bf67b4d2a (last visited Dec. 13, 2024) ("For each requirement, we work closely with the local authority to understand the legal basis for their request and determine which data is most useful and necessary, seeking to minimize the amount of information that could potentially identify an individual.").

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

be sensitive and confidential and does not voluntarily disclose it for several reasons, including because Uber considers this information to be competitively sensitive.

**II.      Uber's Deactivation Policies and Positions**

33.    Through years of experience, Uber has formed beliefs on the complex set of behaviors and indicators that should result in couriers' account deactivation—that is, their loss of access to Uber's platform.  Consumers on Uber's platform value efficient delivery times, and thus, Uber's business model relies on having couriers on the platform with active accounts.  Therefore, Uber takes the decision to deactivate courier accounts seriously and considers deactivation to be a last resort.[23]  Uber also recognizes that because its platform is an essential source of income for many couriers, losing access to the platform is "one of the most distressing moments" that a courier can face.[24]  Uber thus does not deactivate courier accounts because it wants to, but only when the interests of promoting safety, ensuring quality, and eliminating fraudulent activity call for such action.  Uber continuously reviews and seeks to improve its deactivation policies and processes for accuracy, fairness, and in response to couriers' feedback, while also upholding its safety and privacy standards on the platform.

34.    While complaints and issues with courier services are rare in comparison to the scale of Uber's operations, consumers do report complaints and issues, ranging in severity from relatively minor (for example, rudeness) to quite severe (for example, fraud or assault).

35.    Uber's current deactivation policies and positions are consistent with its commitments to safety, privacy, quality, and fraud prevention.

---

[23] *Deactivations*, *supra* ("We're strongly motivated to keep access to the Uber platform open and to help drivers and delivery people get online when they want to work."); Dara Khosrowshahi, *Becoming the fairest platform for flexible work,* Uber (Nov. 13, 2023) https://www.uber.com/blog/deactivations-principles/ (statement from Uber's CEO about Uber's approach to deactivations, explaining that "Blocking someone from accessing their Uber account is one of the most serious decisions we make as a company").

[24] *Id.*

COMPLAINT - 10
(2:24-cv-2103)

**A.    Uber Temporarily Restricts Access or Deactivates Courier Accounts When the Courier Poses a Safety or Quality Risk**

36.    Uber publicly posts its reasons for temporarily restricting or deactivating courier accounts.[25]

37.    With respect to a courier's access to the platform, Uber distinguishes between (i) failing to onboard to the platform, (ii) a temporary restriction of access to the platform, and (iii) a deactivation from the platform.

38.    A courier may fail to onboard, or may temporarily lose access, for a variety of reasons, including failing to offer the required login information or failing to meet minimum eligibility requirements, such as downloading the latest version of Uber's application or uploading proof of a valid driver's license.  A courier who temporarily loses access can typically regain access by providing the correct information or resolving the deficiency—*e.g.*, if the problem is an outdated version of the application, by downloading the latest version of the application; if the problem is expired documentation, by uploading valid proof of a license.  A courier's failure to onboard or loss of access due to their failure to meet minimum eligibility requirements is distinct from a deactivation, in which Uber takes away a courier's account access.

39.    Uber may also temporarily restrict a courier's access while it conducts a review or investigation, including to confirm a courier's identity, review a courier's eligibility documentation, or investigate a report of courier misconduct.  All of these temporary restrictions, too, are distinct from a deactivation, in which Uber takes away a courier's account access.

40.    Two of the most common reasons for deactivation are failed background checks and problems with the documentation Uber requires couriers to submit.  Uber also deactivates courier accounts for consistently below-minimum aggregate consumer ratings, among other reasons.

---

[25] *Deactivations*, *supra* (listing and explaining reasons).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

**1.    Background Checks**

2    41.    Uber believes that background check requirements for couriers are a central

3  component of its safety program.[26]  To that end, couriers must undergo a background check before

4  their first delivery, and they continue to undergo checks on at least an annual basis.[27]

5    42.    Uber uses a third party to conduct background checks of each courier on its

6  platform as part of its commitment to safety.  Reasons for a failed background check may include

7  serious criminal convictions; serious pending criminal charges; multiple moving violations, non-

8  moving violations, or accidents within the last three years; and any serious driving violation, such

9  as driving while intoxicated.[28]  In the case of a failed background check, couriers have at least 7

10  days to address any inaccuracies with the third party that conducted the background check, as

11  mandated by the federal Fair Credit Reporting Act.

12    43.    Couriers whose background checks show serious criminal convictions, such as

13  robbery or kidnapping, are prohibited from making deliveries in order to protect consumers and

14  the public from potentially dangerous situations in their homes and places of work.

15    44.    Uber also deactivates accounts of couriers whose background checks show driving

16  record issues, including multiple collisions and/or presenting fraudulent vehicle registration or

17  insurance documents.  Uber, like other companies in the industry, does not have a direct method

18  for assessing fault in each collision.  Uber learns of motor vehicle accidents through the State of

19  Washington's Department of Motor Vehicles, which only reports whether a collision has occurred

20  and does not assign fault.

21    45.    Uber deactivates accounts of couriers whose background checks show driving

22  record issues because it has determined that these issues are a safety signal and indicators of an

23  unsafe driver.

24

25  _____

[26] *Id.* (listing and explaining "Background checks" as a reason for deactivation).

26  [27] *Safety*, *supra* ("All drivers are background checked before their first trip," and "Uber rescreens drivers at least every year").

27  [28] *Deactivations*, *supra.*

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

### 2.    Inadequate Documentation

46.    Uber temporarily restricts access for couriers who do not submit proper documentation.[29]   Uber requires couriers to upload current versions of certain documents, including a driver's license, vehicle registration and insurance, and profile photo.[30]   Uber temporarily restricts access for couriers who do not satisfy these documentation requirements, in part because allowing such couriers' accounts to remain active on Uber's platform risks the safety of consumers and the public, and compromises consumers' ability to receive deliveries from couriers who have confirmed their driving privileges.

47.    Uber periodically requires couriers to upload photos of themselves for identity verification.[31]   One common issue that can lead to a temporary restriction of access arises when a courier uploads a photo that does not match the photo of the individual displayed on their account profile.  In such cases, Uber cannot verify the identity of the person actually completing deliveries (and therefore also cannot verify that the person completing deliveries satisfies Uber's background check requirements).

### 3.    Couriers With Below-Minimum Aggregate Ratings

48.    Uber strives to ensure that consumers receive a high-quality, safe experience each time they place an order using the Uber platform.  To that end, consumers are able to provide a satisfied (or "thumbs up") rating or a dissatisfied (or "thumbs down") rating for a delivery.  Uber aggregates these ratings for each courier and compares the aggregate rating to the minimum aggregate rating requirement for the courier's delivery location.

---

[29] *Id.* (listing and explaining "Expired documents" and other document-related issues as reasons for deactivation).

[30] *Required Documents for Drivers*, Uber, https://www.uber.com/us/en/drive/requirements/documents/?_csid=6X8cUVEeNECfZZjEbnO_J w&city=washington-dc&state=a3bjsh1IrShgER6foAQoBDMzwCDOLBIvVTvn-0bj9BM%3D&uclick_id=df07b699-20e8-4f2b-9883-6c5d02602864#_ (last visited December 13, 2024).

[31] *Identity Verification Checks*, Uber, https://help.uber.com/en/driving-and-delivering/article/identity-verification-checks?nodeId=75fb55dc-da08-41bb-b1cb-3229f2839956 (last visited Dec. 15, 2024).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

49.    Uber contacts couriers to provide resources when their aggregate rating approaches the minimum for their delivery location.  The following image depicts the substance of the notice Uber sends to couriers who approach the minimum threshold.



50.    Uber deactivates accounts of couriers whose aggregate ratings are consistently below the minimum aggregate rating requirement in their delivery location, even after such a warning.[32]  In Uber's experience, below-minimum aggregate ratings are often correlated with safety, fraud, misconduct, and other quality issues.  For example, consumers generally give couriers "thumbs down" ratings when the courier was rude, was late to pick up an order and/or complete a delivery, or did not deliver the correct items.  Uber has also found that, in other cases,

---

[32] *Deactivations*, *supra* (listing and explaining "Ratings" as a reason for deactivation).

couriers may receive "thumbs down" ratings for making remarks or engaging in conduct that made the consumer feel unsafe. Consumers may not have the time to complete a full report following an uncomfortable incident, and providing a "thumbs down" rating is the easiest way for the consumer to communicate to Uber that there was an issue with the courier's delivery services.

51.    Deactivations for below-minimum aggregate ratings consider the number of consumer ratings and the recency of each consumer rating. Uber never deactivates a courier's account based on a single "thumbs down" consumer rating.

### 4.    Other Reasons for Courier Account Deactivation

52.    Uber also deactivates accounts of couriers for other safety- and quality-related reasons. These reasons include unsafe driving, or exhibiting aggressive, confrontational, or harassing behavior.[33]

53.    Uber deactivates accounts of couriers who discriminate or make offensive remarks based on a consumer's protected characteristics, including race, color, disability, gender identity, sex, and sexual orientation.[34] Uber "believe[s] in a world where movement should be accessible" to all.[35] The company's Community Guidelines prohibit discrimination and Uber does not "tolerate racist or discriminatory conduct and behavior."[36] Uber, therefore, may also deactivate accounts of couriers when it has information from which it can infer that the courier has violated these prohibitions against discrimination.

54.    Additionally, in the interests of the safety, efficiency, and trustworthiness of its platform, Uber's grounds for account deactivation include submitting "[a]ltered or false documents" and "assuming someone else's identity," among a host of other fraudulent activities.[37] Fraud that can lead to deactivation includes both account-level conduct (for example, submitting

---

[33] *Id.*

[34] *Id.*; *see also Uber's Community Guidelines*, *supra* (setting out guidelines against discriminatory and offensive behavior).

[35] *Values*, *supra*.

[36] *Uber Community Guidelines*, *supra*.

[37] *Deactivations*, *supra*.

fraudulent documents or creating fake or duplicate accounts), and trip-level conduct (for example, claiming unwarranted fees or charges or falsely claiming to complete a delivery).[38]

**B.  Uber's Process for Investigating and Reviewing Deactivations Is Tailored to the Circumstances**

55.  It is important to Uber that couriers "have a clear explanation when they lose access, and feel they have a voice if their account is deactivated."[39]  Uber recognizes a "responsibility to ensure [its] processes are fair, accurate, and transparent," and that couriers and the public "trust we are doing the right thing."[40]  For this reason, Uber provides on its website public guidance to couriers regarding its deactivation practices, including advice about how couriers may resolve issues and avoid losing access to Uber's platform.

56.  Uber generally conducts an investigation in connection with most deactivations.[41] One exception is when Uber deactivates a courier account for below-minimum aggregate ratings after the courier has already received prior warning of a low rating and prior warning that deactivation may occur in the event of additional low ratings.

57.  The length of an investigation varies depending on the type of incident and its severity.  Uber strives to complete investigations as quickly as possible, while also ensuring that they are as thorough and complete as possible.

58.  When investigating an incident that could lead to deactivation, Uber generally aims to collect and assess relevant information from consumers in order to determine if deactivation is appropriate.  Uber generally considers evidence in the courier's favor.[42]  For instance, in considering a report of assault, Uber will consider whether the courier's location data supports or refutes the allegations.

---

[38] *Id.* (listing and explaining "Fraudulent activities" as a reason for deactivation).

[39] Khosrowshahi, *Becoming the fairest platform for flexible work*, *supra*.

[40] *Id.*

[41] *Deactivations*, *supra* (explaining "Human involvement" in deactivation decisions).

[42] *Id.* (explaining "Protection from false allegations" for couriers and opportunity for couriers to provide "information to support their case").

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

59.    Uber has also adopted best practices for investigating sexual abuse and sexual assault reports, including integrating trauma-informed and survivor-centered approaches that allow the company to conduct a thorough investigation while minimizing any further trauma to survivors of such abuse or assault.

60.    While a single serious report may lead to deactivation of an account, it is worth noting that the majority of reported incidents are less severe behaviors that may not warrant immediate loss of access to the platform.  Instead, such reports may warrant additional examination of the courier's history on the platform.

61.    Uber generally may take into account the courier's history on the platform, including the length of time the courier has provided deliveries on the platform and the number of deliveries completed.  For example, Uber believes that a minor complaint against a courier who has completed tens of thousands of deliveries over many years without incident should be considered within the broader context of that courier's history on the platform.

62.    The timing of Uber's investigation of a deactivation, and its relationship to if and when the courier loses access to the platform, also varies depending on the nature of the report or issue.  For example, in cases of serious safety incidents, Uber will temporarily restrict the courier's account access while the company conducts an investigation.  This practice reflects Uber's determination that such couriers may pose an immediate risk to the public and customers (*i.e.*, consumers and merchants).

63.    In other cases, such as low consumer ratings, Uber will inform the courier of the complaints and may provide tips to help the courier avoid similar complaints in the future, without deactivating or temporarily restricting the account.

64.    Uber's practices and policies relating to the timing of any review—and whether it takes place before or after a courier loses access—reflect the company's assessment about how quickly a courier engaged in concerning behavior must be removed from its platform in order to meet Uber's safety and quality standards.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

65.     If a courier's account is deactivated, Uber makes every effort to be clear and consistent in its communications and transparent about the reasons behind the decision.[43]

66.     Uber will not provide couriers with all of the details related to their deactivation, however, when doing so poses a risk to consumers or others, or poses a significant fraud risk to Uber, its customers (*i.e.*, consumers and merchants), or the public.  For example, where a courier is deactivated based on a consumer report of sexual assault, Uber will not provide the courier with information that could identify the reporting consumer or reveal their location.  In cases of fraud, Uber may limit the information it provides the courier because it does not want to provide couriers with information that might allow them to evade Uber's fraud-detection mechanisms in the future.

67.     Couriers generally have the ability to seek review, via the "Review Center," of a deactivation decision that takes away their access for more than 7 days and that the courier cannot resolve on their own.[44]

68.     During a review of a deactivation decision, couriers have the opportunity to provide additional information about the incident or issue, such as their comments or video recordings.[45]

**III.     The City's Deactivation Ordinance**

69.     In August of 2023, the Seattle City Council enacted and the Mayor signed the App-Based Worker Deactivation Rights Ordinance.  Mun. Code, ch. 8.40 and § 3.02.125.  Section 2 of the Ordinance—which is set to take effect on January 1, 2025—applies to network companies "that facilitate work performed by 250 or more app-based workers worldwide," Ordinance

---

[43] *Id.* ("If any loss of access occurs, Uber will make every effort to be clear, empathetic, and consistent in our communications and specific and transparent about the reasons behind our decision, except where doing so poses a risk to other users.").

[44] *Id.* ("Outside of the most serious cases, drivers and delivery people [*i.e.*, couriers] should have the ability to request a review of any decision that removes access for more than 7 days and can't be resolved by the driver or delivery person [*i.e.*, courier] on their own."); *see also* Khosrowshahi, *Becoming the fairest platform for flexible work*, *supra* (statement from Uber's CEO about initiatives in deactivation review).

[45] *Deactivations*, *supra* (explaining couriers' "Opportunity to provide additional information" during the review process).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

§ 8.40.040(A), and seeks to regulate the deactivation of app-based workers by such companies, including couriers who use Uber's platform in Seattle.[46]

70.    The Ordinance authorizes OLS to make rules to implement the Ordinance and to enforce its provisions, including by imposing significant penalties.  *See* Ordinance §§ 8.40.125, 8.40.20, 8.40.130, 8.40.150, 8.40.160, 8.40.170.  It also provides a private right of action.  *See* Ordinance § 8.40.230.

71.    The Ordinance defines "deactivation" broadly to include any "blocking of an app-based worker's access to the worker platform, changing an app-based worker's status from eligible to accept offers to perform services to ineligible, or other material restriction in access to the worker platform that is effected by a network company."  Ordinance § 8.40.020.  The Ordinance thus regulates not only deactivations of app-based workers' accounts, but also temporary restrictions of access.

72.    The Ordinance states that it seeks to "protect[] and promote public health, safety, and welfare by establishing protections against unwarranted deactivations for app-based workers."  Ordinance § 1(C).  But the Ordinance offloads the City's vision of what amounts to an "unwarranted deactivation"—and the harmful effects that vision is likely to bring about—onto companies like Uber by forcing them to announce policies that espouse the City's views as if they were the companies' own.

A.    **The Ordinance Mandates that Uber Adopt a Deactivation Policy Espousing the City's Own Views**

73.    One of the Ordinance's key provisions is Section 8.40.050.  It provides that, before a covered company deactivates any app-based worker's account, it must inform the worker of its "deactivation policy, defining what constitutes a violation that may result in deactivation."

---

[46] Drivers who use Uber's platform to transport passengers are not covered by the Ordinance, as Washington state law already regulates their relationship with Uber.  *See* Ordinance § 8.40.020 (excluding from relevant definitions "transportation network compan[ies]" as defined under state law and trips dispatched through such a company's platform).

COMPLAINT - 19
(2:24-cv-2103)

Ordinance § 8.40.050(A)(1).  Thus, if a company expects to ever need to deactivate a courier's account, it must maintain and announce a deactivation policy.

74.    That policy must meet a series of City-prescribed requirements.  It "must be specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy."  *Id.*  And it must be a "[r]easonable policy," under which grounds for deactivation must be "reasonably related to the network company's safe and efficient operations." Ordinance § 8.40.050(A)(2).

75.    The Ordinance does not define the term "reasonably related" or otherwise say what a "[r]easonable policy" is.  Ordinance § 8.40.050(A)(2).  Instead, it provides a list of "[e]xamples of policies" that the City deems "not reasonably related" to "safe and efficient operations," but stresses that such policies "are not limited to" these "[e]xamples."  *Id*.

76.    The Ordinance's list of impermissible example policies includes "[a]ny policy that would result in deactivation based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance."  Ordinance § 8.40.050(A)(2)(e).

77.    In Uber's experience, though, consistently low consumer ratings often reflect serious performance or safety issues.   The Ordinance thus effectively requires Uber to communicate, as its own policy, that it does not believe consumer ratings have anything to do with its platform's safe or efficient operations—even though Uber, based on its experience and considered judgment, *does* believe they are related.

78.    The Ordinance's list of policies that the City deems not "reasonably related" to "safe and efficient operations" also includes "[a]ny policy that would deactivate a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law." Ordinance § 8.40.050(A)(2)(h).   The Ordinance defines "egregious misconduct" narrowly to include certain enumerated crimes, but to exclude "conduct related to . . . traffic collisions unless the app-based worker has accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years."  Ordinance § 8.40.020.

COMPLAINT - 20
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

79.     The Ordinance thus forces Uber to jettison its existing guidance and instead announce a deactivation policy espousing—as if it were Uber's own view—*the City*'s opinion that a courier's record of traffic accidents bears no reasonable relationship to safety except in specific, government-defined circumstances.  Moreover, in the State of Washington, the checks of motor vehicle records on which Uber relies often do not contain accident fault attribution information. So, because Uber lacks access to the fault attribution data necessary to prove those circumstances, the Ordinance effectively forces Uber—notwithstanding its commitment to prioritizing safety—to adopt a policy embracing the view that the vast majority of traffic collisions will not warrant deactivation.

80.     The Ordinance also proscribes as lacking the necessary relationship to safety or efficiency any policy that "would result in a deactivation based on . . . acceptance or rejection of any individual offer, any types of offers, or any number of proportion of offers."  Ordinance § 8.40.050(A)(2)(b).

81.     In other words, the Ordinance appears to require Uber to adopt a deactivation policy endorsing the view that systematically refusing or canceling orders from consumers in certain locations or with certain protected characteristics is not discriminatory conduct worthy of deactivation.  Such a policy, though, is fundamentally inconsistent with Uber's mission and values.

**B.     The Ordinance Forces Uber to Disclose Sensitive Information to Couriers Whose Accounts are Deactivated, Or Otherwise to Retain Those Couriers on its Platform**

82.     Another provision of the Ordinance, Section 8.40.070, likewise compels Uber to espouse the City's views at the expense of Uber's own.  Under that provision, 14 days before a deactivation (in most cases), or on the effective date of the deactivation (in egregious cases), Uber must provide the "app-based worker" with a "notice of deactivation" including, among other information, "[t]he reasons for deactivation"; the "policy that was violated"; "the specific incident or pattern of incidents that violated the deactivation policy"; and "[a]ny and all records relied upon to substantiate deactivation."  Ordinance §§ 8.40.070(A)(1), (3).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

83.     On its face, the Ordinance allows Uber to "take measures to anonymize" certain information that it "reasonably believes . . . could compromise [a] customer or third party's safety," and to provide only a "summary description" when "a complaint from a customer or third party is the sole basis for deactivation."  Ordinance § 8.40.080(D).  But it is far from clear from the Ordinance how—or even whether—companies may "anonymize" or "summar[ize]" incident date, time, and location information.  Nor has OLS finalized any rules clarifying what "measures" companies may take.

84.     Although Uber makes every reasonable effort to be clear and candid about the reason for a deactivation, in some cases, these requirements appear to force Uber to make a difficult choice: either disclose sensitive information it would otherwise keep confidential or, to avoid doing so, allow couriers whose accounts it would like to deactivate to continue using its platform.

85.     For example, consider a courier whose account has been deactivated because a consumer has made a credible report to Uber that the courier sexually assaulted her at her home upon making a delivery.  The Ordinance's disclosure requirements will force Uber, notwithstanding its safety and privacy commitments, to turn over to the courier "[a]ny and all records relied upon to substantiate deactivation," Ordinance § 8.40.070(A)(3), including the consumer's report and the "date, time, and location" of the alleged assault, Ordinance § 8.40.080(A).  Such information leads the alleged perpetrator straight back to his accuser.  To protect consumers' safety and privacy, Uber does not currently turn over such information.  Yet the only way Uber can avoid making that disclosure under the Ordinance is to maintain the courier's access to the platform—even though the Ordinance itself correctly recognizes that sexual assault is "egregious misconduct" warranting immediate deactivation.  Ordinance § 8.40.020.

86.     Or suppose Uber deactivates a courier's account for engaging in fraudulent activity.  The records Uber is forced to turn over to that former courier may well reveal Uber's closely-guarded techniques for detecting fraud, providing future fraudsters with a roadmap to avoid getting caught.  Again, Uber does not currently reveal that information.  But it can only avoid doing so under the Ordinance by maintaining the courier's platform access and thus allowing the potential

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

fraud to continue on the platform—even though fraud, like sexual assault, constitutes "egregious misconduct," Ordinance § 8.40.020, and even though fraudulent activity may pose a safety risk, especially to the extent it involves a courier assuming a false identity on the platform.

### C. The Ordinance Requires Uber to Turn Over Records to OLS

87.    The Ordinance further mandates that covered network companies "affirmatively transmit to the Agency such records as required by rules issued by the Director, on at least a quarterly basis until July 1, 2026, and at least every six months thereafter."  Ordinance § 8.40.090(A).

88.    This provision authorizes OLS to demand several categories of records, including records related to the number of deactivations, the number of couriers challenging their deactivations, the reasons for deactivations, the company's deactivation policy and internal deactivation challenge procedures, and "[a]ny other records that the Director determines are material and necessary to effectuate the purposes of" the Ordinance.  Ordinance § 8.40.090(A)(1).

89.    In November 2024, OLS proposed draft rules implementing these requirements.[47] These Model Rules call for still more granular data to be disclosed, including (1) the total weekly number of couriers where at least 25% of their work involved services in Seattle, (2) the total number of couriers whose primary address falls within each Census Tract, (3) the zip codes and partial phone numbers of couriers in Seattle who use Uber's platform, (4) the total weekly numbers of deactivations and reinstatements, and (5) the reasons for those deactivations.  Uber expects OLS to adopt and finalize these rules, including the categories proposed in the November 2024 Model Rules.

90.    These are categories of data that Uber considers to be confidential and sensitive, and that it does not voluntarily disclose with respect to courier services.[48]  *First*, certain categories

---

[47] These draft rules, together with other draft rules proposed by the agency (described in Part IV below), are herein referred to as the "Model Rules."

[48] Another of the City's ordinances—the App-Based Worker Minimum Payment Ordinance, Mun. Code, ch. 8.37—requires Uber to turn over some similar records to the City.  *See id.* § 8.37.070(G). Uber's first full production of records under this requirement is due on January 31, 2025.  Uber objected to this production requirement during the rulemaking process and continues to object and

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

are competitively sensitive.  Seattle's courier services market is highly competitive, with other companies competing with Uber to attract couriers to their platforms.  Uber's competitors can use the data Uber would provide to OLS (which they might seek through a public records request or other means), coupled with other metrics or their own internal data, to gain a competitive advantage.  For example, based on knowing the weekly number of couriers on Uber's application, competitors can extrapolate directional signals regarding Uber's revenue and volume of business in Seattle.  Competitors might also use the zip codes and partial phone numbers of couriers on Uber's platform to contact them, in order to recruit couriers away from Uber and onto their own platforms.  And because these competitors would have knowledge of Uber's rate of deactivations and reasons for those deactivations, they would be armed in their efforts with information about how to modify their own deactivation policies in order to retain a competitive edge.

91.     *Second*, Uber values the privacy of both couriers and consumers, and tries to minimize the disclosure of information to third parties or regulators when that information can be used to identify an individual.  Third parties conceivably could obtain, via a public records request, the zip codes and partial phone numbers provided to OLS, and couple that with other information to learn the identities of couriers on Uber's platform.

92.     *Third*, the information at issue could also be used to undermine Uber's business operations.  For example, to the extent that Uber will be required to provide detailed information about the threshold at which it will deactivate a courier's account for fraud, its methodology for investigating complaints or assessing deactivation challenges, or the number of consumer complaints that will trigger the deactivation process, that information can be used by couriers on Uber's platform to develop strategies to evade detection and account deactivation in the future.

reserve its rights to challenge the requirement.  To date, Uber has provided only a small sample of records as mandated by the City's rules implementing the requirement, without prejudice to the continued confidential treatment of the balance of the records.

COMPLAINT - 24
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

93.     The Ordinance does not provide for any sort of judicial process before Uber may be forced to turn over these records.  Nor does it provide any opportunity for Uber to seek review, from OLS or otherwise, prior to disclosure.

**IV.     The City Slow-Walks the Rulemaking Process, Despite Uber's Engagement**

94.     The Seattle City Council first introduced a law regulating the deactivation of app-based workers in May 2023, and voted in favor of passing that law in August 2023.[49]  Since that time, Uber has been actively engaged with the City and OLS.  Over the course of that engagement, which has spanned many months, Uber has consistently raised concerns that the Ordinance and Model Rules will lower the company's safety, quality, and privacy standards.

95.     In May 2023, the City Council held hearings about the proposed Ordinance.  Uber attended those hearings and offered testimony.  The Ordinance was signed into law in August 2023.  For nearly eight months after its enactment, OLS did not take any steps to initiate the rulemaking process contemplated by the Ordinance.

96.     Particularly in the absence of any rulemaking action by OLS, Uber could not understand all of the requirements it would be expected to comply with when the Ordinance went into effect.  OLS's lack of guidance was significant because the Ordinance leaves to OLS's discretion significant aspects of the regulation, such as the precise categories of records that need to be disclosed under Section 8.40.090.  Additionally, while Uber believes the Ordinance itself is fundamentally problematic and unconstitutional, Uber remained uncertain as to whether OLS's eventual rules might at least help ameliorate some of the most problematic aspects of the Ordinance, including, for instance, whether OLS would provide greater clarity as to what sorts of deactivation policies it considers to be "reasonably related" to a network company's "safe and efficient operations," as relevant to the requirements of Section 8.40.050 of the Ordinance.[50]

---

[49] History for Seattle City Council Bill No. 120580, Office of the City Clerk of Seattle Legislative Information Center, https://seattle.legistar.com/LegislationDetail.aspx?ID=6214973&GUID=20C5F7BD-7898-47C2-9854-E3A42FFCD664 (last visited Dec. 17, 2024).

[50] Ordinance § 8.40.050(A)(2).

COMPLAINT - 25
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

97.    On April 8, 2024, OLS emailed stakeholders, including Uber, to inform them that it planned to hold meetings to discuss the rulemaking process beginning in May 2024.  On May 1, 2024, however, OLS informed stakeholders that it was postponing the start of those meetings.

98.    More than three months later, on August 20, 2024, OLS informed Uber and other stakeholders that it would once again begin the rulemaking process.

99.    On August 28, 2024, Uber and other stakeholders met with OLS and discussed the companies' concerns about their ability to assess and comply with the Ordinance and OLS's eventual implementing rules given the delayed rulemaking timeline.  On September 6, 2024, those companies sent OLS an email reiterating their concerns about the timeline.

100.    OLS held its first meeting with stakeholders on September 11, 2024, during which it provided an overview of the Ordinance.

101.    On September 18, 2024, Uber submitted a pre-rule comment to OLS.  Because OLS had yet to issue final rules, Uber's comment asked OLS to adopt (1) a six-month grace period for the enforcement of all requirements in the Ordinance, and (2) for any rules that impose additional substantive requirements, an implementation date at least six months after the date of final rule publication.

102.    On September 23, 2024, OLS began issuing the Model Rules piecemeal.  OLS apologized for its delay in issuing the Model Rules.

103.    The very next day, Uber and other companies followed up with OLS on the request for a grace period, given the ongoing delay in the rulemaking process.

104.    OLS subsequently issued other pieces of its Model Rules on October 7, October 18, November 11, and December 10, 2024.

105.    OLS held meetings to discuss its Model Rules on September 25, October 23, November 13, and December 11, 2024.  Uber attended each of these meetings.

106.    On October 9, 2024 and December 10, 2024, Uber submitted comments to OLS's Model Rules, as they were rolled out in a piecemeal fashion.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

107.    As the rulemaking process dragged on and the Ordinance's January 1, 2025 effective date grew closer, Uber and other stakeholders continued to be concerned about their ability to timely assess and comply with the Ordinance and OLS rules.  On October 2, 2024 and October 4, 2024, Uber and other stakeholders held meetings with OLS and Deputy Mayor Greg Wong, respectively, during which they expressed their concerns over the implementation timeline.

108.    Since the Ordinance was first announced, Uber has submitted multiple rounds of comments, offered testimony, and met with industry stakeholders and OLS representatives.  Uber has made substantial efforts to avoid the circumstance it presently finds itself in—on the eve of the Ordinance becoming effective, still without the benefit of any final implementing rules from OLS (or a date when they will be finalized), and without necessary fixes from the Agency on many of the issues Uber has identified as clearly problematic and inconsistent with its safety and privacy commitments.

## COUNT I:  VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (COMPELLED SPEECH) (42 U.S.C. § 1983)

109.    Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1-108 above.

110.    The First Amendment to the U.S. Constitution, applicable to state and local governments through the Fourteenth Amendment's Due Process Clause, protects the right to free speech, including the rights to not speak and to not express a view with which a person disagrees. It "plainly violate[s] the First Amendment" for the City to "enact[] as a direct regulation of speech" a requirement that Uber "have a policy" endorsing its preferred message.  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 210, 213 (2013).

111.    The Ordinance does just that.  The heart of the Ordinance is its requirement that Uber announce a policy detailing what considerations warrant deactivating a courier's account. But the Ordinance does not even give Uber the freedom to choose the content of its own policy. It must instead issue a policy consistent with *the City's* view of what is "reasonably related" to

Uber's "safe and efficient operations." Ordinance § 8.40.050(A)(2). This is nothing more than a "rule of compelled speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 798 (1988).

112. The Ordinance's deactivation policy requirement directs Uber to "express a view," *at least* "implicitly," in two different respects. *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024). First, it requires Uber to express the overarching view that any triggers that might not be considered "reasonably related" to "safe and efficient" operations (such as, perhaps, violations of anti-discrimination policies) can never be sound justifications for deactivations. And, second, it forces Uber to opine on what *is* "reasonably related" to safety and efficiency—in other words, to opine on the important and controversial question of what considerations should justify a loss of access to Uber's widely-used platform.

113. Even worse, the Ordinance requires Uber to adopt and espouse as its own policy *the City*'s views on that question, even when Uber would articulate a different view if free to do so. It also locks Uber into articulating those views indefinitely—even though Uber is continuously reviewing and improving its deactivation policies for accuracy, fairness, and in response to couriers' feedback, while also upholding its safety and privacy standards.

114. As one example, the Ordinance prohibits Uber from announcing a deactivation policy that would "result in a deactivation based solely on a quantitative metric derived from aggregate customer ratings." Ordinance § 8.40.050(A)(2)(e). Instead, Uber must effectively communicate, as its own policy, that it does not believe consumer ratings have anything to do with its platform's safe or efficient operations—even though Uber, based on its experience and considered judgment, *does* believe they are related.

115. Section 8.40.070, which requires Uber to provide couriers whose accounts are deactivated with an array of information, compels still more speech inconsistent with Uber's beliefs. The "forced disclosure" of this information—such as "[t]he reasons for deactivation," the specific "policy that was violated," "the specific incident or pattern of incidents that violated the deactivation policy," and "[a]ny and all records relied upon to substantiate deactivation,"

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Ordinance § 8.40.070(A)(1), (3)—constitutes speech. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024). And these records will necessarily reflect the views embodied in the City-mandated deactivation policy.

116. Moreover, in some cases, disclosing them will require Uber to set aside its own beliefs and communicate the City's instead—for example, when Uber must turn over to a courier whose account was deactivated based on a credible report of sexual assault records that could lead him straight back to the consumer who reported the assault to Uber, or when Uber must provide documents revealing its closely-guarded techniques for detecting fraud to a courier deactivated for engaging in fraudulent activity. Needless to say, these are sensitive disclosures that Uber would much "rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

117. In these ways and more, the Ordinance "alters the content of [Uber's] speech" by forcing it to trumpet the City's preferred tune. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (cleaned up). This compelled speech violates the First Amendment.

## COUNT II: VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (FREEDOM OF ASSOCIATION) (42 U.S.C. § 1983)

118. Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1-117 above.

119. The First Amendment protects the freedom of "expressive association"—that is, the right to "associate" with others "for the purpose of speaking." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006). "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

120. The Ordinance restricts Uber's ability to express itself. It forces Uber, a leading voice on the sensitive matters upon which deactivations are often based, to keep active on its

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

platform—indefinitely—couriers who it would otherwise disassociate from for safety, reliability, reputational, or other reasons, consistent with its public commitments.

121.     The Ordinance undermines Uber's expression even when it *allows* Uber to deactivate a courier's account.  Except in cases of "egregious misconduct," the Ordinance requires Uber to allow couriers to remain active on the platform for 14 days even where the City *agrees* Uber may justifiably have their accounts deactivated.  *See* Ordinance §§ 8.40.070(A), (C).

## COUNT III: VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (VAGUENESS) (42 U.S.C. § 1983)

122.     Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1-121 above.

123.     The Due Process Clause of the Fourteenth Amendment requires that governments provide entities with "fair notice of what conduct is prohibited."  *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008).  And where, as here, potentially vague provisions "threaten[] to inhibit the exercise of constitutionally protected rights" such as "the right of free speech or of association," an even "more stringent" inquiry is appropriate, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982), "to ensure that ambiguity does not chill protected speech," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).

124.     The Ordinance does not come close to providing the fair notice the Due Process Clause requires.  It requires Uber to promulgate a "[r]easonable policy" regarding deactivation.  Ordinance § 8.40.050(A)(2).  But no "commonly accepted meaning exists for the term 'reasonable.'" *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 558 (6th Cir. 1999).

125.     The Ordinance's requirement that policies allow only deactivations "reasonably related" to Uber's "safe and efficient operations" does not solve the problem.  Ordinance

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1   § 8.40.050(A)(2).   All it does is limit the subject matter, clarifying that a policy must say

2   "reasonable" things about safety and efficiency (as opposed to anything else).

3   126.   Yet the Ordinance provides no clarifying definition of "reasonably related."

4   Instead, it offers up only a non-exhaustive list of example policies that the City considers *not*

5   "reasonably related" to safety or efficiency.   But one would think that some of the examples—

6   such as policies triggering deactivation based on "a quantitative metric derived from aggregate

7   customer ratings of an app-based worker's performance," or based on "the results of a background

8   check, consumer report, driver record, or record of traffic infractions"—would easily qualify as

9   "reasonably related" to "safe and efficient operations."   Ordinance §§ 8.40.050(A)(2)(e), (h).   By

10  coupling an inherently vague phrase with this "confusing list of examples," Section 8.40.050

11  "combin[es] indeterminacy" and "produces more unpredictability and arbitrariness than the Due

12  Process Clause tolerates."   *Johnson v. United States*, 576 U.S. 591, 598, 603 (2015).

13  **COUNT IV: VIOLATION OF THE CONTRACTS CLAUSE OF ARTICLE I, SECTION**

14  **10 OF THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

15
16  127.   Uber re-alleges and incorporates by reference all allegations set forth in paragraphs

17  1-126 above.

18  128.   The Contracts Clause of the U.S. Constitution restricts state and local governments

19  from enacting laws "impairing the Obligation of Contracts."   U.S. Const., art. I, § 10, cl. 1.

20  129.   Uber's existing contracts with couriers include provisions affording Uber broad

21  discretion to deactivate those couriers' accounts.   These provisions are a key means of protecting

22  both Uber and the consumers who receive deliveries from couriers on Uber's platform, often at

23  their home or business addresses.

24  130.   The Ordinance substantially impairs Uber's existing contractual relationships with

25  couriers in Seattle who use its platform by imposing a significant, non-foreseeable restriction on

26  Uber's contractual right to exercise broad discretion with respect to deactivations.   Moreover, even

27  after Uber has made the decision that a courier's account must be deactivated, the Ordinance

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

requires Uber to allow that courier access to the platform for an additional 14 days, except in the case of egregious misconduct. When Uber entered into contracts with couriers, it could not reasonably have foreseen the City's unprecedented intrusion into Uber's deactivation decisions. That restriction upsets the reasonable expectations Uber had when it entered into these contracts and prevents Uber from safeguarding its rights under them.

131.    Nor is this impairment an appropriate and reasonable way to advance any significant and legitimate public purpose. The Ordinance's sweeping definition of "deactivation," narrow definition of "egregious misconduct," refusal to allow Uber to address issues revealed by consumer ratings, and extensive disclosure requirements are poorly tailored to protecting law-abiding capable couriers, yet they introduce serious safety, privacy, quality, and reliability concerns. The Ordinance thus violates the Contracts Clause.

## COUNT V: VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

132.    Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1-131 above.

133.    The Fourth Amendment protects against unreasonable searches and seizures by the government. When a person or company "seeks to preserve something as private," and the "expectation of privacy is one that society is prepared to recognize as reasonable," the Fourth Amendment protects that privacy interest. *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (cleaned up).

134.    The Ordinance authorizes OLS to demand that Uber "affirmatively transmit" a variety of private and confidential records to OLS on a recurring basis. Ordinance § 8.40.090. The Model Rules that Uber expects OLS will adopt and finalize demand still further disclosures of records and information. These records contain sensitive business information and couriers' personal information that Uber, consistent with its longstanding commitment to privacy, closely guards and does not generally disclose to third parties or government regulators.

COMPLAINT - 32
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

135.    Uber's expectation of privacy in these records is reasonable.  "Businesses do not ordinarily disclose, and are not expected to disclose, the kind of commercially sensitive information" the Ordinance would make Uber turn over.  *Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013), *aff'd*, 576 U.S. 409 (2015) (cleaned up).

136.    The Ordinance's turn-over mandate thus constitutes a search, and the Fourth Amendment's reasonableness requirement applies.  "Searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 419 (2015) (cleaned up).  But the Ordinance does not provide for judicial process prior to disclosure.  And no Fourth Amendment exception applies; in particular, the Ordinance's production requirements do not constitute "administrative" searches, because the Ordinance does not afford Uber "an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* at 420.  These compelled disclosures therefore violate the Fourth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue a temporary restraining order enjoining Section 2 of the Ordinance, and ordering that Section 2 of the Ordinance shall not be enforced against Plaintiffs based on any acts or omissions, including any alleged non-compliance with the requirements of the ordinance, that occur during the time in which the injunction is in effect;

B.    Issue a preliminary and permanent injunction enjoining Section 2 of the Ordinance, including prohibiting enforcement by Defendant and its employees, agents, and successors, including but not limited to the Office of Labor Standards;

C.    Enter a judgment declaring that the Ordinance violates Uber's right to free speech and free association under the First Amendment to the U.S. Constitution, that the Ordinance violates Uber's right to due process under the Fourteenth Amendment to the U.S. Constitution, that the Ordinance violates Uber's rights under the

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Contracts Clause of the U.S. Constitution, and that the Ordinance violates Uber's right to be free from unreasonable searches under the Fourth Amendment to the U.S. Constitution;

D.      Award Plaintiffs costs, including reasonable attorneys' fees; and

E.      Grant such other and further relief as the Court deems just and proper.

DATED this 18th day of December, 2024.

*Attorneys for Plaintiffs Uber Technologies, Inc. and Portier, LLC*

Davis Wright Tremaine LLP

By */s/ Robert J. Maguire*
        Robert J. Maguire, WSBA #29909

By */s/ Theo A. Lesczynski*
        Theo A. Lesczynski, WSBA #59780
        920 Fifth Avenue, Suite 3300
        Seattle, WA  98104-1610
        Telephone: 206-757-8064
        Fax: 206-757-7064
        E-mail: robmaguire@dwt.com
                theolesczynski@dwt.com

Covington & Burling LLP

        Stacey Grigsby (*phv forthcoming*)
        David Zionts (*phv forthcoming*)
        Neha Jaganathan (*phv forthcoming*)
        Alexander Cave (*phv forthcoming*)
        One CityCenter 850 Tenth Street, NW
        Washington, DC 20001
        E-mail: sgrigsby@cov.com
                dzionts@cov.com
                njaganathan@cov.com
                acave@cov.com

        Neema Sahni (*phv forthcoming*)
        1999 Avenue Of The Stars, Ste 3500
        Los Angeles, CA 90067
        E-mail: nsahni@cov.com

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

## CERTIFICATE OF SERVICE

2          On December 18, 2024, I served a copy of the foregoing document on the following in the

3    manner indicated:

4    SCHEEREEN DEDMAN                    ☐ Messenger
5    Seattle City Clerk                         ☐ U.S. Mail, postage prepaid
     600 4th Ave, 3rd Floor,                    ☐ Federal Express
6    Seattle, WA 98104                          ☐ Fax
     Cityclerkfiling@seattle.gov                ☒ ECF and/or EMAIL
7    MOS_Legalservice@seattle.gov

8

9          DATED this 18th day of December, 2024.

10

11                                              By: *s/ Robert J. Maguire*
                                                    Robert J. Maguire, WSBA #29909

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

COMPLAINT - 35
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax