1

2

3

4

5

6

7

8

The Honorable _____

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

UBER TECHNOLOGIES, INC. and PORTIER, LLC,

                      Plaintiffs,

     v.

CITY OF SEATTLE,

                    Defendant.

No. 2:24-cv-2103

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

MOTION FOR TEMPORARY RESTRAINING ORDER NOTED ON MOTION CALENDAR: December 18, 2024

MOTION FOR PRELIMINARY INJUNCTION NOTED ON MOTION CALENDAR: January 10, 2025

ORAL ARGUMENT REQUESTED

MOTION FOR TRO AND PRELIMINARY INJUNCTION
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

    A.    Uber's Commitments ................................................................................ 3

    B.    Uber's Deactivation Practices ................................................................. 4

    C.    The City's Courier Deactivation Ordinance ........................................... 6

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT ...................................................................................................................... 9

I.    Uber is Likely to Succeed on the Merits ................................................................ 9

    A.    The Ordinance Compels Speech in Violation of the First Amendment ................ 9

        1.    The Ordinance is Subject to Strict Scrutiny Because It Compels Uber to Adopt and Convey the City's Views as Uber's Own Policy ....... 10

        2.    The Ordinance Cannot Survive Strict or Even Intermediate Scrutiny ................................................................................................ 15

    B.    The Ordinance Restricts Uber's Expressive Association Rights in Violation of the First Amendment ........................................................... 17

    C.    The Ordinance is Unconstitutionally Vague in Violation of the Due Process Clause ........................................................................................ 19

    D.    The Ordinance as a Whole is Invalid ..................................................... 21

II.    Uber Will Suffer Irreparable Harm Absent Preliminary Relief ......................... 22

III.    The Balance of Equities and Public Interest Favor Preliminary Relief ............ 24

CONCLUSION .................................................................................................................. 25

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) ..............................................................................................9, 15

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023) ...........................................................................22, 24

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth,*
    529 U.S. 217 (2000) ....................................................................................................16

*Belle Maer Harbor v. Charter Twp. of Harrison,*
    170 F.3d 553 (6th Cir. 1999) .......................................................................................19

*Bolger v. Youngs Drug Prods. Corp.,*
    463 U.S. 60 (1983) ......................................................................................................15

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ..............................................................................................17, 18

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ....................................................................................................21

*Cuviello v. City of Vallejo,*
    944 F.3d 816 (9th Cir. 2019) .........................................................................................9

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) ..................................................................................9, 24

*Elrod v. Burns,*
    427 U.S. 347 (1976) (plurality opinion) .....................................................................22

*F.C.C. v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ....................................................................................................19

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ........................................................................................................15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ....................................................................................................14

*IMDb.com Inc. v. Becerra,*
    962 F.3d 1111 (9th Cir. 2020) .....................................................................................15

*Johnson v. United States,*
    576 U.S. 591 (2015) ..............................................................................................20, 21

*League of Women Voters of Washington v. State,*
    184 Wash. 2d 393 (Wash. 2015) .................................................................................21

*Leonard v. City of Spokane,*
    127 Wash. 2d 194 (Wash. 1995) .................................................................................21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Masonry Bldg. Owners of Oregon v. Wheeler*,
    394 F. Supp. 3d 1279 (D. Or. 2019) .......................................................15

*McCullen v. Coakley*,
    573 U.S. 464 (2014)................................................................................15

*Nat'l Ass'n of Wheat Growers v. Bonta*,
    85 F.4th 1263 (9th Cir. 2023) ..............................................................17

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018).................................................................9, 10, 11, 15

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ..................................................... *passim*

*Reno v. ACLU*,
    521 U.S. 844 (1997)................................................................................16

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988)..........................................................................10, 17

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006)..................................................................................17

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)................................................................................13

*Turner Broad. Sys., Inc. v. F.C.C.*,
    520 U.S. 180 (1997)..........................................................................10, 16

*United States v. Approximately 64,695 Pounds of Shark Fins*,
    520 F.3d 976 (9th Cir. 2008) ................................................................19

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)...............................................................................19

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ................................................................8

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015)...............................................................................15

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ....................................................9, 10, 15

**Constitutional Provisions**

U.S. Const. amend. XIV ...............................................................................19

**Statutes**

Mun. Code, § 8.37.080.................................................................................18

MOTION FOR TRO AND PRELIMINARY INJUNCTION - iii
(2:24-cv-2103)

App-Based Worker Deactivation Rights Ordinance, Seattle, Wash., Mun. Code, ch. 8.40 and § 3.02.125 ................................................................................ *passim*

**Rules**

Federal Rule of Civil Procedure 65 ...............................................................1

**Other Authorities**

*Account Violations and Deactivation*, GrubHub, https://driver.grubhub.com/account-violations-and-deactivation/ (last visited Dec. 18, 2024) ...............................................................................................20

*Background Checks and Immigration Status*, Seattle, https://www.seattle.gov/purchasing-and-contracting/social-equity/background-checks#backgroundchecks (last visited Dec. 18, 2024) ..........................20

*DashForce Service Provider Platform Access Policy*, DoorDash, https://help.doordash.com/dashers/s/article/DashForce-Deactivation-Policy?language=en_US (last visited Dec. 18, 2024).............................................20

*Deactivations*, Uber, https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 18, 2024) ..............................................................5

*Privacy*, Uber, https://www.uber.com/global/en/privacy/overview/ (last visited Dec. 18, 2024).....................................................................................................4

*Uber Community Guidelines*, Uber (Nov. 19, 2024), https://www.uber.com/legal/en/document/?country=united-states&lang=en&name=general-community-guidelines&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb ...........................................................13

*Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Dec. 18, 2024) ...........................................6

*Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Dec. 18, 2024) ...............................................................................................................12

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

## **INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 65, Uber Technologies, Inc. and Portier, LLC (together, "Uber") respectfully request a temporary restraining order and preliminary injunction against the City of Seattle's App-Based Worker Deactivation Rights Ordinance, Mun. Code, ch. 8.40 and § 3.02.125. Starting on January 1, 2025, the Ordinance seeks to impose an unconstitutional regime of compelled speech, forced association, and indecipherable government mandate on platforms like Uber that connect people seeking services to those who want to provide them. Uber seeks emergency relief to preserve the status quo before fundamental constitutional protections are compromised.

Every day, through its Uber Eats marketplace, Uber connects Seattle consumers with independent couriers and merchants to facilitate the delivery of meals, groceries, and more. Managing this complex and dynamic delivery platform requires Uber to make prompt decisions based on real-world and real-time consumer feedback and other information about couriers' actions on and off the platform. Couriers drive through busy streets, go to people's homes, and have face-to-face interactions at any hour of the day. Uber's decisions—which include determining when a courier's access to the Uber platform should be deactivated—are based on robust policies tailored to its platform to promote safety, privacy, reliability, quality, non-discrimination, and a positive merchant and consumer experience.

The Seattle City Council wants Uber to adopt different policies, however. Its overriding priority is to ensure that couriers remain on Uber's platform. And to be sure, that is one of Uber's goals too: Uber has every incentive to keep couriers on the platform. But in some cases, based on its experience, judgment, and values, Uber has struck a balance different from the one the City prefers. To take a few examples: Uber believes that ensuring consumers receive reliable, efficient, and, above all, safe deliveries is more important than allowing couriers with consistently low consumer ratings—a sign of serious performance and/or safety issues—to keep disappointing consumers. The City does not. Uber believes it is important that couriers on its platform should not refuse to deliver to particular neighborhoods based on the characteristics of the people or

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  businesses there.  The City does not.  And Uber believes that guarding against fraud, and protecting

2  consumers who may have been victimized from retaliation, should take precedence over giving

3  every courier with a deactivated account every document or detail on which a deactivation

4  determination is based, no matter how sensitive.  But the City, once again, does not.

5       Understandably, though, the City does not want to be in the complex business of directly

6  deciding which courier accounts should be deactivated and which should not.     Such

7  micromanagement would make it easy for residents to hold the city government accountable for

8  the consequences if their deliveries become unreliable, or even worse, if people are hurt on the

9  roads or at their doors.  To avoid that problem, the City has enacted, and is about to implement, an

10 unprecedented Ordinance that offloads its new vision to companies like Uber—who must

11 themselves announce specific policies that threaten these consequences.  In doing so, the City

12 walks straight into grave constitutional problems.

13      The Ordinance compels Uber to speak—and to voice the City's views, not Uber's own,

14 even when those views would suggest to the world that Uber is not fully committed to the quality

15 of the services provided on its own platform, or worse, to safety and privacy.  To the extent it

16 leaves Uber any choice in what to say about important and often controversial matters, the City

17 offers vague standards and confusing guidance that further chill Uber's speech.  And it forces Uber

18 to associate with couriers whose presence on the platform undermines its commitments and

19 reputation.  Whatever objectives the City may have, it cannot pursue them in defiance of the First

20 and Fourteenth Amendments to the Constitution.

21      In the year-and-a-half between the Ordinance's enactment and the effective date, the City

22 has slow-walked its implementation and resisted providing guidance.  Now, on the eve of an

23 unconstitutional new regime, and still without answers from the City, Uber has no other option

24 than to seek relief from this Court.  As the City has confirmed by its actions, no urgency warrants

25 disrupting the status quo before this Court can adjudicate Uber's serious constitutional claims.  By

26 contrast, there are powerful reasons to preserve the status quo before public safety and

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

constitutional liberties alike are compromised. This Court should enter a temporary restraining order and preliminary injunction barring enforcement of the Ordinance.[1]

## BACKGROUND

### A.    Uber's Commitments

Uber is a technology company that operates a platform connecting people seeking ride and delivery services to third-party drivers and couriers who seek to provide them. For delivery services, the platform also connects couriers with merchants, who are seeking delivery services for their goods. Uber's widely-used platform allows millions of people around the globe to hail rides within minutes and, relevant here, to use Uber Eats for ordering food, beverages, and other goods for delivery on demand. And it provides millions of drivers and couriers with the opportunity to earn income by providing those services, and provides merchants with an additional market opportunity.

Because person-to-person connections are the lifeblood of its business—and because making those connections requires drivers and couriers to transport people and goods—Uber is committed to "'stand[ing] for safety'" by "making 'Uber safer for everyone using [its] platform.'"[2] That is no empty slogan; Uber takes a variety of measures in service of that mission. To name just a few: it publishes safety reports each year, hosts an annual "Only on Uber" event in which executives discuss Uber's latest safety innovations with drivers and couriers, and seeks feedback from an external Safety Advisory Board featuring leading experts and stakeholders.[3]   It also

---

[1] Uber hoped to avoid emergency motions practice on this matter, particularly at this time of year. Before filing this action, Uber asked the City to consent to an injunction pending this Court's decision on a preliminary injunction. The City refused. As a compromise, Uber asked the City to represent in a stipulation that it would not enforce the Ordinance against Uber based on any alleged non-compliance with the Ordinance occurring through March 31, 2025, to allow for orderly preliminary injunction briefing. The City refused. Instead, it said the Office of Labor Services is engaged in a "rulemaking process" and "plans to delay the effective date of the rules by 60-90 days," and to "soft launch" enforcement. The City's "plans" to delay effectiveness of "rules," however, do not provide relief from *the Ordinance*'s unconstitutional demands. Uber also asked for clarification of what the City meant by its proposal, which the City would not provide—leaving Uber no assurance it will not be penalized if it fails to speak the way the Ordinance mandates.

[2] Declaration of Hannah Nilles Decl. ¶¶ 5-6 (citation omitted).

[3] *Id.* ¶¶ 8-10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

conducts routine background checks on the drivers and couriers who provide services on its platforms.[4]

Uber places a similar emphasis on privacy. Millions of people "trust [Uber] with [their] personal data," and Uber is "committed to keeping that trust."[5] It minimizes the disclosure of information that can be used to identify its users. And because the connections its technology facilitates often involve consumers receiving deliveries at their homes and businesses, Uber is especially careful to protect consumer information, and thereby guard against retaliation, when it receives a report alleging driver or courier misconduct.

### B. Uber's Deactivation Practices

Through years of experience, Uber has formed beliefs on the complex set of behaviors and indicators that should result in deactivation of courier accounts—that is, couriers' loss of access to Uber's platform. This case concerns the City's attempt to force Uber to adopt and espouse the City's beliefs instead.

Uber's business relies on having couriers on its platform, and it recognizes that its platform is often an essential source of income for many.[6] Uber accordingly takes the decision to deactivate courier accounts seriously, and it views deactivation only as a last resort.[7] This approach makes sense: Uber is committed to ensuring that efficient and reliable deliveries are available to all, and it has every incentive to keep couriers on its platform to keep delivery times low for consumers. When a consumer makes a report or an issue arises, Uber may temporarily restrict courier access, which is distinct from a deactivation.[8] Uber may temporarily restrict courier access, for example, while it conducts a review or investigation (*i.e.*, while it confirms a courier's identity, reviews a courier's documents, or investigates reports of misconduct).[9]

---

[4] *Id.* ¶ 13.

[5] *Privacy*, Uber, https://www.uber.com/global/en/privacy/overview/ (last visited Dec. 18, 2024).

[6] Declaration of Daniel Crawford ¶ 9.

[7] *Id.*

[8] *Id.* ¶¶ 12-15.

[9] *Id.* ¶ 15.

MOTION FOR TRO AND PRELIMINARY INJUNCTION - 4
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Sometimes, though, temporary restriction of access is inadequate, and Uber must deactivate a courier's account. Deactivation is rare, but nonetheless serves as a key component of Uber's commitments to the safety and quality of its platform. Most often, account deactivation occurs when a courier fails a background check or fails to submit sufficient documentation.[10] For instance, Uber deactivates courier accounts based on the results of a background check when the background check reveals (among other issues) felony offenses, serious pending criminal charges, or an unsafe driving record.[11] Likewise, Uber may deactivate a courier who submits a photo that fails to match his profile, because, in that circumstance, Uber cannot verify the courier's identity, and therefore cannot verify that its background check requirements are met.[12] Uber may also deactivate accounts of couriers whose aggregate consumer ratings fall below a minimum threshold for their city (after first reaching out to help those couriers improve), because Uber's belief and experience is that these ratings reflect substantive feedback about serious quality or safety issues.[13] Additional reasons for account deactivation include discriminatory conduct or remarks and fraudulent activities.[14] Uber provides extensive information and guidance to couriers regarding its deactivation practices on its website. This guidance provides details on the potential paths to losing access to Uber's platform—such as receiving consistently low consumer ratings, failing to drive safely, or engaging in fraudulent activity—as well as advice and resources to help couriers understand how they may improve their performance or resolve administrative issues, and thus avoid losing access.[15] Uber also maintains Community Guidelines applicable to *everyone* who

---

[10] *Id.* ¶ 16.

[11] *Id.* ¶ 18.

[12] *Id.* ¶¶ 22, 29.

[13] *Id.* ¶¶ 23-26.

[14] *Id.* ¶¶ 28-29.

[15] *See Deactivations*, Uber, https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 18, 2024).

MOTION FOR TRO AND PRELIMINARY INJUNCTION - 5
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

uses its platform, and it tells consumers and couriers alike that violating those Guidelines, which include safety-related guidelines, may lead to a temporary or permanent loss of platform access.[16]

Uber takes measures to ensure that courier accounts are deactivated only when warranted.[17] Most notably, Uber maintains a thorough investigation process for courier-related reports.[18] Depending on the circumstances and the seriousness of the potential issue, an investigation may occur either before or after a courier's account is deactivated.[19]  And when Uber determines that deactivation is necessary, it makes every reasonable effort to be clear and candid about the reason.[20]  But Uber will not provide information to couriers that risks jeopardizing the safety of Uber consumers.[21]  As an example, if a courier's account is deactivated based on a consumer's report of sexual assault, violence, or harassment, Uber does not provide the courier with information that could identify the reporting consumer or reveal his or her location.[22]  Nor does Uber provide information that may reveal Uber's fraud-detection mechanisms in a way that may assist future fraudsters.[23]

### C.    The City's Courier Deactivation Ordinance

In August of 2023, the Seattle City Council enacted and the Mayor signed the App-Based Worker Deactivation Rights Ordinance.  Mun. Code, ch. 8.40 and § 3.02.125.  The Ordinance— which is set to take effect in less than two weeks—applies to network companies "that facilitate work performed by 250 or more app-based workers worldwide," Ordinance § 8.40.040(A), and seeks to regulate the deactivation of app-based workers by such companies, including couriers

---

[16] Crawford Decl. ¶ 28; Nilles Decl. ¶ 7; *Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Dec. 18, 2024).

[17] Crawford Decl. ¶¶ 9, 30-43.

[18] *Id*. ¶¶ 31-39.

[19] *Id*. ¶ 37-39.

[20] *Id.* ¶ 40.

[21] *Id*. ¶ 41.

[22] *Id.*

[23] *Id.*

MOTION FOR TRO AND PRELIMINARY INJUNCTION - 6
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

who use Uber's platform in Seattle.[24]   The Ordinance authorizes the City's Office of Labor Services ("OLS" or "Agency") to make rules to implement the Ordinance and to enforce its provisions, including by imposing significant penalties.  *See Id.* §§ 8.40.125-8.40.170.  It also provides a private right of action.  *See id.* § 8.40.230.

One of the Ordinance's key provisions is Section 8.40.050.  It provides that, before a covered company deactivates any app-based worker's account, it must inform the worker of its "deactivation policy, defining what constitutes a violation that may result in deactivation." *Id.* § 8.40.050(A)(1).  Thus, if a company expects to ever need to deactivate a courier's account, it must maintain and announce a deactivation policy.  That policy must meet a series of City-prescribed requirements.  It "must be specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy." *Id.*  And it must be a "[r]easonable policy," under which grounds for deactivation must be "reasonably related to the network company's safe and efficient operations." *Id.* § 8.40.050(A)(2).

The Ordinance does not define the term "reasonably related" or otherwise say what a "[r]easonable policy" is.  *Id.* § 8.40.050(A)(2).  Instead, it provides a list of "[e]xamples of policies" that the City deems "not reasonably related" to "safe and efficient operations," but stresses that such policies "are not limited to" these "[e]xamples."  The examples include, among others, "any policy that would result in deactivation based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance," and "any policy that would deactivate a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law." *Id.* §§ 8.40.050(A)(2)(e), (h).  The Ordinance defines "egregious misconduct" to include certain enumerated crimes, but to exclude "conduct related to … traffic

---

[24] Drivers who use Uber's platform to transport passengers are not covered by the Ordinance, as Washington state law already regulates their relationship with Uber.  *See* Ordinance § 8.40.020 (excluding from relevant definitions "transportation network compan[ies]" as defined under state law and trips dispatched through such a company's platform).

collisions unless the app-based worker has accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years." *Id.* § 8.40.020.

Pursuant to the Ordinance, once a company has issued the required policy, it may deactivate only for violations of that policy, which it must prove by a preponderance of the evidence in the event of a challenge. *Id.* § 8.40.050(A)(4); *see also id.* §§ 8.40.020, 8.40.060(A). And 14 days before a deactivation (in most cases), or on the effective date of the deactivation (in egregious cases), the company must provide the "app based worker" with a "notice of deactivation" including, among other information, "[t]he reasons for deactivation"; the "policy that was violated"; "the specific incident or pattern of incidents that violated the deactivation policy"; and "[a]ny and all records relied upon to substantiate deactivation." *Id.* §§ 8.40.070(A)(1), (3).

These requirements and more are set to take effect on January 1, 2025. On that date, covered companies like Uber must comply with all provisions, and OLS can begin enforcing certain provisions, including the Ordinance's foundational requirement that Uber adopt a deactivation policy "reasonably related" to "safe and efficient operations" under the City's definition. *Id.* §§ 8.40.050, 8.40.130(A), 8.40.230. (The rest of OLS's enforcement authority, including the authority to investigate whether individual deactivations are "unwarranted" and to impose penalties upon determining that they are, *id.* § 8.40.060(A), commences on June 1, 2027. *Id.* § 8.40.130(B).) Because OLS's rulemaking process has been beset by delays and a lack of transparency—despite consistent engagement from Uber and other stakeholders—not a single rule has been finalized, and Uber and other covered companies are still in the dark about what exactly the City demands of them.[25]

## STANDARD OF REVIEW

"[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical." *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (cleaned up). To prevail

---

[25] Declaration of Allison Ford ¶ 20.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

on either, the plaintiff must show that it is "likely to succeed on the merits"; that it is "likely to suffer irreparable harm in the absence of preliminary relief"; that the "balance of equities tips in [the plaintiff's] favor"; and that preliminary relief "is in the public interest." *Cuviello v. City of Vallejo*, 944 F.3d 816, 825 (9th Cir. 2019). Where, as here, the defendant is a government actor, the last two factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

## ARGUMENT

### I.    Uber is Likely to Succeed on the Merits

#### A.    The Ordinance Compels Speech in Violation of the First Amendment

It "plainly violate[s] the First Amendment" for the City to "enact[] as a direct regulation of speech" a requirement that Uber "have a policy" endorsing its preferred message. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 210, 213 (2013). Yet the Ordinance requires Uber to adopt specific policies with which Uber disagrees and forces Uber to espouse those policies as if they were its own. Doing so "alter[s] the content of [Uber's] speech" by forcing it to trumpet the City's preferred tune. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (*NIFLA*) (cleaned up). A law that does that is subject to strict scrutiny and thus "presumptively unconstitutional." *Id.* (cleaned up).

In two recent cases, the Ninth Circuit reaffirmed these foundational principles. Confronted with laws requiring companies to speak about their policies, it did not hesitate to apply strict scrutiny and strike those laws down. *See X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024); *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024). The City goes even further. It is not just ordering companies to speak about the companies' own policies. It is ordering Uber to *adopt* specific policies with which Uber disagrees.

Because the Ordinance dictates the content of Uber's speech, it is subject to strict scrutiny. And because it is not "narrowly tailored to serve compelling state interests," it cannot survive that "stringent standard." *NIFLA*, 585 U.S. at 766 (cleaned up). Even under the intermediate-scrutiny standard applied to compelled commercial speech, the Ordinance still could not survive, as it

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

"burden[s] substantially more speech than necessary to further" the City's interests.  *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997).

1.    **The Ordinance is Subject to Strict Scrutiny Because It Compels Uber to Adopt and Convey the City's Views as Uber's Own Policy**

The heart of the Ordinance is its requirement that Uber announce a policy detailing what considerations warrant deactivating a courier's account.  But the Ordinance does not even give Uber the freedom to choose the content of its own policy.  It must instead issue a policy consistent with *the City's* view of what is "reasonably related" to Uber's "safe and efficient operations."  This is nothing more than a "rule of compelled speech."  *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 798 (1988).  Indeed, the City has chosen an especially pernicious rule—one that requires Uber not only to "express a view," *X Corp.*, 116 F.4th at 901, but to "speak a particular message" at odds with its own views, *NIFLA*, 585 U.S. at 766.  The Ordinance thus regulates "speech based on its communicative content" and is subject to strict scrutiny.  *Id.* (cleaned up).

As the Ninth Circuit confirmed in a pair of decisions earlier this year, laws that require businesses to "express a view" are subject to strict scrutiny.  *X Corp.*, 116 F.4th at 901; *see id.* at 895, 899-903 (applying strict scrutiny to law requiring social media platforms to detail how their terms of service "define and address" various categories of harmful content); *NetChoice*, 113 F.4th at 1109-1121 (same for law requiring online businesses to create reports assessing the harms that children might experience when using their services).  The Ordinance requires Uber to express opinions in spades.  Section 8.40.050—its linchpin provision—requires Uber to adopt and announce a "deactivation policy … defining what constitutes a violation that may result in deactivation."  Ordinance § 8.40.050(A)(1).  This provision directs Uber to "express a view," *at least* "implicitly," in two different respects.  *X Corp.*, 116 F.4th at 901.  First, it requires Uber to express the overarching view that any triggers that might not be considered "reasonably related" to "safe and efficient" operations (such as, perhaps, violations of anti-discrimination policies) can never be sound justifications for deactivations.  And, second, it forces Uber to opine on what *is* "reasonably related" to safety and efficiency—in other words, to opine on the important and

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

controversial question of what considerations should justify a loss of access to Uber's widely-used platform.

Even worse, Uber is not free to express any opinion it may have on those sensitive subjects. Instead, the Ordinance requires it to adopt and espouse *the City's* views. Indeed, the very point of the Ordinance is to "establish protections" against deactivations that *the Seattle City Council* thinks are "unwarranted." Ordinance § 1(C). In service of that aim, Section 8.40.050 dictates a host of reasons that Uber must communicate—*as its own policy*—are not grounds for deactivation. *See id.* § 8.40.050(A)(2). The Ordinance thus forces Uber to voice in its deactivation policies the City's views as if they were its own, even when Uber would articulate a different view if free to do so. Not only that, it locks Uber into articulating those views indefinitely—even though Uber is continuously reviewing and improving its deactivation policies for accuracy, fairness, and in response to couriers' feedback, while also upholding its safety and privacy standards.[26] In short, the Ordinance "plainly alters the content of [Uber's] speech" on a variety of sensitive subjects and compels it "to speak a particular message": the City's message. *NIFLA*, 585 U.S. at 766 (cleaned up). Consider a few examples:

*Consumer ratings.* Uber strives to ensure that consumers receive a high-quality, safe experience each time they place an order.[27] And in its experience, aggregate ratings from consumers that are consistently below the minimum requirement often reflect serious performance or safety issues.[28] Uber's current policy is, therefore, to reach out to couriers to provide resources when their rating approaches a minimum threshold level, and to deactivate courier accounts when that threshold is breached.[29] But the Ordinance prohibits Uber from announcing a deactivation policy that would "result in a deactivation based solely on a quantitative metric derived from aggregate customer ratings." Ordinance § 8.40.050(A)(2)(e). Instead, Uber must effectively

---

[26] Crawford Decl. ¶ 9.

[27] *Id.* ¶ 23.

[28] *Id.* ¶ 25.

[29] *Id.* ¶ 24.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

communicate, as its own policy, that it does not believe consumer ratings have anything to do with its platform's safe or efficient operations—even though Uber, based on its experience and considered judgment, *does* believe they are related.

*Safety and Background Checks.* Cognizant that its platform both contributes to and relies on roadway safety, Uber makes "safety … a top priority every single day."[30] It accordingly conducts background checks on couriers.[31] And under its current guidance, it may deactivate courier accounts based on the results of those checks—for example, if they reveal that a courier has had several traffic accidents, regardless of fault, within the past three years.[32] Uber's guidance is the product of its belief that every traffic accident is a potential indicator of unsafe driving.[33]

But the Ordinance declares that "any policy that would deactivate" a courier's account "based on the results of a background check, consumer report, driver record, or record of traffic infractions" is not reasonably related to safety. *Id.* § 8.40.050(A)(2)(h). The primary exception is for "egregious misconduct," but only as *the City* defines it. And in the City's opinion, "conduct related to … traffic collisions" cannot constitute "egregious misconduct" unless a courier has "accumulated more than three non-criminal moving violations or *at-fault*" collisions in the past three years. *Id.* §§ 8.40.020, 8.40.050(A)(2)(h) (emphasis added). In the State of Washington, however, the checks of motor vehicle records on which Uber relies often do not contain accident fault attribution information.[34] The Ordinance thus forces Uber to jettison its existing guidance and instead announce a deactivation policy espousing—as if it were Uber's own view—*the City*'s opinion that a courier's record of traffic accidents bears no reasonable relationship to safety except in specific, government-defined circumstances. Indeed, because Uber lacks access to the fault attribution data necessary to prove those circumstances, the Ordinance effectively forces Uber—

---

[30] *Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Dec. 18, 2024); Nilles Decl. ¶ 5.

[31] *See Deactivations*, *supra*; Crawford Decl. ¶ 17.

[32] Crawford Decl. ¶¶ 19-20, 45.

[33] *Id.* ¶ 47.

[34] *Id.* ¶ 55.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

notwithstanding its commitment to prioritizing safety—to adopt a policy embracing the view that the vast majority of traffic collisions will not warrant deactivation.

***Discrimination and refusing service.*** Uber is committed to making its services accessible to all.[35] To that end, Uber's Community Guidelines prohibit "discriminating on the basis of … an Uber Eats user's delivery location," adding that "intentionally refusing or canceling requests … solely for the purpose of avoiding a particular neighborhood due to the characteristics of the people or businesses that are located in that area, is not allowed."[36] Uber deactivates courier accounts when it can infer that the courier has violated these prohibitions, and it needs to maintain flexibility to do so.[37] But the Ordinance bars any deactivation policy that "would result in a deactivation based on … acceptance or rejection of any individual offer, any types of offers, or any number or proportion of offers." *Id.* § 8.40.050(A)(2)(b). In other words, the Ordinance appears to require Uber to adopt a deactivation policy endorsing the view that systematically refusing or canceling orders from consumers in certain locations or with certain protected characteristics is not discriminatory conduct worthy of deactivation. Such a policy, though, is fundamentally inconsistent with Uber's mission and values.

Nor are examples like these the end of the story; another provision of the Ordinance compels still more speech inconsistent with Uber's beliefs. That provision is Section 8.40.070, which requires Uber to provide couriers whose accounts have been deactivated with, among an array of other information, "[t]he reasons for deactivation," the specific "policy that was violated," "the specific incident or pattern of incidents that violated the deactivation policy," and "[a]ny and all records relied upon to substantiate deactivation." *Id.* § 8.40.070(A)(1), (3). The "forced disclosure" of this information itself constitutes speech. *NetChoice*, 113 F.4th at 1117; *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of

---

[35] *Id.* ¶ 28.

[36] *Id.* ¶ 51; *Uber Community Guidelines*, Uber, (Nov. 19, 2024), https://www.uber.com/legal/en/document/?country=united-states&lang=en&name=general-community-guidelines&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb.

[37] Crawford Decl. ¶ 51.

MOTION FOR TRO AND PRELIMINARY INJUNCTION - 13
(2:24-cv-2103)

information are speech within the meaning of the First Amendment."). These reasons and records will necessarily reflect the views embodied in the City-mandated deactivation policy. Importantly, in some cases, disclosing them will require Uber to set aside its own beliefs and communicate the City's instead.

Consider, for example, a courier whose account has been deactivated because a consumer has made a credible report to Uber that the courier sexually assaulted her at her home upon making a delivery. The Ordinance's disclosure requirements will force Uber, notwithstanding its safety and privacy commitments, to turn over to the courier "[a]ny and all records relied upon to support the deactivation," Ordinance § 8.40.070(A)(3), including the consumer's report and the "date, time, and location" of the alleged assault, *id.* § 8.40.080(A). Such information leads the alleged perpetrator straight back to his accuser.[38] Questions about how victim privacy should be handled in such situations are hotly debated. Uber believes in keeping such sensitive information protected, but the City is forcing Uber to communicate that it attaches less importance to privacy.[39]

Or suppose Uber deactivates a courier's account for engaging in fraudulent activity. The records Uber is forced to turn over to that ex-courier may well reveal Uber's closely guarded techniques for detecting fraud, providing future fraudsters with a roadmap to avoid getting caught.[40] Needless to say, these are sensitive disclosures that Uber would much "rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). But the Ordinance deprives Uber of that choice.

In these ways and more, the Ordinance mandates that Uber keep its own views on important issues to itself and instead adopt a policy that "explicitly agree[s]" with the City's. *Agency for*

---

[38] The Ordinance allows Uber to "take measures to anonymize" certain information that it "reasonably believes … could compromise [a] customer or third party's safety," and to provide only a "summary description" when "a complaint from a customer or third party is the sole basis for deactivation." Ordinance § 8.40.080(D). But it is far from clear from the Ordinance how—or even whether—companies may "anonymize" or "summar[ize]" incident date, time, and location information. Nor has OLS finalized any rules clarifying what "measures" companies may take.

[39] *See* Crawford Decl. ¶ 41; Nilles Decl. 22-24.

[40] *Id.* ¶ 56.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Int'l Dev.*, 570 U.S. at 213.   Because the Ordinance thus "target[s]"—indeed, dictates—the "communicative content" of Uber's speech, it is "presumptively unconstitutional" and subject to strict scrutiny.  *NIFLA*, 585 U.S. at 766 (cleaned up).[41]

### 2.    The Ordinance Cannot Survive Strict or Even Intermediate Scrutiny

Strict scrutiny is a "stringent standard."  *NIFLA*, 585 U.S. at 766.  To survive it, the law at issue must be "narrowly tailored to serve compelling state interests."  *Id.* (cleaned up).  In other words, it "must be the least restrictive means" of achieving such an interest.  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  "[I]t is the rare case" in which a government can make that showing. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (cleaned up).  The Ordinance is no exception to that general rule.

The Ordinance states that it seeks to protect app-based workers in order to "protect[] and promote[] public health, safety, and welfare."  Ordinance, § 1(C).  Protecting health, safety, and welfare is surely a legitimate goal, and the City is free to pursue it in any number of ways.  But even on the dubious assumption that it is a *compelling* interest—that is, an interest "of the highest order," justifying direct regulation of speech, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010)—the Ordinance is anything but the least restrictive means of achieving it.  To the contrary, the City "could have easily employed less restrictive means to accomplish its protective goals." *NetChoice*, 113 F.4th at 1121.

---

[41]  The  Ordinance  thus  regulates  non-commercial  speech,  not  commercial  speech  subject  to intermediate scrutiny.  "Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction."  *X Corp.*, 116 F.4th at 900 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).  The Ordinance does more than that: it "require[s] [Uber] to recast" its existing deactivation guidance "in language prescribed by the [City], implicitly opining on whether and how" various safety, reliability, and other concerns should be addressed. *Id.* at 901.  Because that is so, there is no need to reach the *Bolger* factors that courts look to in classifying commercial speech in close cases.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64-67 (1983); *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020).  But in any event, none of those factors suggests that the Ordinance regulates commercial speech: the policies are not "advertisement[s]" and do not "refer to a particular product," *IMDb.com*, 962 F.3d at 1122, and Uber has "no economic motivation" to make the required statements because "they compel [Uber] to state a message [it] wish[es] to avoid," *Masonry Bldg. Owners of Oregon v. Wheeler*, 394 F. Supp. 3d 1279, 1298 (D. Or. 2019).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Most obviously, rather than conscript companies like Uber to serve as its mouthpieces, the City could have directly banned deactivations on the grounds it finds unwarranted. Such a measure, to be clear, would be deeply misguided public policy.[42] And it is understandable that City Councilors did not want to micromanage platforms' deactivation decisions, and thus take direct responsibility for the slow delivery times, increase in fraud, potential deterioration in public safety, and other harms that might result from their preferred deactivation standards. *Cf. Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy."). But the First Amendment still prohibits a government from forcing private speakers to convey its preferred message and bear that burden themselves, when direct regulation of conduct would be "at least as effective in achieving" the City's ends. *Reno v. ACLU*, 521 U.S. 844, 874 (1997). The City might have, for instance, adopted an ordinance banning deactivations based on aggregate ratings or background checks. Whatever other flaws such an ordinance would have, it would regulate the *conduct* of deactivating courier accounts on those grounds, rather than compel Uber to *speak* and pretend that *it* does not value public safety or the reliability of its platform enough to deactivate courier accounts based on certain background check reasons or consumer ratings.[43]

Because the City could have achieved its objectives "without burdening a speaker with unwanted speech," *Riley*, 487 U.S. at 800, the Ordinance is not narrowly tailored and thus cannot survive strict scrutiny. But even if the Court were to conclude that the Ordinance regulates "commercial speech" and is therefore subject to intermediate scrutiny, *but see supra* n.41, the Ordinance would nonetheless violate the First Amendment. Under that standard, a law is

---

[42] Depending on the contours, it might still violate other constitutional rights. For instance, making it unlawful to deactivate a courier's account "unreasonably," coupled with a non-exhaustive, counterintuitive list of examples of unreasonable deactivations, would still be unconstitutionally vague. *Cf. infra* Part I.A.C.

[43] The City might have pursued other alternatives, too. For instance, it could have "incentiviz[ed]," rather than mandated, companies to adopt its preferred deactivation policies. *NetChoice*, 113 F.4th at 1121.

MOTION FOR TRO AND PRELIMINARY INJUNCTION - 16
(2:24-cv-2103)

unconstitutional unless it "directly advance[s] a substantial governmental interest, and the means chosen" are "not … more extensive than necessary" to do so. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023) (cleaned up). Because the City Council could have proscribed directly the grounds for deactivation that it disfavors—and stood accountable to voters for imposing standards that will likely prove harmful—the Ordinance "burden[s] substantially more speech than necessary to further" the City's interests. *Turner Broad. Sys., Inc.*, 520 U.S. at 189.

### B.    The Ordinance Restricts Uber's Expressive Association Rights in Violation of the First Amendment

For closely related reasons, the Ordinance also violates Uber's right under the First Amendment to engage in "expressive association"—that is, to "associate" with others "for the purpose of speaking." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006). The Ordinance requires Uber to promulgate a deactivation policy inconsistent with its own commitments and beliefs. *See supra* Part I.A.1. Because the Ordinance also bars Uber from deactivating courier accounts except in cases of violations of that policy, *see* Ordinance §§ 8.40.020, 8.40.050(A)(4), 8.40.060(A), it forces Uber—a leading voice on the sensitive matters upon which deactivations are often based—to associate with those whose conduct has undermined its beliefs.

"The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). In conducting that inquiry, courts "must … give deference to an association's view of what would impair its expression." *Id.* at 653.

Under these standards, the Ordinance restricts Uber's ability to express itself. It forces Uber to keep on its platform—indefinitely—couriers who it would otherwise disassociate from for safety, reliability, reputational, or other reasons. The Ordinance undermines Uber's expression even when it *allows* Uber to deactivate a courier's account. Except in cases of "egregious

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

misconduct," the Ordinance requires Uber to allow couriers to remain active on the platform for 14 days even where the City agrees Uber may justifiably have their accounts deactivated.  *See* Ordinance §§ 8.40.070(A), (C); Crawford Decl. ¶ 52.  This forced association is aggravated by Seattle's pre-existing mandate that Uber allow couriers "to be logged into the network company's worker platform at any date, time of day, or for any amount of time" and to decide "which offers to accept or reject."  Mun. Code, § 8.37.080.  Thus, couriers who are most likely to operate at odds with Uber's policies have 14 days to spend as much time on the platform as they like and accept as many orders as they like.

Such forced associations irreparably risk turning Uber's sincere commitments into empty words.  Uber's mission statement, for example, declares that "[f]rom drivers with background checks to real-time verification, safety is a top priority every single day."[44]  But Uber's commitment to safety will be seriously undermined by the City if Uber is compelled to allow couriers who receive consistently low consumer ratings or fail its background check procedures to continue using its platform.  *See* Ordinance §§ 8.40.050(A)(2)(e), (h).  Nor can Uber proclaim that it "believe[s] in a world where movement should be accessible"[45] when the City mandates that couriers who systematically reject orders from certain neighborhoods be allowed to continue making deliveries in areas they deem more desirable.  *See* Ordinance § 8.40.050(A)(2)(c).  This burden on Uber's associational rights is unconstitutional.[46]

---

[44] *Values*, *supra*.

[45] *Id.*

[46] Any suggestion that Uber lacks this protection because it is a business would be mistaken.  The "First Amendment's protection of expressive association is not reserved for advocacy groups." *Boy Scouts of Am.*, 530 U.S., at 648.  It is implicated so long as a "group engages in 'expressive association,'" meaning "some form of expression, whether it be public or private."  *Id.*  Uber's long record of public commitments and position statements regarding safety, privacy, and more qualifies it for protection under this standard.  *See* Nilles Decl. ¶¶ 5-17.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

**C.    The Ordinance is Unconstitutionally Vague in Violation of the Due Process Clause**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall make or enforce any law which shall … deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Among other protections, that basic guarantee requires governments to provide regulated entities with "fair notice of what conduct is prohibited." *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008). And where, as here, potentially vague provisions "threaten[] to inhibit the exercise of constitutionally protected rights" such as "the right of free speech or of association," an even "more stringent" inquiry is appropriate, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982), "to ensure that ambiguity does not chill protected speech," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).

The Ordinance does not come close to providing the fair notice the Due Process Clause requires.  On pain of significant penalties, *see* Ordinance §§ 8.40.170, it requires Uber to promulgate a "[r]easonable policy" regarding deactivation.  *Id.* § 8.40.050(A)(2).  But no "commonly accepted meaning exists for the term 'reasonable.'"  *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 558 (6th Cir. 1999); *see id.* at 556-559 (ordinance's use of the word "reasonable" unconstitutionally vague).  And the Ordinance's requirement that policies allow only deactivations "reasonably related" to Uber's "safe and efficient operations" does not solve the problem.  Ordinance § 8.40.050(A)(2).  All it does is limit the subject matter, clarifying that a policy must say "reasonable" things about safety and efficiency (as opposed to anything else). Without a more precise definition of "reasonably related," it provides no meaningful guidance at all.

Yet the Ordinance provides no clarifying definition.  Instead, it offers up only a non-exhaustive list of example policies that the City considers *not* "reasonably related" to safety or efficiency.  But rather than clear up the confusion, that list only adds to it.  While some of the examples are perhaps understandable—for instance, deactivations based on "an app-based worker

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

contacting the network company" or "asserting their legal rights," *id.* § 8.40.050(A)(2)(d), (g), would seem to have little to do with "safe and efficient operations"—others are confounding. One would think that policies triggering deactivation based on "a quantitative metric derived from aggregate customer ratings of an app-based worker's performance," or based on "the results of a background check, consumer report, driver record, or record of traffic infractions" would easily qualify as "reasonably related" to "safe and efficient operations." *Id.* §§ 8.40.050(A)(2)(e), (h). Indeed, background checks are commonly used throughout the industry,[47] and the City itself requests background checks for workers on some city contracts.[48] Yet the Ordinance declares that these grounds are generally not "reasonably related" to safety or efficiency. *Id.* §§ 8.40.050(A)(2)(e), (h).

This counterintuitive list of examples exacerbates the Ordinance's vagueness problem. The Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015), is illustrative. That case, like this one, involved a statute with an already ambiguous catch-all clause followed by a "confusing list of examples." *Id.* at 603. "[C]ombining indeterminacy" in that way, the Court held, "produce[d] more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at 598. The Court's colorful hypothetical showed why: "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red' assuredly does so." *Id.* at 603 (cleaned up, emphasis in original).

That lesson applies with full force here. Like the statute at issue in *Johnson*, the Ordinance employs an inherently vague phrase—"reasonably related" to "safe and efficient operations"— and compounds the confusion with a list of examples most people would think *are* at least reasonably related to safe and efficient operations. By declaring exactly the opposite, the

---

[47] *See, e.g.*, *DashForce Service Provider Platform Access Policy*, DoorDash, https://help.doordash.com/dashers/s/article/DashForce-Deactivation-Policy?language=en_US (last visited Dec. 18, 2024); *Account Violations and Deactivation*, GrubHub, https://driver.grubhub.com/account-violations-and-deactivation/ (last visited Dec. 18, 2024).

[48] *Background Checks and Immigration Status*, Seattle, https://www.seattle.gov/purchasing-and-contracting/social-equity/background-checks#backgroundchecks (last visited Dec. 18, 2024).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Ordinance "combine[s] indeterminacy," *id.* at 598, further muddying the meaning of an already unclear phrase. Background checks and ratings, one might say, are "navy blue" in the Ordinance's list of "shades of red."

In the end, the Ordinance charges Uber with announcing a deactivation policy "specific enough" for couriers to avoid violating, Ordinance § 8.40.050(A)(1), but gives Uber next to no guidance about what specifics that policy may and may not lawfully contain. Because performance of that task "at best could be only guesswork," the Ordinance both "denies fair notice" to Uber and "invites arbitrary enforcement." *Johnson*, 576 U.S. at 597, 602 (cleaned up). The result will be chilled expression and deactivation policies that are both underinclusive and unresponsive to changes in on-the-ground conditions. In the face of such a vague statutory directive, better to leave a potential deactivation trigger out of the policy—even if it concerns a safety or privacy issue about which Uber cares deeply—lest the City disapprove. And should Uber guess right and land on a deactivation policy the City *does* approve, it would be unwise to adapt in response to new circumstances, since any policy change is a new roll of the dice. The Due Process Clause does not allow the City to place Uber in that untenable position.

### D.    The Ordinance as a Whole is Invalid

The challenged provisions are not severable from the remainder of the Ordinance, which should be enjoined in its entirety. "Severability of a local ordinance is a question of state law." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988). While the Ordinance has a severability clause, *see* Ordinance § 8.40.250, Washington courts nonetheless reject assertions of severability where the invalid provisions are "intertwined with the remainder of the [law]" and "fundamental to [its] efficacy." *E.g.*, *League of Women Voters of Washington v. State*, 184 Wash. 2d 393, 411-412 (Wash. 2015), *as amended on denial of reconsideration* (Nov. 19, 2015); *Leonard v. City of Spokane*, 127 Wash. 2d 194, 201-02 (Wash. 1995) (no severability, despite severability clause, because invalid provision was statute's "heart and soul" and statute would be "virtually worthless" without it).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Here, the requirement that Uber adopt a deactivation policy with the City's preferred content—in violation of the First and Fourteenth Amendments—is the foundation upon which the rest of the Ordinance is built. Numerous other provisions, such as the procedures for challenging deactivation determinations and the requirement to provide notice of deactivations, presume that a deactivation policy is in place pursuant to that unconstitutional provision. *See* Ordinance §§ 8.40.060, 8.40.070. These provisions would make no sense and cannot operate if the requirement to adopt a deactivation policy in the first place is invalidated, so the entire Ordinance must fall.

## II.    Uber Will Suffer Irreparable Harm Absent Preliminary Relief

If the Ordinance takes effect on January 1 as scheduled, Uber will immediately suffer a variety of irreparable harms. Chief among them is the loss of its constitutional rights. When a plaintiff alleges a "constitutional violation and injury," and "shows he is likely to prevail on the merits" of his constitutional claims, "that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). That principle applies with special force where, as here, a plaintiff's First Amendment rights are at stake. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Because Uber is likely to succeed on the merits of its claims, the Ordinance taking effect as scheduled will cause an immediate deprivation of Uber's constitutional rights. That constitutes *per se* irreparable harm.

Uber will also suffer a variety of additional injuries to its business and reputation should the Ordinance take effect as scheduled.

*First*, as Uber has explained, it will be forced to announce a deactivation policy that conforms to the City's views on when courier accounts should be deactivated. When it does, it will appear to the public that *Uber* has lowered its quality, safety, and privacy standards, reneging on its public commitments and irreparably harming Uber's reputation.[49]

---

[49] Nilles Decl. ¶ 24; Crawford Decl. ¶ 54.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Second*, the moment the Ordinance takes effect, Uber will be at imminent risk of being compelled to give access to the platform—potentially indefinitely—to couriers whose accounts it would otherwise deactivate under its existing policies.[50]  As just one example, any couriers whose average consumer ratings may fall below the thresholds that would otherwise trigger account deactivation will nonetheless be able to remain on the platform unless and until Uber has other, City-approved grounds for deactivating their accounts.  Because these are the lowest-performing couriers on Uber's platform, that forced association risks undermining Uber's reputation for high-quality deliveries.  And, because low ratings can reflect consumers' concerns about safety, keeping them on the platform also undercuts Uber's repeated and publicly affirmed commitments to making its platform safe for all.[51]

*Third*, in some cases, the Ordinance's requirement that Uber provide couriers whose accounts are deactivated with evidence substantiating its deactivation decisions puts Uber to an impossible choice between irreparable harms.[52]  When Uber determines that a courier has committed fraud, for example, Uber must choose whether to either deactivate the courier's account—and turn over information revealing its proprietary techniques for detecting fraud, thereby providing a roadmap for future fraudsters to evade detection—or maintain his access to the platform despite the fraud (which the Ordinance itself rightfully recognizes as "egregious misconduct," *see* Ordinance § 8.40.020).  To do the former would compromise Uber's fraud detection methods by giving fraudsters a playbook, but to do the latter would allow the potential fraud to continue on the platform.[53]

---

[50] Crawford Decl. ¶¶ 45-54.

[51] Crawford Decl. ¶¶ 23, 25.

[52] *Id.* ¶¶55-56.

[53] *Id.*¶ 56.

MOTION FOR TRO AND PRELIMINARY INJUNCTION - 23
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

III.    **The Balance of Equities and Public Interest Favor Preliminary Relief**

Where the defendant is a government actor, the balance of equities and public interest factors merge.  *See Drakes Bay Oyster Co.*, 747 F.3d at 1092.  That inquiry strongly favors preliminary relief.

*First,* "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Baird*, 81 F.4th at 1040 (cleaned up).  Uber's likelihood of success "tips the public interest sharply" in favor of relief.  *Id.*

*Second*, in important respects, the Ordinance disables Uber from acting on strongly-held views about how best to promote safety—undoubtedly a public interest.

*Third*, the City will not be harmed by a modest delay of the Ordinance's effectiveness pending resolution of Uber's serious constitutional claims.  That is plain from the Ordinance itself.  The City enacted the Ordinance in August 2023, but scheduled it to take effect only in January 2025.  Even once it takes effect, the Ordinance prohibits OLS from enforcing certain provisions— including the ban on deactivations inconsistent with network companies' deactivation policies— for nearly two-and-a-half years more.  *See* Ordinance § 8.40.130(B).  Those built-in delays hardly suggest an urgent need for the Ordinance to take effect.  Nor does the City's dilatoriness in issuing rules to implement the Ordinance.   Only in September 2024—thirteen months after the Ordinance's enactment—did OLS *begin* the rulemaking process.[54]  Throughout, Uber has repeatedly engaged with OLS, suggesting reasonable modifications to proposed model rules and suggesting a reasonable grace period for compliance, given OLS's lengthy delay and the impending effective date.[55]  Yet OLS has *still* not issued final rules.[56]  Simply put, the City has shown an utter lack of urgency from the start.  The equities and public interest strongly favor preserving Uber's constitutional rights over any interest the City has in enforcing an Ordinance that has not yet gone into effect.

---

[54] Ford Decl. ¶ 11.

[55] *Id.* ¶¶ 10-20.

[56] *Id.* ¶ 20.

MOTION FOR TRO AND PRELIMINARY INJUNCTION - 24
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

## **CONCLUSION**

2      For the foregoing reasons, Plaintiffs' Motion for Temporary Restraining Order and

3  Preliminary Injunction should be granted.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    DATED this 18th day of December, 2024.

2

3                                  *Attorneys for Plaintiffs Uber Technologies, Inc.*
                                   *and Portier, LLC*
4
                                   Davis Wright Tremaine LLP
5
                                   By */s/ Robert J. Maguire*
6                                       Robert J. Maguire, WSBA #29909
                                        Theo A. Lesczynski, WSBA #59780
7                                       920 Fifth Avenue, Suite 3300
                                        Seattle, WA  98104-1610
8                                       Telephone: 206-757-8064
                                        Fax: 206-757-7064
9                                       E-mail: robmaguire@dwt.com
                                                theolesczynski@dwt.com
10

11                                 Covington & Burling LLP

12                                 By */s/ Stacey Grigsby*
                                        Stacey Grigsby (*phv forthcoming*)
13                                      David Zionts (*phv forthcoming*)
                                        Neha Jaganathan (*phv forthcoming*)
14                                      Alexander Cave (*phv forthcoming*)
                                        One CityCenter 850 Tenth Street, NW
15                                      Washington, DC 20001
                                        E-mail: SGrigsby@cov.com
16                                              DZionts@cov.com
                                                NJaganathan@cov.com
17                                              ACave@cov.com

18                                      Neema Sahni (*phv forthcoming*)
                                        1999 Avenue Of The Stars, Ste 3500
19                                      Los Angeles, CA 90067
                                        E-mail: NSahni@cov.com
20

21                                 I certify that this memorandum contains
22                                 8,352 words, in compliance with the Local
                                   Civil Rules.
23

24          In compliance with LCR 65(b), Defendant's counsel is Jessica L. Goldman, Summit Law

25   Group, 315 5th Ave. S, Suite 1000, Seattle, WA 981014, (206) 676.7000,

26   jessicag@summitlaw.com

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

### CERTIFICATE OF SERVICE

2          On December 18, 2024, I served a copy of the foregoing document on the following in

3  the manner indicated:

4  SCHEEREEN DEDMAN                    ☐ Messenger
   Seattle City Clerk
5  600 4th Ave, 3rd Floor,             ☐ U.S. Mail, postage prepaid
   Seattle, WA 98104                   ☐ Federal Express
6  Cityclerkfiling@seattle.gov         ☐ Fax
7  MOS_Legalservice@seattle.gov        ☒ ECF and/or EMAIL

8

9          DATED this 18th day of December, 2024.

10                                      By: _s/ Robert J. Maguire_____
                                            Robert J. Maguire, WSBA #29909
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

MOTION FOR TRO AND PRELIMINARY INJUNCTION - 27
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax