UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UBER TECHNOLOGIES, INC. and PORTIER, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF SEATTLE,<br><br>    Defendant. | No. 2:24-cv-2103<br><br>**DECLARATION OF DANIEL CRAWFORD IN SUPPORT OF UBER'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Daniel Crawford, declare as follows:

1.  My name is Daniel Crawford. I am over the age of 18, have personal knowledge of the facts stated in this declaration, and can competently testify to their truth.

2.  I am currently Senior Program Manager for Global Account Actioning at Uber Technologies, Inc. ("Uber"). I have worked at Uber since September 2016 and have been in my current position since November 2023. My responsibilities include developing and maintaining Uber's processes for a variety of functions, including those related to the deactivation of courier accounts.

3.  I make this declaration in support of Uber's Motion for a Temporary Restraining Order and Preliminary Injunction, which seeks to temporarily restrain and preliminarily enjoin Defendants from enforcing the App-Based Worker Deactivation Rights Ordinance enacted by the City of Seattle in August 2023 and set to take effect on January 1, 2025 (the "Ordinance").[1]

4.  As part of my work for Uber, I am familiar with the Ordinance and the accompanying proposed rules regarding implementation and compliance issued by the Office of Labor Standards, as well as the steps Uber would have to take to comply with the Ordinance by the current implementation date of January 1, 2025.

---

[1] Seattle, Wa., Ordinance 126878 (Aug. 14, 2023).

## I.    Uber Only Deactivates Courier Accounts When Necessary

5.    Uber is a technology company that operates a platform that connects consumers seeking ride and delivery services to drivers and couriers seeking to provide such services.

6.    Uber manages a complex delivery platform for courier services that allows millions of consumers across the globe to safely and efficiently receive restaurant orders, groceries, and other goods for delivery on demand. And Uber provides millions of couriers with the opportunity to earn income by providing its networking services. In any given city, thousands of couriers work at a given time. Those couriers travel to homes and businesses at any hour of the day and engage in direct, face-to-face interactions with consumers.

7.    Uber takes its responsibility to maintain the safety and quality of services performed on its platform seriously.

8.    As part of this, and like other companies that facilitate courier services, Uber maintains policies and positions regarding the circumstances under which a courier should lose access to the Uber platform and the procedure by which Uber makes those determinations.[2]

9.    At the same time, Uber's business is built on facilitating consumers' and couriers' connections on the platform. Consumers on Uber's platform value efficient delivery times, and thus, Uber's business model relies on having couriers on the platform with active accounts. Therefore, Uber takes the decision to deactivate courier accounts seriously and considers deactivation to be a last resort.[3]

---

[2] *Deactivations*, Uber, https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 18, 2024) (Uber's publicly posted deactivation policy); *Uber Community Guidelines*, Uber (Nov. 19, 2024) https://www.uber.com/legal/en/document/?country=united-states&lang=en&name=general-community-guidelines&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb; *see also Losing account access and your right to appeal*, Grubhub, https://driver.grubhub.com/account-violations-and-deactivation/ (last visited Dec. 18, 2024) (Grubhub's deactivation policy); *DashForce Service Provider Platform Access Policy*, DoorDash, https://help.doordash.com/dashers/s/article/DashForce-Deactivation-Policy?language=en_US (last visited Dec. 18, 2024) (DoorDash deactivation policy).

[3] *Deactivations*, *supra* ("We're strongly motivated to keep access to the Uber platform open and to help drivers and delivery people get online when they want to work."); Dara Khosrowshahi, *Becoming the fairest platform for flexible work,* Uber (Nov. 13, 2023) https://www.uber.com/blog/deactivations-principles/ (statement from Uber's CEO about Uber's approach to deactivations, explaining that "Blocking someone from accessing their Uber account is one of the most serious decisions we make as a company").

Uber also recognizes that because its platform is an essential source of income for many couriers, losing access to the platform is "one of the most distressing moments" that a courier can face.[4] Uber thus does not deactivate courier accounts because it wants to, but only when the interests of promoting safety, ensuring quality, and eliminating fraudulent activity call for such action. Uber continuously reviews and seeks to improve its deactivation policies and processes for accuracy, fairness, and in response to couriers' feedback, while also upholding its safety and privacy standards on the platform.

10. While complaints and issues with courier services are rare in comparison to the scale of Uber's operations, consumers do report complaints and issues, ranging in severity from relatively minor (for example, rudeness) to quite severe (for example, fraud or assault).

11. Uber's current deactivation policies and positions are consistent with its commitments to safety, privacy, quality, and fraud prevention.

## II. Uber Temporarily Restricts Access or Deactivates Courier Accounts When the Courier Poses a Safety or Quality Risk

12. Uber publicly posts its reasons for temporarily restricting or deactivating courier accounts.[5]

13. With respect to a courier's access to the platform, Uber distinguishes between (i) failing to onboard to the platform, (ii) a temporary restriction of access to the platform, and (iii) a deactivation from the platform.

14. A courier may fail to onboard, or may temporarily lose access, for a variety of reasons, including failing to offer the required login information or failing to meet minimum eligibility requirements, such as downloading the latest version of Uber's application or uploading proof of a valid driver's license. A courier who temporarily loses access can typically regain access by providing the correct information or resolving the deficiency—*e.g.*, if the problem is an outdated version of the application, by downloading the latest version of the application; if the problem is expired documentation, by uploading valid proof of a license. A courier's failure to onboard or loss of access due to their failure

---

[4] *Id.*

[5] *Deactivations*, *supra* (listing and explaining reasons).

DECLARATION OF DANIEL CRAWFORD   3
No. 2:24-cv-2103

1  to meet minimum eligibility requirements is distinct from a deactivation, in which Uber takes away a courier's account access.

15. Uber may also temporarily restrict a courier's access while it conducts a review or investigation, including to confirm a courier's identity, review a courier's eligibility documentation, or investigate a report of courier misconduct. All of these temporary restrictions, too, are distinct from a deactivation, in which Uber takes away a courier's account access.

16. Two of the most common reasons for deactivation are failed background checks and problems with the documentation Uber requires couriers to submit. Uber also deactivates courier accounts for consistently below-minimum aggregate consumer ratings, among other reasons.

### A. Background Checks

17. Uber believes that background check requirements for couriers are a central component of its safety program.[6] To that end, couriers must undergo a background check before their first delivery, and they continue to undergo checks on at least an annual basis.[7]

18. Uber uses a third party to conduct background checks of each courier on its platform as part of its commitment to safety. Reasons for a failed background check may include serious criminal convictions; serious pending criminal charges; multiple moving violations, non-moving violations, or accidents within the last three years; and any serious driving violation, such as driving while intoxicated.[8] In the case of a failed background check, couriers have at least 7 days to address any inaccuracies with the third party that conducted the background check, as mandated by the federal Fair Credit Reporting Act.

19. Couriers whose background checks show serious criminal convictions, such as robbery or kidnapping, are prohibited from making deliveries in order to protect consumers and the public from potentially dangerous situations in their homes and places of work.

---

[6] *Id.* (listing and explaining "Background checks" as a reason for deactivation).

[7] *Safety*, Uber, https://www.uber.com/us/en/safety/ (last visited Dec. 18, 2024) ("All drivers are background checked before their first trip," and "Uber rescreens drivers at least every year").

[8] *Deactivations, supra*.

20. Uber also deactivates accounts of couriers whose background checks show driving record issues, including multiple collisions and/or presenting fraudulent vehicle registration or insurance documents. Uber deactivates accounts of these couriers because it has determined that these issues are a safety signal and indicators of an unsafe driver.

### B. Inadequate Documentation

21. Uber temporarily restricts access for couriers who do not submit proper documentation.[9] Uber requires couriers to upload current versions of certain documents, including driver's license, vehicle registration and insurance, and profile photo.[10] Uber temporarily restricts access for couriers who do not satisfy these documentation requirements, in part because allowing such couriers to remain on Uber's platform risks the safety of consumers and the public, and compromises consumers' ability to receive deliveries from couriers who have confirmed their driving privileges.

22. Uber periodically requires couriers to upload photos of themselves for identity verification.[11] One common issue that can lead to a temporary restriction of access arises when a courier uploads a photo that does not match the photo of the individual displayed on their account profile. In such cases, Uber cannot verify the identity of the person actually completing deliveries (and therefore also cannot verify that the person completing deliveries satisfies Uber's background check requirements).

### C. Couriers With Below-Minimum Aggregate Ratings

23. Uber strives to ensure that consumers receive a high-quality, safe experience each time they place an order using the Uber platform. To that end, consumers are able to provide a satisfied (or "thumbs up") rating or a dissatisfied (or "thumbs down") rating for a delivery. Uber aggregates these

---

[9] *Id.* (listing and explaining "Expired documents" and other document-related issues as reasons for deactivation).

[10] *Required Documents for Drivers*, Uber, https://www.uber.com/us/en/drive/requirements/documents/?_csid=6X8cUVEeNECfZZjEbnO_Jw&city=washington-dc&state=a3bjsh1IrShgER6foAQoBDMzwCDOLBIvVTvn-0bj9BM%3D&uclick_id=df07b699-20e8-4f2b-9883-6c5d02602864#  (last visited Dec. 18, 2024).

[11] *Identity Verification Checks*, Uber, https://help.uber.com/en/driving-and-delivering/article/identity-verification-checks?nodeId=75fb55dc-da08-41bb-b1cb-3229f2839956 (last visited Dec. 18, 2024).

ratings for each courier and compares the aggregate rating to the minimum aggregate rating requirement for the courier's delivery location.

24. Uber contacts couriers to provide resources when their aggregate rating approaches the minimum for their delivery location. The following image depicts the substance of the notice Uber sends to couriers who approach the minimum threshold:



25. Uber deactivates accounts of couriers whose aggregate ratings are consistently below the minimum aggregate rating requirement in their delivery location, even after such a warning.[12] In Uber's experience, below-minimum aggregate ratings are often correlated with safety, fraud, misconduct, and other quality issues. For example, consumers generally give couriers "thumbs down" ratings when the courier was rude, was late to pick up an order and/or complete a delivery, or did not deliver the correct items. Uber has also found that, in other cases, couriers may receive "thumbs down" ratings for making remarks or engaging in conduct that made the consumer feel unsafe. Consumers may not have the time to complete a full report following an uncomfortable incident, and providing a "thumbs down" rating is the easiest way for the consumer to communicate to Uber that there was an issue with the courier's delivery services.

26. Deactivations for below-minimum aggregate ratings consider the number of consumer ratings and the recency of each consumer rating. Uber never deactivates a courier's account based on a single "thumbs down" consumer rating.

### D. Other Reasons for Courier Account Deactivation

27. Uber also deactivates accounts of couriers for other safety- and quality-related reasons. These reasons include unsafe driving, or exhibiting aggressive, confrontational, or harassing behavior.[13]

28. Uber deactivates accounts of couriers who discriminate or make offensive remarks based on a consumer's protected characteristic, including race, color, disability, gender identity, sex, and sexual orientation.[14] Uber "believe[s] in a world where movement should be accessible" to all.[15] The company's Community Guidelines prohibit discrimination and "[Uber does not] tolerate racist or discriminatory

---

[12] *Deactivations*, *supra* (listing and explaining "Ratings" as a reason for deactivation).

[13] *Id.*

[14] *Id.*; *see also Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Dec. 18, 2024) (setting out guidelines against discriminatory and offensive behavior).

[15] *Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Dec. 18, 2024).

conduct and behavior."[16]  Uber, therefore, may also deactivate accounts of couriers when it has information from which it can infer that the courier has violated these prohibitions against discrimination.

29. Additionally, in the interests of the safety, efficiency, and trustworthiness of its platform, Uber's grounds for account deactivation include submitting "[a]ltered or false documents" and "assuming someone else's identity," among a host of other fraudulent activities.[17]  Fraud that can lead to deactivation includes both account-level conduct (for example, submitting fraudulent documents or creating fake or duplicate accounts), and trip-level conduct (for example, claiming unwarranted fees or charges or falsely claiming to complete a delivery).[18]

### III. Uber's Process for Investigating and Reviewing Deactivations Is Tailored to the Circumstances

30. It is important to Uber that couriers "have a clear explanation when they lose access, and feel they have a voice if their account is deactivated."[19]  Uber recognizes a "responsibility to ensure [its] processes are fair, accurate, and transparent," and that couriers and the public "trust we are doing the right thing."[20]  For this reason, Uber provides on its website public guidance to couriers regarding its deactivation practices, including advice about how couriers may resolve issues and avoid losing access to Uber's platform.

31. Uber generally conducts an investigation in connection with most deactivations.[21]  One exception is when Uber deactivates a courier account for below-minimum aggregate ratings after the courier has already received prior warning of a low rating and prior warning that deactivation may occur in the event of additional low ratings.

---

[16] *Uber Community Guidelines, supra*.

[17] *Deactivations*, *supra*.

[18] *Id.* (listing and explaining "Fraudulent activities" as a reason for deactivation).

[19] Khosrowshahi, *supra*.

[20] *Id.*

[21] *Deactivations*, *supra* (explaining "Human involvement" in deactivation decisions).

32. The length of an investigation varies depending on the type of incident and its severity. Uber strives to complete investigations as quickly as possible, while also ensuring that they are as thorough and complete as possible.

33. When investigating an incident that could lead to deactivation, Uber generally aims to collect and assess relevant information from consumers in order to determine if deactivation is appropriate. Uber generally considers evidence in the courier's favor.[22] For instance, in considering a report of assault, Uber will consider whether the courier's location data supports or refutes the allegations.

34. Uber has also adopted best practices for investigating sexual abuse and sexual assault reports, including integrating trauma-informed and survivor-centered approaches that allow the company to conduct a thorough investigation while minimizing any further trauma to survivors of such abuse or assault.

35. While a single serious report may lead to deactivation of an account, it is worth noting that the majority of reported incidents are less severe behaviors that may not warrant immediate loss of access to the platform. Instead, such reports may warrant additional examination of the courier's history on the platform.

36. Uber generally may take into account the courier's history on the platform, including the length of time the courier has provided deliveries on the platform and the number of deliveries completed. For example, Uber believes that a minor complaint against a courier who has completed tens of thousands of deliveries over many years without incident should be considered within the broader context of that courier's history on the platform.

37. The timing of Uber's investigation of a deactivation, and its relationship to if and when the courier loses access to the platform, also varies depending on the nature of the report or issue. For example, in cases of serious safety incidents, Uber will temporarily restrict the courier's account access while the company conducts an investigation. This practice reflects Uber's determination that such couriers may pose an immediate risk to the public and customers (*i.e.*, consumers and merchants).

---

[22] *Id.* (explaining "Protection from false allegations" for couriers and opportunity for couriers to provide "information to support their case").

38. In other cases, such as low consumer ratings, Uber will inform the courier of the complaint and may provide tips to help the courier avoid similar complaints in the future, without deactivating or temporarily restricting the account.

39. Uber's practices and policies relating to the timing of any review—and whether it takes place before or after a courier loses access—reflect the company's assessment about how quickly a courier engaged in concerning behavior must be removed from its platform in order to meet Uber's safety and quality standards.

40. If a courier's account is deactivated, Uber makes every effort to be clear and consistent in its communications and transparent about the reasons behind the decision.[23]

41. Uber will not provide couriers with all of the details related to the deactivation of their account, however, when doing so poses a risk to consumers or others, or poses a significant fraud risk to Uber, its customers (*i.e.*, consumers and merchants), or the public. For example, where a courier's account is deactivated based on a report of sexual assault, Uber will not provide the courier with information that could identify the reporting consumer or reveal their location. In cases of fraud, Uber may limit the information it provides the courier because it does not want to provide couriers with information that might allow them to evade Uber's fraud-detection mechanisms in the future.

42. Couriers generally have the ability to seek review, via the "Review Center," of a deactivation decision that takes away their access for more than 7 days and that the courier cannot resolve on their own.[24]

43. During a review of a deactivation decision, couriers have the opportunity to provide additional information about the incident or issue, such as their comments or video recordings.[25]

---

[23] *Id.* ("If any loss of access occurs, Uber will make every effort to be clear, empathetic, and consistent in our communications and specific and transparent about the reasons behind our decision, except where doing so poses a risk to other users.").

[24] *Id.* ("Outside of the most serious cases, drivers and delivery people [*i.e.*, couriers] should have the ability to request a review of any decision that removes access for more than 7 days and can't be resolved by the driver or delivery person [*i.e.*, courier] on their own."); *see also* Khosrowshahi, *supra* (statement from Uber's CEO about initiatives in deactivation review).

[25] *Deactivations*, *supra* (explaining couriers' "Opportunity to provide additional information" during the review process).

## IV. Uber's Business Operations Will Be Significantly Prejudiced If the Ordinance Goes Into Effect On January 1

44. Uber's business operations will be significantly prejudiced if the Ordinance goes into effect on January 1, 2025.

45. **First**, the Ordinance would require Uber to keep on its platform couriers whose accounts it would otherwise deactivate for failing to satisfy the company's safety, efficiency, and quality standards. This includes, for example, couriers who have had three not-at-fault accidents in the past three years and the lowest-performing couriers with consistently below-minimum aggregate consumer ratings.

46. Although Section 8.40.050 of the Ordinance allows a network company to deactivate couriers' accounts when doing so is "reasonably related to [a] network company's safe and efficient operations," it also states that deactivation because of "a background check, consumer report, driver record, or record of traffic infractions" is not so reasonably related "except in cases of egregious misconduct or where required by other applicable law."[26] The definition of "egregious misconduct" in the Ordinance excludes traffic collisions unless the courier has "accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years."[27]

47. But in Uber's experience, couriers with, for example, four accidents (regardless of fault) in the prior three years pose a safety risk to Uber's consumers, the public, and others while carrying out their deliveries. In this regard, Uber recognizes that often, issues that come to its attention are an indication of a larger pattern of underperformance and/or misconduct that was previously undetected. For example, multiple accidents may suggest that the courier is consistently inattentive to traffic patterns and other potential safety considerations on the road.

48. The Ordinance would also force Uber to associate with couriers who are the worst performers, as it precludes "deactivation based solely on a quantitative metric derived from aggregate customer ratings."[28] Consistently low aggregate ratings, however, are generally correlated with

---

[26] Ordinance § 8.40.050(A)(2).

[27] *Id.* § 8.40.020.

[28] *Id.* § 8.40.050(A)(2)(e).

significant quality and efficiency issues (*e.g.*, not delivering the ordered food, or delivering the items late) or safety issues (*e.g.*, interpersonal conflict). For instance, Uber has observed that consumers and merchants will often provide a dissatisfied (or "thumbs down") rating, but relatively seldom will report complaints. The Ordinance thereby subjects merchants and consumers to a continued risk of low-quality service, with obvious reputational risk for Uber.

49. Courier ratings can also be evaluated on a statistical level relative to the courier's previous performance and that of other couriers. Based on Uber's experience and analyses of data and trends over time, couriers with consistently low aggregate ratings also are more likely to be correlated with other consumer reports or safety incidents on the platform.

50. For these reasons, absent the Ordinance, Uber would not permit couriers with consistently low aggregate ratings to make deliveries or interact with consumers at their homes and businesses.

51. The Ordinance also requires Uber to keep couriers on its platform who systematically refuse or cancel orders from consumers, as it precludes deactivation on the basis of a courier's "acceptance or rejection of any individual offer, any types of offers, or any number or proportion of offers . . . ."[29] Uber's Community Guidelines prohibit "discriminating on the basis of . . . an Uber Eats user's [*i.e.*, consumer's] delivery location," adding that "intentionally refusing or canceling requests . . . solely for the purpose of avoiding a particular neighborhood due to the characteristics of the people or businesses that are located in that area, is not allowed."[30] Uber deactivates courier accounts when it has information from which it can infer that the courier has violated these prohibitions against discrimination, and it needs to maintain flexibility to do so. The Ordinance prevents Uber from having that flexibility.

52. Even where Uber's reason for deactivation is deemed appropriate under the Ordinance, Uber will be forced under the regulation to permit couriers to make deliveries and interact with its customers (*i.e.,* consumers and merchants) for another two weeks by virtue of Section 8.40.070(A), which requires a company to provide 14 days' notice of a deactivation. This includes couriers who have below-minimum aggregate consumer ratings, and couriers with multiple collisions and traffic violations.

---

[29] *Id.* § 8.40.050(A)(2)(b).

[30] *Uber Community Guidelines*, *supra*.

53. Being forced to associate with couriers who are unsafe and otherwise poor performers will hamper Uber's ability to provide efficient and safe deliveries to consumers. A courier who knows he is facing account deactivation 14 days later will likely be less motivated to uphold Uber's safety and reliability standards during that period.

54. ***Second***, Uber will suffer reputational harm if it is forced to lower its standards and permit couriers on its platform who do not exemplify its safety and quality values. Both safety and quality are a core part of Uber's brand and reputation. Uber has repeatedly and publicly affirmed its commitment to public safety and the safety of all consumers, including in its mission statement, in the Community Guidelines that all users of the platform must abide by, and in publicly available safety reports.[31] Consumers and other members of the public expect that couriers, who drop off deliveries at their homes and businesses, will be courteous and safe. But if Uber is required to associate with couriers who it believes to be unsafe, it may lose the trust of consumers. Uber will likewise lose the trust of consumers if it cannot maintain the quality of courier services by deactivating accounts of the worst performers, who generally have issues such as not delivering items, delivering incorrect items, or acting unprofessionally in their interactions with consumers.

55. ***Third***, because the Ordinance is vague and unclear in many respects, Uber will have to choose between risking the safety of its consumers or being subject to enforcement for violating the Ordinance. For example, although the Ordinance permits deactivation when a courier has more than three "at-fault" collisions in the last three years,[32] Uber, like other companies in the industry, does not have a direct method for assessing fault in each collision. Uber learns of motor vehicle accidents through the State of Washington's Department of Motor Vehicles, which only reports whether a collision has occurred and does not assign fault. Thus, Uber does not have the information it needs to determine whether couriers meet even the low standard of safety and quality that the Ordinance deems a permissible basis for deactivation. Uber will therefore have to decide between permitting couriers who have more than three

---

[31] *Values*, *supra*; *Uber's Community Guidelines*, *supra*; *Uber's US Safety Report*, Uber, https://www.uber.com/us/en/about/reports/us-safety-report/ (last visited Dec. 18, 2024).
[32] Ordinance § 8.40.020.

collisions to remain on its platform because it cannot ascertain how many of those collisions were "at fault" or risking violation of the Ordinance in order to ensure the safety of consumers and the public.

56. **Fourth**, because the Ordinance requires Uber to provide couriers with evidence substantiating its deactivation decisions, Uber faces an impossible choice where providing such information would be harmful to the company's operations—and by extension, to consumers. For example, while Uber currently deactivates the accounts of couriers who commit fraud, it guards its fraud-detection processes closely. If Uber were to continue to deactivate the accounts of couriers on this basis, in order to satisfy the deactivation-notice requirements in Section 8.40.070 and 8.40.080 of the Ordinance, Uber would necessarily have to reveal its fraud-detection processes in some cases, thereby providing a roadmap for future fraudsters and, in turn, threatening the safety and integrity of the platform and its consumers by opening it up to more fraud. As a result, the Ordinance puts Uber to an untenable choice: it must either decide that it will no longer deactivate couriers' accounts on the basis of fraud, or maintain this as a basis for deactivation but risk revealing its fraud detection methodologies. Either way, Uber will be significantly and irreparably harmed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 18th day of December, 2024, at San Francisco, California.



Daniel Crawford