The Honorable Marsha J. Pechman

1

2

3

4

5

6             UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF WASHINGTON
7                      AT SEATTLE

8   UBER TECHNOLOGIES, INC. and PORTIER,
    LLC,
9                                              CASE NO. 2:24-cv-2103-MJP
                            Plaintiffs,
10                                             DEFENDANT'S OPPOSITION TO
                                               MOTION FOR TEMPORARY
11            v.                               RESTRAINING ORDER

12  CITY OF SEATTLE,                           **NOTED ON MOTION CALENDAR:**
                                               **December 18, 2024**
13                          Defendant.

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER
(CASE NO. 2:24-cv-2103-MJP)

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS ............................................................................................................... 2

      A.    Uber is a business selling goods and services............................................ 2

      B.    The Ordinance.......................................................................................... 2

            1.    The City Council's findings............................................................. 2

            2.    The Ordinance's requirements. ....................................................... 4

      C.    The City engaged in a robust legislative process....................................... 5

      D.    OLS rulemaking....................................................................................... 6

      E.    Uber's new policy.................................................................................... 6

      F.    Uber is substantially regulated................................................................ 7

      G.    Uber's last-minute lawsuit....................................................................... 7

III.  ARGUMENT ..................................................................................................... 8

      A.    Uber must satisfy a stringent standard. .................................................... 8

      B.    Uber's claims are not likely to succeed. ................................................... 9

            1.    Uber's compelled speech claim is meritless. ................................... 9

            2.    The Ordinance does not impinge any association right..................... 16

            3.    The Ordinance is not unconstitutionally vague. .............................. 19

      C.    Uber is not likely to suffer irreparable harm........................................... 23

      D.    The equities do not favor Uber and an injunction would not be in the
            public interest......................................................................................... 24

      E.    The Ordinance is severable...................................................................... 25

IV.   CONCLUSION................................................................................................. 26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - i
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arcara v. Cloud Books, Inc.*,
   478 U.S. 696 (1986) ....................................................................................10

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021) .....................................................................12

*Baird v. Bonta*,
   81 F4th 1036 (9th Cir. 2023) .......................................................................24

*Belle Maer Harbor v. Charter Twp. of Harrison*,
   170 F.3d 553 (6th Cir. 1999) ..................................................................21, 22

*Board of Directors of Rotary International v. Rotary Club of Duarte*,
   481 U.S. (1987) ...........................................................................................18

*Bolger v. Youngs Drug Products*,
   463 U.S. 60 (1983) .......................................................................................12

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000) ................................................................................16, 17

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*,
   271 F.3d 1141 (9th Cir. 2001) .....................................................................20

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) .......................................................................23

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) .......................................................................8

*El Centro De La Raza v. State*,
   192 Wn.2d 103 (2018) .................................................................................25

*Expressions Hair Design v. Schneiderman*,
   588 U.S. 37 (2017) .......................................................................................10

*Fla. Bar v. Went for It, Inc.*,
   515 U.S. 618 (1995) .....................................................................................11

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) .........................................................................9

*Gerberding v. Munro*,
   134 Wn.2d 188 (1998) .................................................................................26

*Healy v. James*,
   408 U.S. 169 (1972) .....................................................................................16

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

*Hill v. Colorado*,
530 U.S. 703 (2000) ............................................................................................20

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) .............................................................................11

*Interpipe Contracting, Inc. v. Becerra*,
898 F.3d 879 (9th Cir. 2018) .............................................................................10

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) ......................................................................10, 11

*Johnson v. United States*,
576 U.S. 591 (2015) ............................................................................................22

*Karlin v. Foust*,
188 F.3d 446 (7th Cir. 1999) .............................................................................21

*League of Women Voters of Wash. v. State*,
184 Wn.2d 393 (2015) ........................................................................................25

*Leonard v. City of Spokane*,
127 Wn.2d 194 (1995) ........................................................................................25

*Lydo Enters., Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984) ...........................................................................24

*McGary v. Inslee*,
No. C23-5388 BHS, 2023 WL 5822280 (W.D. Wash. Sep. 8, 2023) .........................23

*McMahon v. World Vision, Inc.*,
704 F. Supp. 3d 1121 (W.D. Wash. 2023) .........................................16, 17, 18

*N.Y. State Club Ass'n, Inc. v. City of New York*,
487 U.S. 1 (1988) ...............................................................................................16

*Nat'l Ass'n for Fixed Annuities v. Perez*,
217 F. Supp. 3d 1 (D.D.C. 2016) .....................................................................21

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ............................................................................................15

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ..........................................................................14

*Plintron Techs. USA LLC v. Phillips*,
No. C24-93, 2024 WL 553718 (W.D. Wash. Feb. 12, 2024)....................8, 9, 23, 24

*Rent-a-Center v. Canyon Television & Appliance*,
944 F.2d 597 (9th Cir. 1991) .............................................................................24

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
487 U.S. 781 (1988) ............................................................................................15

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - iii
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ...................................................................16, 17, 19

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
  547 U.S. 47 (2006) .....................................................................10, 11, 17

*San Francisco Apartment Ass'n v. City & Cnty. of San Francisco,*
  881 F.3d 1169 (9th Cir. 2018) ..........................................................12, 13

*Sorrell v. IMF Health Inc.,*
  564 U.S. 552, 567 (2011). ........................................................................12

*State v. Abrams,*
  163 Wn.2d 277 (2008) ...............................................................................25

*State v. Arlene's Flowers, Inc.,*
  193 Wn.2d 469 (2019) ...............................................................................17

*Tucson v. City of Seattle,*
  91 F.4th 1318 (9th Cir. 2024) .....................................................19, 20, 23

*United States v. Ward,*
  No. CR-11-2123-RMP, 2013 WL 12203098 (E.D. Wash. Jan. 18, 2013).............21

*United States v. Williams,*
  553 U.S. 285 (2008) ..................................................................................19

*Valle Del Sol Inc. v. Whiting,*
  709 F.3d 808 (9th Cir. 2013) ....................................................................12

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982) ............................................................................20, 21

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ..................................................................................20

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) ..................................................................................11

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................8, 24

*X Corp. v. Bonta,*
  116 F.4th 888 (9th Cir. 2024) ........................................................12, 13, 14

*Young v. Am. Mini Theatres, Inc.,*
  427 U.S. 50 (1976) ....................................................................................20

**Statutes**

18 U.S.C. §922(d)(8) .......................................................................................21
42 U.S.C. §12112 ...........................................................................................21
RCW 10.120.020 ...........................................................................................21

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - iv
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

RCW 46.72B.080 ....................................................................................................7
RCW 46.72B.090(4) ..............................................................................................7
RCW 46.72B.110(1) ..............................................................................................7
RCW 49.46.300(15)(iii) .........................................................................................7
U.S. Const. amend. IV ..........................................................................................21

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - v
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

## I.   INTRODUCTION

Plaintiffs Uber Technologies, Inc. and Portier, LLC ("Uber") bring this 11th hour action against the City of Seattle ("City") seeking to invalidate a worker-protection law.  Uber challenges Seattle's App-Based Worker Deactivation Rights Ordinance ("Ordinance"), passed in August 2023.  It requires Uber and other like business to treat app-based workers[1] fairly, by having a written policy explaining why Uber may remove them from its platform, explaining why Uber has deactivated them, prohibiting the removal of workers solely based on Uber's secret algorithms, and requiring an internal appeal process involving human beings.[2]  Uber represents that it has a "responsibility to ensure that our processes are fair, accurate, and transparent," that its "delivery people trust that" Uber is "doing the right thing,"[3] and it knows that its platform "is often an essential source of income for many" workers.  Dkt. 8 at 4:15.  Despite these representations, Uber sues claiming the City may not require a fair, accurate, and transparent process to protect workers.

Uber participated substantially in the City's consideration of protections for app-based workers which culminated in the City's adoption of the Ordinance and other worker-protection laws in August 2023.  Despite knowing for 16 months precisely what the Ordinance provides and knowing that the City's administrative regulations are not yet in effect, Uber filed a last-minute motion for temporary restraining order ("TRO") nearly 13 days before the Ordinance takes effect.  Uber claims the Ordinance creates "grave" First Amendment and Due Process "problems."

Its claims cannot justify a TRO.  Uber cannot show a likelihood of success on the merits of any of the three weak constitutional claims it asserts in its motion.  Uber faces no irreparable harm here if it complies with the Ordinance and protects its workers while its last-minute lawsuit is litigated in regular order.  The balance of equities does not favor Uber against the workers who

---

[1] An "app-based worker" has entered into an agreement to use a network company's platform to provide services for payment by the company.  Seattle Municipal Code ("SMC") 8.40.020.

[2] A "deactivation" is "the blocking of an app-based worker's access to the worker platform, changing an app-based worker's status from eligible to accept offers to perform services to ineligible, or other material restriction in access to the worker platform[.]"  SMC 8.40.020.

[3] https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 19, 2024).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 1
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

make Uber's platform so profitable for the company.  And granting Uber's last-minute request to halt the Ordinance's basic protection of workers is not in the public interest.

## II.  FACTS

**A.  Uber is a business selling goods and services.**

Uber is a sprawling company whose businesses include Uber Eats, a food delivery platform that "connect[s] consumers and restaurants, grocers, and other merchants so they can buy and sell meals, groceries, and other items[.]"[4]  Purchasers download the Uber Eats app and place orders through the app.[5]  Uber's app then matches buyers and sellers with workers who pick up and deliver the food.[6]

Uber collects the payment for this commercial transaction and remits a portion to the worker.[7]  Uber workers make a national average of $19 hourly.[8]  Uber takes a cut of 20-30% of all orders.[9]  Uber Eats generated $12.1 billion in revenue in 2023, an 11% year-on-year increase.[10]

**B.  The Ordinance.**

**1.  The City Council's findings.**

In August 2023, the Ordinance was passed. https://clerk.seattle.gov/~archives/Ordinances/Ord_126878.pdf (the "Ordinance") (last visited Dec. 19, 2024).  Based on input from all stakeholders and the City's analysis of the data, it aims to protect workers from unwarranted deactivations.  *Id.* §1(C).

---

[4] https://www.uber.com/us/en/about/uber-offerings/?uclick_id=0a545c31-5139-4a66-8b07-4cb9d57d6d21 (last visited Dec. 20, 2024).

[5] https://www.upperinc.com/blog/how-much-does-uber-eats-pay-per-delivery/ (last visited Dec. 20, 2024).

[6] https://www.uber.com/us/en/about/uber-offerings/?uclick_id=0a545c31-5139-4a66-8b07-4cb9d57d6d21 (last visited Dec. 20, 2024).

[7] https://www.uber.com/us/en/drive/basics/how-payments-work/ (last visited Dec. 20, 2024).

[8] https://financebuzz.com/uber-eats-drivers-earnings (last visited Dec. 20, 2024)

[9] https://www.businessofapps.com/data/uber-eats-statistics/#:~:text=Uber%20Eats%20generated%20$12.1%20billion,Uber%20Eats%20in%2011%2C000%20cities (last visited Dec. 20, 2024).

[10] *Id.*

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 2
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

The Ordinance is based on the City Council's key findings.  Companies typically assign and evaluate workers through algorithms.  *Id.* §1(F) (citing *Working with Machines: The Impact of Algorithmic and Data-Driven Management on Human Workers*, Proceedings of the 33rd Annual ACM Conference on Human Factors in Computing Systems, Apr. 18, 2015, at 1603-12).  Algorithmic management creates significant challenges for workers, including information asymmetries and extreme power imbalances.  *Id.* §1(G) (citing *Explainer: Algorithmic Management in the Workplace*, Data & Society, Feb. 2019).  Workers frequently do not know how they are to be evaluated.  Algorithms dictating core aspects of workers' relationship with a company can change unexpectedly, leading to arbitrary evaluations and unwarranted deactivations.  *Id.* §1(H) (citing *FTC Policy Statement on Enforcement Related to Gig Work*, Sept. 2022).

The Council also found that workers are subject to company policies that unilaterally deactivate workers without access to a fair process or responsive company personnel with the power to correct unwarranted deactivations.  *Id.* §1(I).  Companies do not apply clear performance expectations or policies for deactivations, and often deactivate workers without explanation or warning.  *Id.* § 1(K) (citing *Essential but Unprotected: App-based Food Couriers in New York City*, 2021, at 31-32).  Workers are deactivated for low customer ratings, even though extensive research finds that consumer-sourced rating systems are highly likely to be influenced by racial bias and workers report deactivation based on customer harassment and false reports.  *Id.* §1(L) (citing *App-Based Workers Speak: Studies Reveal Anxiety, Frustration, and a Desire for Good Jobs*, Oct. 2021, at 12, 18).  Moreover, many companies do not have processes to reconsider a deactivation based on a case-by-case human review and have little incentive to offer those processes.  *Id.* § 1(M) (citing *Fired by Bot at Amazon: "It's You Against the Machine"*, Bloomberg, June 28, 2021; *Instacart shoppers demand answers over alleged wrongfully deactivated accounts*, CNN Business, Apr. 30, 2021).

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   The Council found that companies perform recurring background checks on workers.

2   However, companies do not provide clear guidance on background check criteria, methods for

3   evaluating the relationship of criminal history record information to the performance of app-based

4   service, procedures for correcting background check information, or procedures for appealing

5   deactivations based on background check information.  *Id.* §1(N).  These problems are

6   compounded by the high prevalence of background checks with errors, mismatched identities, and

7   incomplete information due to scant oversight of background check information provided in the

8   private market.  *Id.* §1(P) (citing *How Criminal Background Checks Lead to Discrimination*

9   *Against Millions of Americans*, The Washington Post, July 10, 2020).  A common problem is that

10  law enforcement agencies fail to update arrest or charge records with information about case

11  outcomes.  *Id.* §1(Q) (citing *Criminal Record Inaccuracies and the Impact of a Record Education*

12  *Intervention on Employment-Related Outcomes*, U.S. Dep't of Labor, Jan. 2, 2020).  Indeed, Uber

13  concedes that "the checks of motor vehicle records on which Uber relies often do not contain fault

14  attribution information."  Dkt. 8 at 12.

15         **2.       The Ordinance's requirements.**

16         As Uber has known for 16 months, the Ordinance's worker protection requirements take

17  effect January 1, 2025.  Companies "must inform" workers "in writing" of the company's

18  deactivation policy, "defining what constitutes a violation that may result in deactivation."  SMC

19  8.40.050(A)(1).

20         The policy "must be specific enough for" a worker "to understand what constitutes a

21  violation and how to avoid violating the policy."  *Id.*  It "must be reasonably related to" the

22  company's "safe and efficient operations."  SMC 8.40.050(A)(2).  The Ordinance provides many

23  examples of policies that do not satisfy this standard.  *Id.*  For example, the company may not

24  deactivate a worker based on her "availability to work or number of hours worked," her

25  "cancellation of an offer with cause," her "contacting the network company," her "statements

26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 4
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

regarding compensation and/or working conditions," her assertion of "legal rights," or "based solely" on customer rating data.  *Id.*

A company may not deactivate "a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law."  SMC 8.40.050(A)(2)(h).  The Ordinance provides detailed guidance as to the types of "egregious misconduct" that justify deactivation such as endangering anybody's physical safety and threatening or harassing anybody.  SMC 8.40.020.  The company "may immediately deactivate" a worker to comply with any law or when the worker has engaged in "egregious misconduct."  SMC 8.40.050(C).

The company must inform the worker of the reasons for deactivation.  SMC 8.40.070.  The worker has a right to challenge any deactivation.  SMC 8.40.060.  The company must review and respond to any such challenge.  SMC 8.40.060(B).

The City's Office of Labor Standards ("OLS") may not begin imposing penalties on network companies for an "unwarranted deactivation" *until June 1, 2027*.  SMC 8.40.060(A), 8.40.130(B).  Likewise, *until June 1, 2027*, OLS may not enforce the Ordinance's investigation, confirmation of violation, consistent application, proportionate penalty, or anti-discrimination provisions.  SMC 8.40.130(B).

## C.    The City engaged in a robust legislative process.

Uber "fiercely opposed" the City's consideration of regulations to protect workers from deactivation through algorithms, without notice, explanation, or ability to appeal a deactivation to a person.[11]

Uber participated extensively during the legislative process.  Allison Ford "participated in communications, hearings, and Uber's written submissions regarding the Ordinance[.]"  Dkt. 13 ¶3.  She attended the hearings in May 2023 "and offered testimony on Uber's behalf" repeatedly.

---

[11] https://www.seattletimes.com/seattle-news/politics/uber-sues-seattle-over-driver-deactivation-law/ (last visited Dec. 21, 2024).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 5
(CASE NO. 2:24-cv-2103-MJP)

1    *Id.* ¶5 & Exs. 1-2.  She expressed Uber's "commit[ment] to working together to further improve

2    the ordinance from its original draft" and the desired outcome of "protect[ing] workers and

3    provid[ing] them with the process they need[.]"  *Id.*, Ex. 2.  As the legislation was under

4    discussion, Ford acknowledged the changes made in response to Uber's feedback.  12/23/24

5    Marwaha Decl.

6    **D.    OLS rulemaking.**

7          Once the Ordinance was adopted, Uber "actively engaged with" OLS's consideration of

8    "proposed rules[.]"  Dkt. 13 ¶¶3-4.  That process "has spanned many months[.]"  *Id.*  For example,

9    four months ago, Uber "met with OLS and discussed" its "concerns[.]"  *Id.* ¶10.  Uber attended

10   many additional meetings with OLS and provided a "pre-rule comment to OLS" more than three

11   months ago.  *Id.* ¶¶12, 19; *see also* 12/23/24 Middaugh Decl.

12   **E.    Uber's new policy.**

13         Before the Ordinance was adopted, Uber deactivated workers by algorithm without

14   explanation or meaningful avenue to appeal.[12]  Drivers of color experienced a substantially higher

15   rate of deactivation than white drivers.[13]  Most of these workers faced economic hardship after

16   Uber fired them.[14]  Deactivated drivers worked on average four-and-a-half years for Uber.[15]

17         Three months *after* the Ordinance was adopted, Uber changed its process.[16] Uber says that

18   "[i]t's our responsibility" to "follows the law[.]"[17]  It recognizes that when it "[b]lock[s] someone

19   from accessing their Uber account," that is "one of the most distressing moments that a driver or

20

21   ───────────────
     [12] https://www.latimes.com/business/technology/story/2023-02-28/column-uber-and-lyfts-deactivation-policy-is-
22   dehumanizing-and-unfair (last visited Dec. 20, 2024); https://cdn.craft.cloud/5cd1c590-65ba-4ad2-a52c-
     b55e67f8f04b/assets/media/Fired-by-an-App-February-2023.pdf (last visited Dec. 20, 2024).

23       [13] https://www.latimes.com/business/technology/story/2023-02-28/column-uber-and-lyfts-deactivation-policy-is-
     dehumanizing-and-unfair (last visited Dec. 20, 2024).

24       [14] *Id.*

         [15] *Id.*

25       [16] https://www.fastcompany.com/90981942/uber-is-revamping-its-driver-deactivation-process (last visited Dec. 20,
     2024).

26       [17] https://www.uber.com/blog/deactivations-principles/ (last visited Dec. 20, 2024).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 6
(CASE NO. 2:24-cv-2103-MJP)

1    courier can experience."[18]  *For the first time*, "[a]fter a lot of listening and reflection," Uber agreed

2    to tell workers why their account was deactivated, to allow them a review of the decision, and to

3    share with the worker recordings to dispute unfair customer claims.[19]

4          In many ways, Uber's deactivation policy complies or does not conflict with the

5    Ordinance.  https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited

6    Dec. 20. 2024); 12/23/24 O'Connor-Kriss Decl. ¶¶4-19.  Some of Uber's provisions are consistent

7    with the Ordinance, though not wholly so.  O'Connor-Kriss Decl. ¶¶20-31.  Only *one* provision

8    violates the Ordinance.  *Id.* ¶¶33-34.

9    **F.    Uber is substantially regulated.**

10         Many regulations of network companies require the use of words.  For example, a June

11   2021 ordinance required agreements with restaurants for pick-up or delivery services.[20]  A June

12   2022 ordinance requires Uber to provide workers a notice of rights.  SMC 8.37.070, .100.  A

13   March 2023 ordinance requires Uber to provide workers a notice of rights created by OLS.  SMC

14   8.39.100.

15         Uber is subject to state regulation too.  It "must adopt a policy of nondiscrimination,"

16   RCW 46.72B.110(1), a "zero tolerance policy" with respect to drugs and alcohol and post this

17   policy to its website, RCW 46.72B.080, a compliant background check policy, RCW

18   46.72B.090(4), and a compliant agreement.  RCW 49.46.300(15)(iii).

19   **G.    Uber's last-minute lawsuit.**

20         Uber waited until the week before Christmas and 13 days before the Ordinance takes effect

21   to sue.  "Uber" ***did not*** "hope[] to avoid emergency motions practice in this matter, particularly at

22

23

---

24         [18] *Id.*

25         [19] *Id.*; https://www.fastcompany.com/90981942/uber-is-revamping-its-driver-deactivation-process (last visited Dec. 20, 2024).

26         [20] https://library.municode.com/wa/seattle/ordinances/municipal_code?nodeId=1092194 (last visited Dec. 19, 2024).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 7
(CASE NO. 2:24-cv-2103-MJP)

this time of year." Dkt. 8 at 3 n.1. In response to Uber's notice just before it sued, the City

provided the following pre-filing response, only snippets of which Uber conveyed to the Court:

> It is the City's position that a Temporary Restraining Order is
> unnecessary. We can represent that OLS will not pursue
> enforcement action immediately upon the January 1, 2025 effective
> date. Since the passage of the Ordinance over a year ago, your
> client has been engaged with OLS as an active participant in the
> ongoing rulemaking process. In response to network company
> feedback, including Uber, OLS plans to delay the effective date of
> the rules by 60-90 days. This delay would provide network
> companies with time to implement necessary measures to comply
> with OLS rules, which should be published for public comment in
> late January.
>
> In the recent past, OLS has worked with app companies to have a
> soft launch for enforcement of new app-based worker ordinances.
> Instead of imposing penalties, OLS has provided education and
> outreach to workers and network companies and provided technical
> assistance for compliance concerns. This soft launch and the
> delayed effective date of the rules demonstrates that there will be no
> harm arising out of any OLS enforcement to enjoin within the
> timeframe proposed for a preliminary injunction hearing, which was
> the concern raised during preliminary discussions….

12/23/24 Goldman Decl., Ex. 1.

## III.   ARGUMENT

**A.      Uber must satisfy a stringent standard.**

     Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008). Uber must establish: 1) a likelihood of success on the merits, 2) that it is likely

to suffer irreparable harm in the absence of preliminary relief, 3) that the balance of equities tips in

Uber's favor, **and** 4) that an injunction is in the public interest. *Plintron Techs. USA LLC v.*

*Phillips*, No. C24-93, 2024 WL 553718, *2 (W.D. Wash. Feb. 12, 2024). "When the government

is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092

(9th Cir. 2014).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 8
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**B.     Uber's claims are <u>not</u> likely to succeed.**

Likelihood of success on the merits "is the most important" factor.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three" elements.  *Id.* (internal quotation marks omitted).  Where the moving party offers only a conclusory argument without evidentiary support, it fails to meet its burden to demonstrate success on the merits.  *Plintron Techs.*, 2024 WL 553718 at *3.

Uber fails to satisfy this determinative threshold inquiry.

**1.      Uber's compelled speech claim is meritless.**

Uber claims the Ordinance compels speech in violation of the First Amendment because it requires Uber to speak and opine on issues with which it disagrees and adopt the City's view. Uber erroneously equates complying with a law to opining on it.  Nothing prohibits Uber from stating that the policy is required by law and Uber disagrees with it.

Critically, Uber ignores the distinction between commercial and noncommercial speech in arguing that strict scrutiny should apply.  It mistakenly compares itself to social media companies and other actors at the center of the political stage who were compelled by legislation to express their own opinions or make statements on political issues.  But Uber's place under the First Amendment is more modest.  To the extent the Ordinance implicates speech, it is commercial speech, not subject to strict scrutiny and well within the bounds of the First Amendment.

**a.      The economic regulations do not implicate the First Amendment.**

Although Uber conflates them, it challenges two provisions.  One requires adoption of a conforming deactivation policy.  SMC 8.40.050(A)(2).  The other requires notifying workers of the policy.  SMC 8.40.050(A)(1).  The policy requirement regulates conduct, not speech.  It requires that "deactivation must be reasonably related to the network company's safe and efficient operation."  SMC 8.40.050(A)(2).  That some speech may, as a practical matter, be required for

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   Uber to convey its policy or provide fair notice of it is of no consequence.  Laws governing

2   conduct that have only an incidental impact on speech do not trigger First Amendment scrutiny.

3           The First Amendment extends only to conduct that is inherently expressive.  *Rumsfeld v. F.*

4   *for Acad. & Institutional Rts., Inc*., 547 U.S. 47 (2006); *Interpipe Contracting, Inc. v. Becerra*,

5   898 F.3d 879, 895 (9th Cir. 2018).  "[T]he First Amendment does not prevent restrictions directed

6   at commerce or conduct from imposing incidental burdens on speech."  *Sorrell v. IMF Health Inc*.,

7   564 U.S.552, 567 (2011).  Regulating conduct that is facilitated by written or spoken language

8   does not abridge freedom of speech.  *Expressions Hair Design v. Schneiderman*, 588 U.S. 37, 47

9   (2017).

10          The threshold question is whether the desire to stifle speech motivated the regulation of

11  "conduct with a 'significant expressive element'" or "the ordinance has the inevitable effect of

12  'singling out those engaged in expressive activity.'"  *Int'l Franchise Ass'n, Inc. v. City of Seattle*,

13  803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 696, 706

14  (1986)).  Because neither the policy nor notice requirements single out those engaged in

15  expressive activity – such as newspapers or advocacy organizations – this case turns on the

16  "significant expressive element" standard.  Applying it, the Ninth Circuit rejected a First

17  Amendment challenge to the City's minimum wage ordinance because the regulated conduct

18  lacked a significant expressive element:

19              The ordinance … is not wholly unrelated to a communicative
20              component, but that in itself does not trigger First Amendment
                scrutiny ….  [T]he ordinance applies to businesses that have adopted
21              a particular business model, not to any message the businesses
                express.  It is clear that the ordinance was not motivated by a desire
22              to suppress speech, the conduct at issue is not franchisee expression,
                and the ordinance does not have the effect of targeting expressive
23              activity.

24  *Id.* at 408-09 (cleaned up).

25

26

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    The two provisions challenged here regulate business dealings between companies and

2    workers.  They are economic regulations that do not target speech or expressive conduct and were

3    not motivated by a desire to suppress speech.  They are like the statute in *Rumsfeld* that required

4    law schools – despite their opposition to the military's treatment of gay soldiers – to permit

5    military recruitment of students.  *Rumsfeld* upheld the statute as a regulation of conduct, not

6    speech, analogizing it to an anti-discrimination measure: the government "can prohibit employers

7    from discriminating in hiring on the basis of race.  The fact that this will require an employer to

8    take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed

9    as one regulating the employer's speech rather than conduct."  *Rumsfeld*, 547 U.S. at 62.

10    Communicating a required worker-protection policy and providing notice of that policy do

11    not implicate the First Amendment because the speech is incidental to the economic activity.  *See*

12    *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685-86 (9th Cir. 2019) (ordinance

13    about housing and rental agreements regulated non expressive conduct despite incidental burdens

14    on speech).  These provisions implicate no network company speech regarding its views on

15    anything, let alone speech "with a significant expressive element."  *Int'l Franchise*, 803 F.3d at

16    408.  Uber is "free to discuss any issue with any person at any time," *Williams-Yulee v. Fla. Bar*,

17    575 U.S. 433, 452 (2015), including its disagreement with this economic regulation of its business.

18    Under controlling authority that Uber ignores, the policy and notice provisions regulate

19    commercial conduct without implicating the First Amendment.

20          **b.     If the First Amendment is implicated, these provisions concern**
               **commercial speech.**

21    If this Court finds the First Amendment implicated, the policy and notice provisions

22    validly regulate commercial speech that is subject to lower scrutiny.  "Commercial speech enjoys

23    a limited measure of protection, commensurate with its subordinate position in the scale of First

24    Amendment values, and is subject to modes of regulation that might be impermissible in the realm

25    of noncommercial expression."  *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995) (cleaned

26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 11
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

up); *accord Sorrell*, 564 U.S. at 579 (noting government's legitimate interest in protecting consumers from commercial harms).

Uber points to *Bolger v. Youngs Drug Products*.  In that seminal commercial speech case, the Court described the breadth of commercial speech: "an eight-page pamphlet discussing at length the problem of venereal disease and the use and advantages of condoms in aiding the prevention of venereal disease" was commercial speech though it did not expressly propose a transaction and the only commercial element was a statement at the bottom of the last page noting that "the pamphlet [was] contributed as a public service by … the distributor of Trojan-brand prophylactics."  463 U.S. 60, 62 n.4, 68 (1983).  *Bolger* emphasized that even speech about "important public issues" is entitled to less First Amendment protection when made in commercial transactions.  *Id.* at 67-68.

Speech related to the protection of workers is commercial speech.  *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) ("Courts have found commercial speech" when it concerns "benefits to employee compensation, improvements to a brand's image, general exposure of a product, and protection of licensees' interests."); *San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*, 881 F.3d 1169, 1176-77 (9th Cir. 2018) ("a discussion between a landlord and a tenant about the possibility of entering into a buyout agreement is commercial speech, as it relates solely to the economic interests of the parties and does no more than propose a commercial transaction"); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013) ("The act of soliciting work as a day laborer may communicate a political message, but the primary purpose of the communication is to advertise a laborer's availability for work and to negotiate the terms of such work," which is "only commercial speech.").  The same is true of the policy and notice provisions.  Any regulated speech is commercial, as it occurs within the context of, and is inextricably linked to, a commercial transaction between the company and workers.

Courts "try to give effect to a common-sense distinction between commercial speech and other varieties of speech."  *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (cleaned up).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 12
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  Factors favoring a finding of commercial speech are whether it is an advertisement, the speech

2  refers to a particular product, and the speaker's motivation is economic. *Id.* The first factor is

3  absent here, but the latter two are present – the provisions pertain only to Uber's delivery service,

4  and its motivation in retaining and terminating drivers is economic. Common sense confirms that

5  the deactivation policy and worker notice are, at best, commercial speech that exclusively

6  concerns terminating commercial contracts.

7          **c.**     **The policy and notice provisions satisfy commercial speech scrutiny.**

8        There are two lesser standards of review applied to commercial speech. One applies to

9  *restrictions* on commercial speech. *San Francisco Apartment*, 881 F.3d at 1177. Uber correctly

10  recites the *Central Hudson* test as requiring the direct advancement of a substantial government

11  interest by means no more extensive than necessary to meet that interest. Dkt. 18 at 17. But Uber

12  does not complain of restrictions on its speech.

13        Uber instead complains of compelled speech – the policy it must adopt and the notice it

14  must give workers. Where *compelled* commercial speech that is factual and noncontroversial is

15  involved, the less rigorous, reasonable-relation standard applies: "The government may compel

16  truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably

17  related' to a substantial governmental interest." *San Francisco Apartment*, 881 F.3d at 1177; *see

18  also X Corp.*, 116 F.4th at 900 (akin to rational basis). The limitations on deactivation and notice

19  are factual and uncontroversial. If First Amendment interests are even implicated, the reasonable-

20  relation test is the standard of review, and it is amply satisfied.

21        Nevertheless, the Ordinance also passes scrutiny under *Central Hudson*. It directly

22  advances substantial government interests, primary of which is protecting workers against

23  unwarranted deactivations. The Ordinance does so through means that are no more extensive than

24  necessary to meet these interests. The substantive deactivation requirements and the notice

25  provision explain to workers why Uber can and has deactivated them and how the worker can

26  obtain review of deactivation. *See San Francisco Apartment*, 881 F.3d at 1178 (required

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 13
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

disclosures by landlords to tenants informing tenants of their rights in lease buyout negotiations advances the government's substantial interest in increasing the fairness of lease buyout negotiations).

Uber argues that the two provisions are broader than necessary because the City "could have proscribed directly the grounds it disfavors[.]" Dkt. 8 at 17. The City did so by proscribing the substantive reasons why Uber may not deactivate a worker, which must be reflected in a policy. SMC 8.40.050(A)(2). Moreover, the government interest in preventing unwarranted deactivations cannot be effectively achieved unless workers are informed of the deactivation policy and provided with the specific information and procedures pertaining to any actual deactivation.

> **d.**    **These two provisions are not subject to, but also would satisfy, strict scrutiny.**

Uber's argument that strict scrutiny applies is wrong. The cases on which it relies involved parties who, unlike Uber, stand at the center of the political stage and were actually compelled by law to opine or make statements on noncommercial matters. In *X Corp.*, a social media company was required by statute to "opine" in reports to the government on "politically fraught" issues such as identifying "hate speech," "racism," "extremism," "radicalization," and "foreign political interference," and to state whether it would moderate such content. 116 F.4th at 894, 899, 902. Uber is not required to opine on any subject, let alone the core First Amendment speech at issue in *X Corp.*

Similarly, in *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024), the statute required on-line companies to report to the government and "opine on potential speech-based harms to children, including harms resulting from the speech of third parties, disconnected from any economic transaction." *Id.* at 1119. The court found this law to require core First Amendment speech *about speech* and applied strict scrutiny. *Id.* at 1121.

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 14
(CASE NO. 2:24-cv-2103-MJP)

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    Strict scrutiny has also been applied to a law requiring anti-abortion pregnancy crisis

2    centers, contrary to their core mission, to provide their clients with a government-written script on

3    free or low-cost abortions provided by the state. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,

4    585 U.S. 755 (2018); *see also Riley v. Nat'l Fed'n of the Blind of N. Carolina*, *Inc.*, 487 U.S. 781

5    (1988) (applying strict scrutiny to law regulating charitable solicitations).

6    Here, by contrast, the nominal speech required conveys only the permissible reasons for

7    terminating a contract between a for-profit business and its workers. Uber is not being forced to

8    speak on political – or any – issues nor to express any opinion, political or commercial. Uber is

9    only required to convey factual commercial information regarding the substantive basis for

10   deactivating workers as allowed by Seattle law. Strict scrutiny does not apply.

11   Uber's list of examples illustrates that the Ordinance *does not* require Uber to express a

12   belief or opinion about anything. Uber complains that the Ordinance requires it to "convey that it

13   does not believe consumer ratings have anything to do with its platform's safe and efficient

14   operation." Dkt. 8 at 11. Not only does the Ordinance not require Uber to state its belief about

15   anything, but it specifically allows for deactivation based on consumer ratings so long as

16   deactivation is not "solely" based on consumer ratings. SMC 8.40.050(A)(2)(e). Uber may tell

17   the world that its belief conflicts with the Ordinance's substantive standard and notice

18   requirement, just as it may tell the world that the minimum wage law and anti-discrimination laws

19   are bad policy.

20   Next Uber contends that the Ordinance requires it to announce a deactivation policy

21   "espousing – as if it were Uber's own view – the City's *opinion* that a courier's record of traffic

22   accidents bears no reasonable relationship … to safety[.]" Dkt. 8 at 12. Uber must simply inform

23   workers what the policy *is*. Uber may say that the substance of the policy and the notice are

24   required by City law and espouse its "own view" disagreeing about the connection of traffic

25   accidents to safety, just as it may espouse its "own view" disagreeing with worker safety

26   requirements.

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 15
(CASE NO. 2:24-cv-2103-MJP)

1

Uber also contends that the Ordinance requires it to adopt a deactivation policy "endorsing

2

the view" that systematically refusing or cancelling orders from certain consumers is not

3

discriminatory conduct.  Dkt. 8 at 13.  Just as an employer who informs workers of their rights

4

under anti-discrimination laws is neither endorsing the view that the law is wise nor stating the

5

employer's view about anything, so too Uber is not required to endorse the policy, only inform its

6

workers of it.  Uber may endorse any view, about anything, to anyone, anywhere.

7

Uber's other examples suffer from the same defects.

8

### 2.    The Ordinance does not impinge any association right.

9

Uber next contends that its First Amendment right to freedom of expressive association

10

protects its decision not to associate with workers who it deems worthy of deactivation.  It is

11

wrong.

12

"Among the rights protected by the First Amendment is the right of individuals to

13

associate to further their personal beliefs."  *Healy v. James*, 408 U.S. 169, 181 (1972).  "Freedom

14

of association … plainly presupposes a freedom not to associate."  *Roberts v. U.S. Jaycees*, 468

15

U.S. 609, 623 (1984).  But the "right to associate for expressive purposes is not … absolute."  *Id.*

16

Rather, "the nature and degree of constitutional protection afforded freedom of association may

17

vary depending on the extent to which … the constitutionally protected liberty is at stake in a

18

given case."  *Id.*  The right to associate does not mean "that in every setting in which individuals

19

exercise some discrimination in choosing associates, their selective process of inclusion and

20

exclusion is protected by the Constitution."  *N.Y. State Club Ass'n, Inc. v. City of New York*, 487

21

U.S. 1, 13 (1988).

22

"To determine whether [Uber] is protected by the First Amendment's freedom of

23

expressive association, the court 'must determine whether [Uber] engages in expressive

24

association.'"  *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1143 (W.D. Wash. 2023)

25

(quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)), *appeal filed* (May 22, 2024).

26

Although the First Amendment's protection is not reserved for advocacy groups, "there is only

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

minimal constitutional protection of the freedom of commercial association." *Roberts*, 468 U.S. at 634 (O'Connor, J., concurring in part & concurring in the judgment). "The Constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State." *Id.* Notably, "the Supreme Court has never held that a commercial enterprise, open to the general public, is an 'expressive association' for purposes of First Amendment protections." *State v. Arlene's Flowers, Inc.*, 193 Wn.2d 469, 533 (2019) (citing *Dale*, 530 U.S. at 648).

Uber does not engage in expressive association and its reliance on *Dale* is mistaken. The plaintiff in *Dale* was the Boy Scouts – a non-profit, membership organization that challenged the application of an antidiscrimination law to its membership policy. 530 U.S. at 648. The Court held that the law violated the organization's associational right, in part, because the Boy Scouts was *not* a "clearly commercial entit[y]" that would typically be subject to laws of public accommodation. *Id.* at 657. Rather, the very *purpose* of the Boy Scouts was "to instill values in young people," "both expressly and by example." *Id.* at 649-50. Uber, by contrast, does not contract with workers "for the purpose of speaking," *Rumsfeld*, 547 U.S. at 68, but, rather, for the purpose of conducting commercial transactions.

Uber's contractual relationship with its drivers is akin to that of an employer. Courts have routinely rejected claims of associational rights asserted in the employment context. *McMahon*, 704 F. Supp. 3d at 1143-45 (collecting cases). In *McMahon*, a Judge from this Court considered a non-profit religious organization's assertion that it held a First Amendment right to refuse to associate with an employee who was in a same-sex marriage. World Vision asserted that its "community associates together in expressive activities to further their shared stances," including the organization's "marriage policy." *Id.* at 1143-44. It argued that the "forced inclusion" of an employee who was in a same-sex marriage would significantly burden the organization's "right to oppose or disfavor same-sex conduct or marriage." *Id.* at 1144 (internal quotation marks omitted). This Court disagreed, concluding that antidiscrimination law "does not implicate World Vision's

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 17
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

expressive associational rights" because the organization's "very mission" was "not to oppose or discourage same-sex marriage." *Id.* at 1144-45. World Vision had no associational right that was infringed by its "forced" association with an employee whom it wished to fire.

Uber may place import on the safe operations of its business, but the company's "very mission" is not to promote or advocate for its definition of safety. Even if Uber did engage in expressive association, the Ordinance does not unconstitutionally burden its expression.

*Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 539 (1987), is instructive. Rotary International, a nonprofit corporation, was founded as "an organization of business and professional men united worldwide who provide humanitarian service, encourage high ethical standards in all vocations, and help build goodwill and peace in the world." *Id.* at 539. The organization refused membership to women because doing so resulted in an "aspect of fellowship" among its members and allowed the organization "to operate effectively in foreign countries with varied cultures and social mores." *Id.* at 541. The organization challenged a law prohibiting sex discrimination, asserting, as Uber does here, that the law infringed on its right to associate, including by selecting its members.

Like Uber, Rotary International articulated an expressive activity, an exclusionary membership policy, and a connection between its expressive activities and its exclusionary policy. Nevertheless, the Court determined that the organization failed to "demonstrate that admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes" or would require the clubs "to abandon their basic goals." *Id.* at 548.

Uber cannot establish that the Ordinance affects in any significant way its ability to advocate for safe and reliable food deliveries. The company can continue to "stand for safety" by publishing safety reports, host events to discuss safety innovations, seek feedback from experts and stakeholders, and conduct background checks on platform workers. Dkt. 8 at 3-4. It can voice its disagreement with the Ordinance and advocate for different safety standards. Limiting

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    the circumstances under which a worker can be deactivated does not cause Uber to abandon its

2    basic goals as a business and, therefore, does not infringe on any associational rights.[21]

3            To the extent the Ordinance does impact the company's First Amendment association

4    right, infringements on the right to association "may be justified by regulations adopted to serve

5    compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through

6    means significantly less restrictive of associational freedoms."  *Roberts*, 468 U.S. at 623.  "On its

7    face, the [Ordinance] does not aim at the suppression of speech, does not distinguish between

8    prohibited and permitted activity on the basis of viewpoint, and does not license enforcement

9    authorities to administer the statute on the basis of such constitutionally impermissible criteria."

10   *Id.*  Rather, it was enacted to "protect[] and promote[] public health, safety, and welfare by

11   establishing protections against unwarranted deactivations for app-based workers" to "ensure[]

12   that such workers can perform their services in a safe and reliable manner and thereby promote[]

13   the welfare of the people[.]"  Ordinance §1.  This is a compelling interest, unrelated to the

14   suppression of ideas, that cannot be achieved through means significantly less restrictive of any

15   associational freedoms.

16          **3.    The Ordinance is not unconstitutionally vague.**

17          Nor is Uber likely to succeed on the merits of its vagueness claim.

18          An ordinance is unconstitutionally vague if it "fails to provide a person of ordinary

19   intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages

20   seriously discriminatory enforcement" (the arbitrary enforcement theory).  *United States v.*

21   *Williams*, 553 U.S. 285, 304 (2008).  "The operative question under the fair notice theory is

22   whether a reasonable person would know what is prohibited by the law."  *Tucson v. City of*

23   *Seattle*, 91 F.4th 1318, 1329 (9th Cir. 2024) (internal quotation marks omitted).  As for arbitrary

24   enforcement, "a law is void for vagueness if it lack[s] any ascertainable standard for inclusion and

25

26          [21] Notably, Uber does not even argue that its "forced" association with workers would affect its ability to advocate a
        viewpoint. It alleges only mere economic consequences. Dkt. 10 ¶53.

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 19
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

exclusion, thereby authorizing or encouraging the authorities [to] arbitrarily prosecute one class of persons instead of another." *Id.* (internal quotation marks omitted).

"The degree of vagueness that the Constitution tolerates … depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Economic regulation is subject to a more lenient vagueness test as its subject matter is often narrow "and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Id.*

By contrast, "[w]hen First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly," even permitting facial challenges.  *Tucson*, 91 F.4th at 1329.  Still, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) ("[E]ven when a law implicates First Amendment rights, the constitution must tolerate a certain amount of vagueness.").  Rather, where free speech rights are implicated, a statute is unconstitutionally vague on its face only if the "deterrent effect on legitimate expression is … both real and substantial" *and* "the statute is [not] readily subject to a narrowing construction by the state courts." *Tucson*, 91 F.4th at 1329-30 (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976)).  "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (internal quotation marks omitted).

Uber raises a facial attack, claiming one provision of the Ordinance is unconstitutionally vague because it requires Uber to create a "[r]easonable" deactivation policy.  Dkt. 8 at 19-21.  Uber argues that by using the word "reasonable," the Ordinance fails to provide fair notice of what conduct is prohibited.  *Id.* at 19.  As a threshold matter, Uber itself suggested the City use the word

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 20
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

"reasonable" in the Ordinance. Dkt. 11, Ex. 6 at 3. Next, Uber's participation in the rulemaking process shows the Ordinance is precisely the type of economic regulation for which "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry," mitigating any real vagueness concerns. *Vill. of Hoffman*, 455 U.S. at 498. Even under the most stringent of vagueness inquiries, Uber's claim fails for three other reasons.

*First*, under no version of the vagueness analysis is the Ordinance unconstitutional simply because it uses the word "reasonable." *See United States v. Ward*, No. CR-11-2123-RMP, 2013 WL 12203098, at *4 (E.D. Wash. Jan. 18, 2013) ("[A] statute is not void for vagueness merely because it uses the word 'reasonable' or 'unreasonable.'") (internal quotation marks omitted). "[T]he adjective 'reasonable' is, of course, ubiquitous in the law." *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 41 (D.D.C. 2016). The U.S. Constitution proscribes "unreasonable" searches and seizures. U.S. Const. amend. IV. Federal and state statues commonly require businesses and individuals to act "reasonably." *See, e.g.*, 42 U.S.C. §12112 ("reasonable accommodations"); 18 U.S.C. §922(d)(8) ("reasonable cause," "reasonable fear"); RCW 10.120.020 ("reasonable care"). "It is thus unsurprising that the case law is replete with decisions rejecting vagueness challenges, like that raised here, to the words 'reasonable,' 'reasonably,' and 'unreasonably.'" *Perez*, 217 F. Supp. 3d at 42 (citing cases); *see also, e.g.*, *Karlin v. Foust*, 188 F.3d 446, 465 (7th Cir. 1999). In short, a word used in the Constitution to proscribe conduct is not by its nature unconstitutionally vague.

The only case Uber cites for the proposition that "reasonable" is unconstitutionally vague is readily distinguishable. *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999), involved an ordinance regulating the use of "bubbling devices" to keep a waterway from freezing around boats and structures. The ordinance limited the size of open water areas that a bubbling device could create: the area "could not exceed a five-foot radius from the protected object, or an area 'determined by the inspecting officer to be a reasonable radius.'" *Id.* at 555. Violation of the ordinance carried criminal penalties, including incarceration. *Id.* The ordinance

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1  was unconstitutionally vague because it gave enforcement officers "unlimited discretion" to find

2  violations and thus imposed no bar to arbitrary, discriminatory imposition of criminal sanctions.

3  *Id.* at 557-60.  By stark contrast, the Ordinance does not impose criminal penalties or vest

4  enforcement officials with unlimited discretion.  It requires companies to impose reasonable

5  policies or risk a civil penalty of $622.85 per aggrieved party, SMC 8.40.170(E), and offers

6  guidance as to what constitutes a reasonable and unreasonable policy.

7       *Second*, by enumerating a list of policies not reasonably related to safe and efficient

8  operations, the Ordinance provides *more*, not less, clarity.  Uber invokes the hypothetical used in

9  *Johnson v. United States*, 576 U.S. 591 (2015): that while "shades of red" alone does not generate

10  confusion, "the phrase 'fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise

11  involve shades of red' assuredly does so."  *Id.* at 603.  But far from calling navy blue a "shade of

12  red," and unlike the criminal sentencing statute in *Johnson*, the Ordinance includes a list of per se

13  unreasonable policies that are comprehensible and consistent with the Ordinance's stated purpose.

14       Uber quotes in *part* only two proscribed policies of the eight listed.  Uber argues they are

15  so confusing as to render the entire Ordinance vague.  Here are the two, *in full*: (1) "[a]ny policy

16  that would result in deactivation based *solely* on a quantitative metric derived from aggregate

17  customer ratings of an app-based worker's performance" and (2) "[a]ny policy that would

18  deactivate a worker based on the results of a background check, consumer report, driver record, or

19  record of traffic infractions, *except in cases of egregious misconduct or where required by other*

20  *applicable law.*"  SMC 8.40.050(A)(2) (emphasis added).

21       The Ordinance does not prevent network companies from ever deactivating workers based

22  on their driving record.  In citing traffic infractions as an example, Uber conspicuously omits the

23  carveout for "egregious misconduct," the definition of which includes, as one example, accruing

24  three or more non-criminal moving violations in the past three years.  SMC 8.40.020.  Nor does

25  the Ordinance proscribe deactivations based on criminal conduct.  *See., e.g.*, SMC 8.40.050(C)

26  (network company may immediately deactivate worker who has engaged in "egregious

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 22
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

misconduct"); SMC 8.40.020 (defining "egregious misconduct" to include, *inter alia*, behaviors that endanger physical safety, intentionally cause economic harm, or are threatening, harassing, or abusive). Further, the Ordinance explains *why* these proscribed policies are not "reasonably related" to safe and efficient operations through five pages of findings supported by empirical data. Ordinance §1. Uber is not likely to succeed in proving the Ordinance somehow gives "next to no guidance" as to what a policy may or may not contain by offering a clear list of prohibited policies with explanations.

     *Third*, the record shows that Uber understands what the Ordinance requires; it simply disagrees with it. Uber participated extensively in the legislative process. In engaging with the City, Uber disagreed with the limitations on the use of background checks, traffic violations, and aggregate ratings, not confusion with what the Ordinance requires. Dkt. 11 ¶¶19-20 & Exs. 1-10. So too, in its motion, Uber does not identify any proposed policy it would introduce but for the purportedly "vague" mandate. Nor does Uber even hint at what expression would be "chilled." Dkt. 8 at 21:9. Rather, it wishes to enact policies it well understands are prohibited by the Ordinance. Dkt. 9 ¶¶20-21.

     Uber fails to identify any "deterrent effect" of purported vagueness in the Ordinance, let alone a "real and substantial" deterrent effect on "legitimate expression," as is required to succeed on a facial challenge. *Tucson*, 91 F.4th at 1329-30.

**C.    Uber is <u>not</u> likely to suffer irreparable harm.**

     Even when there is a strong likelihood of success on the merits an injunction "cannot issue" "if there is just a mere possibility of irreparable harm." *McGary v. Inslee*, No. C23-5388 BHS, 2023 WL 5822280, *3 (W.D. Wash. Sep. 8, 2023). "Speculative injury does not constitute irreparable injury sufficient to warrant" preliminary injunctive relief. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Thus, a TRO should be rejected where there is no evidence "to suggest, or for the Court to rely on, that irreparable injury would occur if the Court does not issue a TRO." *Plintron Techs.*, 2024 WL 553718 at *4. Moreover, a lengthy delay

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 23
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    before seeking injunctive relief implies a lack of urgency and irreparable harm.  *Lydo Enters., Inc.*

2    *v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).  Despite being an active and consistent

3    stakeholder since before passage of the Ordinance, Uber waited 16 months to bring this action.

4    This delay undermines the asserted need for a TRO.  *Plintron Techs.*, 2024 WL 553718 at *2

5    (party waiting to bring TRO within three months undermined claimed necessity).

6         Any harm Uber may suffer is not "irreparable."  As discussed above, the notion that Uber

7    will suffer "the loss of its constitutional rights," Dkt. 8 at 22:11, is not just speculative, but

8    baseless.  And it ends consideration for the requested TRO.  *Baird v. Bonta*, 81 F4th 1036, 1041

9    (9th Cir. 2023) (If a plaintiff "alleges a constitutional violation," the likelihood of success on the

10   merits factor is "usually decisive.").  The damages that concern Uber are "to its business and

11   reputation[.]"  Dkt. 8 at 22:19.  Still, even *real* assertions of possible economic damage do not

12   constitute irreparable injury.  *Rent-a-Center v. Canyon Television & Appliance*, 944 F.2d 597, 603

13   (9th Cir. 1991).

14   **D.    The equities do <u>not</u> favor Uber and an injunction would <u>not</u> be in the public interest.**

15        In assessing these final factors, the Court "must balance the competing claims of injury and

16   must consider the effect on each party of the granting or withholding of the requested relief."

17   *Winter*, 555 U.S. at 24.  If it were appropriate to get this far in the analysis, the balance of equities

18   and the public interest would point only in the City's direction.  It has a substantial interest in

19   protecting workers who are at the mercy of Uber's deactivation without warning, explanation, or

20   reasonable basis related to Uber's safe and efficient operations.  But, as Uber knew *before it filed*

21   *suit*, on January 1, 2025, OLS will not be enforcing any rules against Uber, as they are not yet in

22   effect.  12/23/24 Middaugh Decl. ¶3.  Likewise, on January 1, 2025, Uber will not be subject to

23   penalty imposed by OLS for any unwarranted deactivation, or failure to: conduct a pre-

24   deactivation investigation, demonstrate that a violation of its policy occurred, consistently apply

25   its rules, or impose a proportionate penalty because OLS does not have authority to enforce these

26   provisions until 2027.  SMC 8.40.130(B).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 24
(CASE NO. 2:24-cv-2103-MJP)

1

2

**E.    The Ordinance is severable.**

        As Uber recognizes, severability of a local ordinance is a question of state law.  In making

3

a severability determination, Washington courts consider "whether the constitutional and

4

unconstitutional provisions are so connected … that it could not be believed that the legislature

5

would have passed one without the other; or where the part eliminated is so intimately connected

6

with the balance of the act as to make it useless to accomplish the purposes of the legislature."

7

*State v. Abrams*, 163 Wn.2d 277, 285-86 (2008).

8

        As to the first part, the inclusion of a severability clause, such as the Ordinance contains,

9

SMC 8.40.250, "provide[s] the necessary assurance that the Legislature would have enacted the

10

appropriate sections of the legislation despite the unconstitutional sections."  *El Centro De La

11

Raza v. State*, 192 Wn.2d 103, 132 (2018) (internal quotation marks omitted).

12

        As to the second part, the challenged sections are not "so intertwined with the remainder of

13

the [Ordinance] and so fundamental to the [Ordinance's] efficacy" as to render the entire thing

14

"invalid."  *League of Women Voters of Wash. v. State*, 184 Wn.2d 393, 412 (2015).  The

15

Ordinance also establishes a right for workers to challenge their deactivation through a procedure

16

established by the company, SMC 8.40.060, prohibits companies from retaliating against workers

17

who exercise their rights, SMC 8.40.120, and establishes a private right of action for those injured

18

by a violation of the Ordinance.  SMC 8.40.230.  The Ordinance also grants OLS rulemaking

19

authority, enforcement power, and investigation power; establishes a navigation program; assesses

20

penalties; and establishes an appeal procedure.  SMC 8.40.125-.220.  Uber does not challenge any

21

of these provisions, and none depends on the requirement to adopt a deactivation policy.

22

        The cases relied on by Uber to defeat severability are inapposite.  Uber neglected to state

23

that both *League of Women Voters* and *Leonard v. City of Spokane*, 127 Wn.2d 194, 201-02

24

(1995), concerned legislation in which the *funding mechanism* was deemed unconstitutional.  The

25

funding mechanism "represents the heart and soul" of a legislative enactment, which is rendered

26

"virtually worthless without it."  *Leonard*, 127 Wn.2d at 202; *accord League of Women Voters*,

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

184 Wn.2d at 412.  Here, by contrast, even without the deactivation policy requirement, the

Ordinance as a whole "has not been rendered 'useless,' as required by the test for severability."

*Gerberding v. Munro*, 134 Wn.2d 188, 198 (1998).  To the extent the Court determines that any

section of the Ordinance is unconstitutional, it should sever only that portion.

## IV.   CONCLUSION

The City requests that the Court deny Uber's motion.

DATED this 23rd day of December, 2024.

Respectfully submitted,

SUMMIT LAW GROUP PLLC
Attorneys for Defendant City of Seattle

I CERTIFY THAT THIS MEMORANDUM CONTAINS
8,394 WORDS, IN COMPLIANCE WITH THE LOCAL
CIVIL RULES.

By *s/ Jessica L. Goldman*
 Jessica L. Goldman, WSBA #21856
 *jessicag@summitlaw.com*
 Lawrence C. Locker, WSBA #15819
 Jesse L. Taylor, WSBA #51603
 Eva Sharf Oliver, WSBA #57019
 Molly J. Gibbons, WSBA #58357
 315 Fifth Avenue South, Suite 1000
 Seattle, WA  98104
 Telephone: (206) 676-7000


ANN DAVISON
Seattle City Attorney
Attorneys for the City of Seattle

By *s/Ghazal Sharifi*
 Ghazal Sharifi, WSBA #47750
 *Ghazal.Sharifi@seattle.gov*

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 26
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001