UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UBER TECHNOLOGIES, INC. and PORTIER, LLC,<br><br>Plaintiffs,<br><br>MAPLEBEAR INC. d/b/a INSTACART,<br><br>Plaintiff-Intervenor<br><br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant. | CASE NO. 2:24-cv-2103-MJP<br><br>ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

This matter comes before the Court on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (Dkt. No. 8.) Having reviewed the Motion, the Response (Dkt. No. 20), the Memorandum in Support Intervention (Dkt. No. 27), and all supporting materials, and having held oral argument on December 31, 2024, the Court DENIES the Motion.

**BACKGROUND**

Plaintiffs Uber Technologies, Inc. and Portier, LLC ("Uber") operate a food delivery platform, Uber Eats, which allows customers to order food, groceries, and other items through the Uber Eats phone app. (Declaration of Daniel Crawford ¶¶ 5–6 (Dkt. No. 10).) The app sends the order to the business for fulfillment, and then offers the platform's delivery drivers, or "app workers," the opportunity to pick up the orders and deliver them to the customers for a fee. App workers do not have the same legal protections as employees, and are vulnerable to being "deactivated," or losing access to the delivery app and an "essential source of income." (Crawford Decl. ¶ 9.)

In August 2023, the City of Seattle passed the App-Based Worker Deactivation Rights Ordinance (the "Ordinance"). The Ordinance is attached to this Order. Set to go into effect on January 1, 2025, the Ordinance "establish[es] labor standards on deactivation protections for app-based workers working in Seattle." Ordinance at 1. The Ordinance adds a new chapter to the Seattle Municipal Code, SMC 8.40, which takes aim at unwarranted deactivations by requiring "network companies," such as Uber, to "inform" app workers "in writing" of the company's deactivation policy, "defining what constitutes a violation that may result in deactivation." SMC 8.40.050(A)(1). The policy must be "specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy," and it must be "reasonably related to the network company's safe and efficient operations." SMC 8.40.050(A)(1)–(2). The Ordinance includes a non-exhaustive list of example policies which are "not reasonably related to . . . safe and efficient operations." SMC 8.40.050(2)(a)–(h).

Beyond the deactivation policy requirement primarily at issue in this dispute, the Ordinance includes: (1) the right for an app worker to challenge their deactivation, SMC

8.40.060; (2) a requirement that network companies to retain "records relied upon by the network company to substantiate deactivation," SMC 8.40.080(A); (3) an authorization for the Seattle Office of Labor Standards ("OLS") director to "promulgate, revise, or rescind rules," SMC 8.40.125, and (4) permission for OLS to investigate potential violations of the Ordinance, SMC 8.40.150. And while the Ordinance prohibits OLS from penalizing or investigating "unwarranted deactivations" until June 1, 2027, see SMC 8.40.130(B), there is a private right of action that allows civil suits to be brought against network companies for violations, see SMC 8.40.230.

After the Ordinance was passed, Uber and other stakeholders engaged with the City throughout the legislative process to refine the contours of the prohibitions and enforcement mechanisms outlined by the Ordinance. (Declaration of Jasmine Marwaha ¶¶ 6, 9 (Dkt. No. 22).) During that time, Uber "submitted multiple rounds of comments, offered testimony, and met with industry stakeholders and OLS representatives," but were "concerned about their ability to timely assess and comply with the Ordinance and OLS rules." (Declaration of Allison Ford ¶¶ 18, 20 (Dkt. No. 11).) Although Uber was invited to stakeholder meetings starting in 2021, (see Marwaha Decl. ¶¶ 6, 9), and provided feedback early in the process, (see id. at Ex. 1), Uber claims that the process "dragged on" and was subject to "substantial delays," (see Ford Decl. ¶¶ 18–19).

Considering the City's perceived foot-dragging, Uber filed its lawsuit and the Motion 13 days before the Ordinance took effect. Uber seeks to enjoin enforcement of SMC 8.40 against it, arguing that they would be irreparably harmed should the law be allowed to take effect on January 1, 2025. Though the Motion is not specific, the proposed order seeks a temporary restraining order ("TRO") and injunction preventing enforcement of the Ordinance against only

Uber and not others. (See Dkt. No. 8-1 at 1.) At oral argument, however, Uber clarified that it is pursuing only an as-applied challenge to the Ordinance.

**ANAYLSIS**

**A.     Legal Standard**

A TRO or preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22 (2008). The purpose of a TRO or preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010).

TROs are governed by the same standard applicable to preliminary injunctions. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical"). To obtain a TRO or preliminary injunction, Uber must show it is (1) likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009). A TRO or preliminary injunction is "never awarded as of right." Winter, 555 U.S. at 22. In each case, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Id.

The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in Winter. A stronger showing of one element may offset a weaker showing of another. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–32 (9th Cir. 2011). So "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious

Uber and not others. (See Dkt. No. 8-1 at 1.) At oral argument, however, Uber clarified that it is pursuing only an as-applied challenge to the Ordinance.

**ANAYLSIS**

**A.     Legal Standard**

A TRO or preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22 (2008). The purpose of a TRO or preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010).

TROs are governed by the same standard applicable to preliminary injunctions. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical"). To obtain a TRO or preliminary injunction, Uber must show it is (1) likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009). A TRO or preliminary injunction is "never awarded as of right." Winter, 555 U.S. at 22. In each case, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Id.

The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in Winter. A stronger showing of one element may offset a weaker showing of another. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–32 (9th Cir. 2011). So "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious

questions going to the merits.'" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir. 2019) (quoting All. for the Wild Rockies, 632 F.3d at 1135).

In considering the likelihood of success on the merits, the Court is not strictly bound by the rules of evidence, as the temporary restraining order or preliminary injunction "is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). Because of the extraordinary nature of injunctive relief, including the potential for irreparable injury if not granted, a court may consider evidence outside the normal rules of evidence, including: hearsay, exhibits, declarations, and pleadings. Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009). "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed . . . at which point the burden shifts to the government to justify the restriction." Thalheimer v. City of San Diego, 645 F.3d 1109, 1115–16 (9th Cir. 2011).

**B.      Likelihood of Success on the Claims**

Uber identifies three claims that it believes justify a TRO and preliminary injunction: (1) the Ordinance compels speech in violation of the First Amendment; (2) the Ordinance restricts Uber's expressive association rights in violation of the First Amendment; and (3) the Ordinance is unconstitutionally vague in violation of the Due Process Clause. The Court examines all three claims and the reasons why Uber is unlikely to succeed on them.

**1.      First Amendment Claim**

Uber argues that the Ordinance violates the First Amendment by compelling speech and failing to satisfy strict scrutiny. Uber is incorrect.

      **a.**       **Legal Standard for First Amendment Claim**

Given that Uber pursues an as-applied challenge, and not a facial challenge, it must show only that the Ordinance unconstitutionally regulates its own speech. See Italian Colors Rest. v. Becerra, 878 F.3d 1165, 1174–75 (9th Cir. 2018).

      **b.**       **The Ordinance Does Not Trigger First Amendment Protection Because It Does Not Regulate Speech**

The starting point of the Court's analysis is whether the Ordinance presents a restriction on speech. The Court finds that the Ordinance does not, and that the First Amendment claim is unlikely to succeed on the merits.

"The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" Sorrell v. IMS Health Inc., 564 U.S. 552, 566 (2011) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). But "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." Id. at 567. And "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." Id. For example, the Supreme Court has held that the First Amendment did not apply to an antidiscrimination law requiring employers to remove "White Applicants Only" signs, to an ordinance barring outdoor fires that also forbid burning a flag, and antitrust laws preventing restraints on trade. See id.

"To determine whether the First Amendment applies, we must first ask the 'threshold question [of] whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of singling out those engaged in expressive activity." HomeAway.com, Inc. v. City of Santa Monica, 918 F.3d 676, 685 (9th Cir. 2019) (quoting Int'l Franchise Ass'n v. City of Seattle, 803 F.3d 389, 408 (9th Cir. 2015) (citation and quotation

1  omitted)). "A court may consider the 'inevitable effect of a statute on its face,' as well as a

2  statute's 'stated purpose.'" Id. (quoting Sorrell, 564 U.S. at 565). "However, absent narrow

3  circumstances, a court may not conduct an inquiry into legislative purpose or motive beyond

4  what is stated within the statute itself." Id.

5        With these guideposts in mind, the Court finds that the Ordinance's requirements do little

6  more than regulate conduct without any significant impact on speech or expression. This can be

7  seen in both the Ordinance's stated goal and its requirements. The Ordinance seeks to "protect[]

8  and promote[] public health, safety, and welfare by establishing protections against unwarranted

9  deactivations for app-based workers." Ordinance, Section 1(C). It furthers that goal by requiring

10 network companies like Uber to maintain and disclose a deactivation policy and to ensure that

11 the policy "reasonably relate[s] to the network company's safe and efficient operations." SMC

12 8.40.050(A)(1)-(2). In other words, the Ordinance wants to make sure network workers know the

13 basis for being terminated and to make sure the grounds for termination have some reasonable

14 relation to safety and efficiency. The Ordinance aims to ensure fairness to workers and safety to

15 the public. It does not seek to regulate speech or expressive conduct.

16       To the extent the Ordinance implicates speech, it is incidental to its worker-related

17 conduct goals. Uber argues that the Ordinance compels it to publicly embrace the City's view on

18 what is "safe and efficient," not what it believes is reasonable. But the Ordinance merely limits

19 the grounds on which Uber may justify a termination. That these grounds must be related to

20 safety and efficiency does not compel Uber to make an affirmative statement on what it may or

21 may not believe is safe or efficient. Nothing in Uber's briefing or oral argument changes this

22 fact. For example, Uber argues that it will be forced to proclaim that "it does not believe

23 consumer ratings have anything to do with its platform's safe or efficient operations" even

24

though it strongly disagrees. (Mot. at 12.) This argument does not track the actual language of the Ordinance. The Ordinance does not compel Uber to say that consumer ratings are irrelevant—it only requires Uber's policy not to solely rely on consumer ratings to support deactivation. And, perhaps most importantly, the Ordinance does not require Uber to stake out any position on what is or is not related to safety and efficiency. It can voice its opposition to the City's minimum standards even if it must comply with them. To the extent Uber has to conform its policy to minimum standards, it is no different from ensuring regulatory compliance with anti-discrimination or workplace safety laws. The focus remains on conduct, and any expressive impact is incidental.

Uber's additional claims that the Ordinance forces it to publicly endorse the City's view on safety also ring hollow. Uber identifies three examples of how it believes the Ordinance compels speech. First, Uber argues that it will not be allowed to deactivate a worker who has fewer than three non-criminal moving violations or at-fault collisions, even though it cannot obtain "at fault" data to make this determination. Even if this is true, it does not implicate expressive speech or conduct—it merely limits a factual basis on which Uber may deactivate a worker, and any burden on speech is incidental. Second, Uber argues that the Ordinance would require it to adopt a policy that conflicts with its ability to terminate drivers for refusing or canceling requests originating from a particular neighborhood. But as the City points out, this does not compel speech; it merely requires Uber to maintain a non-discrimination policy in conformity with the City's Ordinance. That this may be related to safety and efficiency does not transform the requirement into a matter of free expression. Lastly, Uber argues that it will be compelled to speak because it must disclose information about incidents leading to a deactivation that might, in fact, harm third parties. But these disclosures do not implicate expressive speech

1  and they are merely incidental to the worker-protections embedded in the law. And, as with other
2  aspects of Uber's Motion, it distorts the disclosure requirements. To the extent it must provide a
3  worker with the materials justifying a termination, any information about, for example, an
4  assault, can be anonymized to avoid any harm to third parties. See SMC 8.40.080. Even if this
5  anonymization process were somehow flawed, it does not trigger First Amendment concerns.

6        The two Supreme Court cases on which Uber principally relies do not support Uber's
7  argument that the Ordinance regulates speech. First, Uber cites to a Supreme Court case that
8  determined a federal law requiring non-governmental organizations to adopt an express policy
9  opposing prostitution to obtain federal funding compelled speech. Agency for Int'l Dev. v. All.
10 For Open Soc'y Int'l, Inc., 570 U.S. 205, 210 (2013). But here, the Ordinance does not require
11 Uber to adopt an express statement that endorses the City's view on what constitutes safety or
12 efficiency. Rather, it must refrain from having a policy that leads to terminations for certain
13 kinds of conduct, all of which relate to commercial activity of app workers. That this may
14 suggest to some that Uber has a particular view on safety does not render the Ordinance's impact
15 on speech anything more than incidental to its focus on protecting app workers and setting
16 minimum standards for deactivation. Second, Uber cites to another Supreme Court case where
17 the Court found a law requiring licensed and unlicensed pregnancy clinics to inform patients
18 about their rights and ability to obtain abortions compelled speech in violation of the First
19 Amendment. Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 760–61, 769, 773
20 (2018). But here, Uber is not required to make any affirmative statement with which it may
21 disagree. Rather, it must just disclose its policies and make sure they meet minimum standards.
22 To the extent Uber disagrees with the standards as being unrelated to safety or efficiency, it is
23 free to say so and no penalties would attach for so stating. The facts before the Court here are far
24

1  closer to those at issue in Rumsfeld v. F. for Acad. & Institutional Rts., Inc., where the Supreme

2  Court found a law requiring military recruiters on law school campuses regulated conduct and

3  that any impact on speech was merely incidental. 547 U.S. 47, 62 (2006). That a law prohibits

4  employers from engaging in particular conduct, such as racial discrimination, "hardly means that

5  the law should be analyzed as one regulating the employer's speech rather than conduct." Id.

6  Here, the Ordinance regulates conduct—the grounds on which an "app worker" may be

7  terminated—and any speech-related impacts are minimal and similarly incidental to those at

8  issue in Rumsfeld.

9      The Ordinance is also far afield of the two main Ninth Circuit cases on which Uber relies,

10  which involved California laws found to implicate the First Amendment. First, in X Corp. v.

11  Bonta, the Ninth Circuit found a California law requiring social media companies to disclose

12  content-moderation policies and to stake out public positions on divisive issues such as hate

13  speech, racism, extremism, harassment, and other issues both targeted and compelled speech.

14  116 F.4th 888, 897–98 (9th Cir. 2024). The disclosures in X Corp. implicated controversial free

15  speech issues in the context of businesses engaged in providing public fora for speech activity.

16  Here, the Ordinance regulates delivery workers and the focus is on non-speech related conduct in

17  a purely commercial context, far from the speech-specific businesses at issue in X Corp. The

18  Ordinance does not require definitions or disclosures of Uber's general views on safety or

19  efficiency. Second, the Ordinance is also different from the challenged law in NetChoice, LLC v.

20  Bonta, which required social media platforms to essentially create and file reports that identified

21  each online service, product, or feature that children might access and any risk that they posed to

22  children. 113 F.4th 1101, 1109 (9th Cir. 2024). Here, the Ordinance does not require Uber to

23  publicly stake out an affirmative position on sensitive social issues that implicate overall speech

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 10

activity. Nor is Uber in the business of providing services that implicate speech activity, as was the case in NetChoice. Here, Uber must simply conform its deactivation policy to the City's minimum requirements that concern delivery worker safety and fairness—conduct, not speech. The Ordinance does not require Uber to opine on or express any opinion as to whether its services or products harm anyone, as was the case in NetChoice.

The Court here finds that Uber's First Amendment claim likely fails because the Ordinance does not compel speech and the First Amendment's protections are not triggered.

### 2. The Ordinance Does Not Restrict Uber's Expressive Associative Rights

Uber claims that the Ordinance violates its right to engage in expressive association. This claim fails for the simple reason that the Ordinance does not implicate expressive conduct.

The Supreme Court has "recognized a First Amendment right to associate for the purpose of speaking, which [it has] termed a 'right of expressive association.'" Rumsfeld, 547 U.S. at 68 (quoting Boy Scouts of America v. Dale, 530 U.S. 640, 644 (2000)). The right to associate does not mean "that in every setting in which individuals exercise some discrimination in choosing associates, their selective process of inclusion and exclusion is protected by the Constitution." N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 13 (1988). "To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association'" which is "some form of expression, whether it be public or private." Dale, 530 U.S. at 648. If the plaintiff identifies an expressive association, then "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." Id. The right to associate also includes the right not to associate with others. See id.

1     Uber has failed to identify any expressive association that it engages in, and the record
2 here suggests that Uber's association with its "app workers" is purely commercial. The
3 arrangement that Uber has with its "app workers" mirrors that of employer and employee. The
4 "app worker" drivers "associate" with Uber for the purposes of employment and deriving
5 income. And Uber's desire to "associate" with the "app workers" is ultimately to derive revenue,
6 build good will, and compete with other "network" operators like Instacart. There is nothing
7 expressive in this arrangement and the Court finds a lack of expressive association implicated.
8 Uber's activities share no similarity with those of the Boy Scouts, whose rights were at issue in
9 Dale. Unlike Uber, the Boy Scouts is a non-profit organization association of individuals who
10 wish to share and learn common values and skills, not to generate revenue for commercial gain.
11 Uber associates with "app workers" for purely commercial reasons, and not to share values or
12 exchange ideas. Uber has not identified any basis on which the Court might find that the
13 Ordinance impacts any expressive right to associate. The Court therefore finds little likelihood of
14 success on the merits of this claim.

15     **3.    The Ordinance Is Not Unconstitutionally Vague**

16     Uber next argues that the Ordinance violates the Due Process Clause of the Fourteenth
17 Amendment by failing to meaningfully explain what the City views as a policy that is
18 "reasonably related" to "safe and efficient operations," and is thus void for vagueness. (Mot. at
19 19–21.) The Court finds Uber to be unlikely to succeed on the merits of its Due Process claim.
20     A law is void for vagueness if it "fails to provide a person of ordinary intelligence fair
21 notice of what is prohibited," or if it is "so standardless that it authorizes or encourages seriously
22 discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008) (citing Hill v.
23 Colorado, 530 U.S. 703, 732 (2000); Grayned v. City of Rockford, 408 U.S. 104, 108–109
24

1   (1972)). "The operative question under the fair notice theory is whether a reasonable person
2   would know what is prohibited by the law." Tingley v. Ferguson, 47 F.4th 1055, 1089 (9th Cir.
3   2022), cert. denied, 144 S. Ct. 33 (2023).  However, "perfect clarity and precise guidance have
4   never been required even of regulations that restrict expressive activity." Ward, 491 U.S. at 794;
5   see also United States v. Flores, 63 F.3d 1342, 1373 (5th Cir. 1995) (rejecting argument "that the
6   term 'substantial' is vague" and concluding that a "'substantiality' requirement is frequently
7   encountered and readily understood").

8   "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature
9   of the enactment." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489,
10  498 (1982). Rules that impose "criminal rather than civil penalties" or "threaten[] to inhibit the
11  exercise of constitutionally protected rights" are subject to "a more stringent vagueness test." Id.
12  at 498–99. In contrast, rules enacting "economic regulation[s]," are "subject to a less strict
13  vagueness test because its subject matter is often more narrow, and because businesses . . . can
14  be expected to consult relevant [rules] in advance of action," and because "the consequences of
15  imprecision are qualitatively less severe." Id. at 498–99. "Accordingly, [economic] regulations
16  will be found to satisfy due process so long as they are sufficiently specific that a reasonably
17  prudent person, familiar with the conditions the regulations are meant to address and the
18  objectives the regulations are meant to achieve, would have fair warning of what the regulations
19  require." Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n, 108
20  F.3d 358, 362 (D.C. Cir. 1997) (collecting cases).

21  Having found neither a threat to Uber's exercise of its First Amendment rights, nor the
22  possibility of criminal sanctions, the Court analyzes the merits of Uber's due process challenge
23  under a less strict vagueness test. However, for the avoidance of doubt, the Court notes that
24

Uber's due process argument would be unlikely to succeed on the merits even if subject to a more stringent level of scrutiny.

Uber first takes issue with the Ordinance's use of the term "reasonable," arguing that "no "commonly accepted meaning exists for the term reasonable[.]" (Mot. at 19.) As a general matter, the Court does "not doubt the constitutionality of laws that call for the application of a qualitative standard" such as reasonability. Johnson v. United States, 576 U.S. 591, 603–04 (2015). "[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." Id. at 604 (quoting Nash v. United States, 229 U.S. 373, 377 (1913) (alteration in original)). Indeed, the term "reasonable" is ubiquitous in our statutory scheme and common law. For example, the very inquiry Uber must satisfy regarding fair notice is "whether a reasonable person would know what is prohibited by the [Ordinance]." Tingley, 47 F.4th at 1089 (emphasis added). The Court therefore rejects Uber's argument regarding the vagueness of the term "reasonable," and, in doing so, joins a host of federal courts who have rejected the same essential premise. See, e.g., Nat'l Ass'n for Fixed Annuities v. Perez, 217 F. Supp. 3d 1, 41 (D.D.C. 2016) (collecting cases "replete with decisions rejecting vagueness challenges . . . to the words 'reasonable,' 'reasonably,' and 'unreasonably'".)

The Court further finds as unavailing Uber's reliance on the out-of-circuit, Belle Maer Harbor v. Charter Twp. of Harrison, 170 F.3d 553 (6th Cir. 1999). There, the court's motivating due process concern sounded in discriminatory enforcement, noting that it "constitutes the more important aspect of the vagueness doctrine." Id. at 556–57 (citing Smith v. Goguen, 415 U.S. 566 (1974)). The Sixth Circuit found that the regulation's use of the reasonableness standard "entrusts the enforcement decision regarding the . . . restriction to the moment-to-moment judgment of the policeman on his beat," which, when combined with the imposition of criminal

1    sanctions, violated due process by providing "[t]ownship inspectors with a convenient tool for

2    harsh and discriminatory enforcement against particular groups deemed to merit their

3    displeasure." Id. at 559 (quotations omitted.) In contrast, Uber does not appear to claim that the

4    Ordinance will be discriminatorily enforced, nor does the Ordinance impose criminal sanctions.

5           Uber next accuses the Ordinance of muddying its already-murky waters by including

6    eight examples of impermissible policies, claiming that the examples are "confusing" because

7    they include policies which "most people would think are at least related to safe and efficient

8    operations." (Mot. at 20 (emphasis in original).) According to Uber, some example policies, such

9    as those prohibiting drivers from contacting the network company or asserting their legal rights,

10   "have little to do with safe and efficient operations," while others, such as policies triggering

11   deactivation based on customer ratings or the result of a background check, are so clearly related

12   to safety and efficiency that their "confounding" inclusion in the list undermines the whole

13   enterprise. (Id.) This is not a vagueness problem rather than a fundamental disagreement between

14   Uber and the City as to what policies are reasonably related to the safe and efficient operation of

15   delivery services.

16          Uber fails to show how the "reasonably related" language in the Ordinance somehow

17   prevents it from understanding what types of deactivation policies would be prohibited. The

18   Court therefore finds little likelihood of success on the merits of this claim.

19   **C.     Irreparable Harm**

20          Given the Court's analysis as to the merits of Uber's claim, the Court finds no basis to

21   find an irreparably harm. Accordingly, this factor weighs against issuance of a TRO or

22   preliminary injunction.

23

24

### D. Balance of Equities and Public Interest

The balance of equities and public interest also do not favor Uber, given the lack of likely success on the merits. Even if there was a likelihood of success, the public interest and balance of equities are divided, as the Ordinance does attempt to serve the public interest.

\* \* \*

Having considered the four <u>Winter</u> factors, the Court finds that the TRO and preliminary injunction should not issue. The Court therefore DENIES the Motion.

### CONCLUSION

The Court appreciates the depth of briefing and argument provided by both Parties in this matter. Having considered the issues, the Court finds that the TRO and preliminary injunction should not issue, primarily because Uber has not identified any likelihood of success on the merits of the three claims it has identified. Therefore, the Court DENIES the Motion as to both requests.

The clerk is ordered to provide copies of this order to all counsel.

Dated December 31, 2024.

Marsha J. Pechman
United States Senior District Judge

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 16